Stephen H.M. Bloch # 7813
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
Telephone:  (801) 486-3161
steve@suwa.org

James S. Angell (*pro hac vice pending*)
Albert B. Sahlstrom (*pro hac vice pending*)
EARTHJUSTICE
1400 Glenarm Place, Suite 300
Denver, CO  80202
Telephone: (303) 623-9466
jangell@earthjustice.org
asahlstrom@earthjustice.org

Attorneys for Proposed Defendant-Intervenors
Southern Utah Wilderness Alliance, *et al.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UINTAH COUNTY, UTAH, a Utah political subdivision; UINTAH COUNTY BOARD OF COMMISSIONERS; )<br><br>Plaintiffs, )<br><br>v. )<br><br>KEN SALAZAR, in his official capacity as SECRETARY OF THE INTERIOR, *et al.*, )<br><br>Defendants, )<br><br>SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.*, )<br><br>Proposed Defendant-Intervenors. | Case No.  2:10-cv-00970<br><br>The Honorable Clark Waddoups<br><br>MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANT[1] |

---

[1] Federal Defendants take no position on this motion and will not file an opposition brief. Counsel for Plaintiffs indicates that they are unable to take a position at this time and will respond after viewing the motion to intervene.

Plaintiffs (collectively "Uintah County") have filed suit challenging the protective management of Bureau of Land Management ("BLM") lands in Uintah County.  If Uintah County is successful, the impact of its challenge – and in particular, the injunctive relief it requests – would be felt across millions of acres of wilderness-quality lands in Utah.  The Southern Utah Wilderness Alliance, The Wilderness Society, and Sierra Club (collectively "SUWA") have conservation interests in these lands that have repeatedly been recognized by the District of Utah and the Tenth Circuit.  Because SUWA's interests could be severely harmed by a Uintah County victory, and because those interests are not adequately represented by Federal Defendants, SUWA requests that it be allowed to intervene as of right as defendant in this action pursuant to Fed. R. Civ. P. 24(a)(2).  Alternatively, SUWA requests leave to permissively intervene pursuant to Fed. R. Civ. P. 24(b).

## BACKGROUND

### I.    THE APPLICANTS

#### A.    Southern Utah Wilderness Alliance

The Southern Utah Wilderness Alliance ("SUWA") is a Salt Lake City-based conservation organization with more than 13,000 members, many of whom reside in Utah. Declaration of Ray Bloxham at ¶ 2 (attached as Exh. 1).  SUWA's mission is to foster the preservation of the outstanding wilderness lands in Utah and ensure that these lands are managed in their natural state for the benefit of all Americans.  *Id.*  SUWA promotes local and national recognition of the region's unique character through research and public education; it supports administrative and legislative initiatives to permanently protect Utah's wild places within the National Park and National Wilderness Preservation System or by other protective designations

where appropriate; it builds support for such initiatives on the local and national level; and it provides leadership within the conservation movement by advocating for wilderness preservation. *Id.*

**B.     The Wilderness Society**

The Wilderness Society ("TWS") is a non-profit national membership organization founded in 1935.  Exh. 1 at ¶ 3.  TWS has thousands of members and supporters in Utah, and hundreds of thousands more across the nation. *Id.*  TWS works to protect America's wilderness and develop a network of wild lands through public education, scientific analysis, and advocacy. *Id.*  TWS's goal is to ensure that future generations will enjoy the clean air, water, wildlife, beauty, and opportunities for recreation and renewal that pristine deserts, mountain forests, and rivers provide. *Id.*  Protecting wilderness-quality BLM lands in Utah has been a TWS priority for decades. *Id.*

**C.     Sierra Club**

The Sierra Club is a non-profit organization with over 700,000 members.  Exh. 1 at ¶ 4. The Utah Chapter of the Sierra Club has approximately 6,000 members. *Id.*  The mission of the Sierra Club is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environment. *Id.*  Sierra Club has been involved with public lands issues in Utah for more than 60 years.  Declaration of James Catlin at ¶ 3 (attached as Exh. 2).

**D.     The Conservation Interests of SUWA, TWS, and Sierra Club**

Staff and members of SUWA, TWS, and Sierra Club have worked for years to educate

the public, and have pressed Congress and the Department of the Interior ("DOI") to secure permanent protection for proposed wilderness areas in Uintah County and elsewhere in Utah. Exh. 1 at ¶¶ 6-7; *see* Exh. 2 at ¶¶ 4-6, 9-10.  Further, SUWA, TWS, and Sierra Club members and staff enjoy hiking, viewing cultural resources (pre-historic and historic), camping, bird-watching, study, contemplation, solitude, photography, and other activities on wilderness-quality lands throughout Utah, including in Uintah County.  Exh. 1 at ¶ 7; Exh. 2 at ¶¶ 3-4, 12, 25-26.

The Utah Wilderness Coalition, of which SUWA and Sierra Club are members, proposes 34 areas, totaling nearly 500,000 acres, for wilderness designation in BLM's Vernal office, the majority of which are located in Uintah County.  Exh. 1 at ¶ 6.  Their longstanding interests in the protection of the proposed wilderness areas in Uintah County have also led the groups to challenge BLM proposals that would degrade the areas' wilderness, wildlife, and archeological values:

- In 2002, SUWA, TWS and another conservation group sued BLM for approving the so-called "Veritas 2" geophysical exploration project in Uintah County that cut through several proposed wilderness areas.  *Id.* at ¶ 8; *see S. Utah Wilderness Alliance v. Norton*, 277 F. Supp. 2d 1169, 1174-75 (D. Utah 2003) (affirming BLM's decision), *appeal dismissed*, 116 Fed. Appx. 200 (10th Cir. 2004), *vacated as moot*, 2004 WL 2827894 (D. Utah Nov. 30, 2004).

- SUWA has filed numerous requests for state director review challenging Vernal field office decisions to approve oil and gas development in proposed wilderness areas.  Exh. 1 at ¶ 8.

- SUWA and TWS sued the Department of the Interior for, among other things, issuing oil and gas leases in November 2003 within the Desolation Canyon proposed wilderness area in Uintah County without first accounting for the area's wilderness values.  Exh. 1 at ¶ 8; *see S. Utah Wilderness Alliance v. Norton*, 457 F. Supp. 2d 1253, 1257-59, 1269 (D. Utah 2006).  The court held that DOI's actions violated the National Environmental Policy Act, and it and reversed and remanded the agency's decision approving the leases. *See S. Utah Wilderness Alliance v. Norton*, 457 F. Supp. 2d at 1269.

• SUWA, NRDC, TWS and several other local, regional and national conservation organizations have sued DOI for its 2008 land management planning decisions that recognized proposed wilderness areas in Uintah County, but failed to protect them from oil and gas leasing and other damaging activities. Exh. 1 at ¶ 8.

## II.    FACTUAL BACKGROUND

### A.    History of Wilderness Identification and Protection in Utah

Congress passed the Wilderness Act of 1964, 16 U.S.C. §§ 1131-36, to ensure that the American people would be able to experience and enjoy the nation's most remarkable and pristine lands in their natural wild state. *See id.* § 1131. Although the Act declares that wilderness areas shall be made up of "federally owned areas," *id.* § 1131(a), its wilderness review provisions only specifically mandate a review of wildlife refuges, the national park system, and a small portion of the national forests, *id.* § 1132(b), (c). This disparity spawned a debate regarding whether BLM lands, which are not mentioned explicitly in the review provisions, were eligible for wilderness designation. *See* S. Rep. No. 94-583, at 44 (1975).

In 1976, Congress passed the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-84, which resolved that debate by confirming the wilderness eligibility of BLM lands. FLPMA also cleared away a mélange of conflicting, outdated public lands laws and provided BLM with a comprehensive, statutory statement of purposes, goals, and authority for the use and management of BLM lands.

To facilitate Congress's evaluation and eventual designation of wilderness on BLM lands, FLPMA included three key provisions: First, § 201 requires BLM to "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values)." *Id.* § 1711(a). Second, § 202 requires BLM to develop and maintain land use plans for each BLM area. *See id.*

§ 1712(a).  These land use plans provide an orderly, public process for balancing competing

demands such as commercial exploitation, recreation, and environmental protection.  *See id.* §

1712; 43 C.F.R. § 1601.0-2.  FLPMA does not dictate how land use plans must strike this

balance. Instead, Congress directed the agency to manage its lands under the principles of

"multiple use and sustained yield."[2]  *See* 43 U.S.C. §§ 1712(c)(1), 1732(a).  The Supreme Court

has recognized that "not all uses are compatible" under this scheme, and that protection of

wilderness may require exclusion of other potential uses from BLM lands.  *See Norton v. S. Utah*

*Wilderness Alliance*, 542 U.S. 55, 58-59 (2004).  Finally, § 603 instituted a set of deadlines for

an initial wilderness inventory of BLM lands.  Section 603(a) set a fifteen-year deadline for

determining – on the basis of an inventory carried out under § 201 – which BLM lands are

eligible for wilderness designation.  *See* 43 U.S.C. § 1782(a).  Section 603(a) then required BLM

to issue a formal recommendation to the President concerning the suitability of these areas for

wilderness protection.  *See id.*  Following that recommendation, § 603(b) required that, within

---

[2] "Multiple use" is defined broadly as :

> The management of the public lands and their various resource values so that they
> are utilized in the combination that will best meet the present and future needs of
> the American people; . . . the use of some lands for less than all of the resources; a
> combination of balanced and diverse resource uses that takes into account the
> long term needs of future generations for renewable and non-renewable resources,
> including, but not limited to, recreation, range, timber, minerals, watershed,
> wildlife and fish, and natural scenic, scientific and historical values; and
> harmonious and coordinated management of the various resources without
> permanent impairment of the productivity of the lands and the quality of the
> environment with consideration being given to the relative values of the resources
> and not necessarily to the combination of uses that will give the greatest economic
> return or the greatest unit output.

43 U.S.C. § 1702(c); *see also* 43 C.F.R. § 1601.0-5(i).

two years, the President tell Congress which lands he believes should be designated as wilderness. *See id.* § 1782(b).

BLM began to inventory and identify its wilderness-eligible lands in the late 1970s, ultimately concluding that 3.2 million of the nearly 24 million acres of BLM lands in Utah qualified as wilderness. *See Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1188 (10th Cir. 2008). Consequently, these lands have since been managed as FLPMA § 603 Wilderness Study Areas ("WSAs").[3] *Id.* In 1991, the statutory deadline for the President to make Utah wilderness recommendations to Congress, President Bush recommended that only 1.9 million acres receive formal protection under the Wilderness Act. Congress did not act on this proposal. *Id.*

In the 1980s and 1990s, SUWA, with other national and regional conservation organizations, conducted its own wilderness inventory of BLM lands. Exh. 1 at ¶¶ 1, 5. The groups ultimately determined that some nine million acres of BLM lands meet the criteria to qualify for wilderness designation. *Id.* at ¶¶ 5-6. BLM's planning documents for the Vernal

---

[3] WSAs are managed in a manner that prevents "impairment" of their eligibility for wilderness designation by preserving their wilderness characteristics until Congress either designates the areas as wilderness or releases them from their WSA status. 43 U.S.C. § 1782(c). The term "Wilderness Study Area" does not appear in FLPMA, but rather originated in BLM documents, which used the term to describe both: (1) wilderness-eligible lands that were the subject of the § 603 wilderness reviews; and (2) lands receiving discretionary protective management through BLM's § 202 planning process. *See* Interim Management Policy and Guidelines for Land Under Wilderness Review, 44 Fed. Reg. 72014, 72015 n.1, 72018 (Dec. 12, 1979) (attached as Exh. 3) ("The wilderness review required by section 603 focuses on roadless areas of 5,000 acres or more . . . BLM as a matter of policy has used its general management authority under sections 302 and 202 of FLPMA to include in the wilderness review some roadless areas smaller than 5,000 acres."); U.S. GEN. ACCOUNTING OFFICE, GAO/RCED-93-151, FEDERAL LAND MANAGEMENT: STATUS AND USES OF WILDERNESS STUDY AREAS 3-4, 18-40 (Sept. 23, 1993) (attached as Exh. 4) (noting that both FLPMA §§ 202 and 603 may be used to designate wilderness candidate areas, and listing areas designated by both sections as "Study Areas . . . Recommended for Wilderness Designation"). This choice of terminology has unsurprisingly resulted in some confusion as to the management implications of § 603 and § 202 WSA designation.

Resource Management Plan ("RMP") confirm that the majority of the wilderness-quality lands that SUWA identified in the Vernal Planning Area do in fact contain wilderness values  *Id.* at ¶¶ 5-6 (the Utah Wilderness Coalition proposes 34 areas for wilderness designation in the Vernal Planning Area); *see* BUREAU OF LAND MGMT, VERNAL FIELD OFFICE, PROPOSED RESOURCE MANAGEMENT PLAN AND FINAL ENVIRONMENTAL IMPACT STATEMENT 4-175 (Aug. 2008) (attached as Exh. 5) (describing 25 of those areas as having "wilderness characteristics").  These lands are included in the proposed America's Red Rock Wilderness Act.  The most recent iteration of the bill, H.R. 1925/S. 799, was introduced in the 111th Congress and has 168 co-sponsors in the House and 23 co-sponsors in the Senate.

**B.     The State of Utah's Challenge to BLM's Wilderness Inventory and Its Alleged De Facto Wilderness Management**

In an effort to resolve the dispute over BLM's wilderness inventories, then-Interior Secretary Babbitt announced in 1996 that BLM would re-inventory roughly three million acres of public lands identified in the then-current version of America's Red Rock Wilderness Act. *See Utah v. Babbitt*, 137 F.3d 1193, 1199 (10th Cir. 1998).  In an effort to prevent that re-inventory, Utah immediately filed suit.  *Id.* at 1199-1200.  Utah's complaint included seven claims challenging the re-inventory and one claim challenging BLM's alleged de facto wilderness management of certain non-Section 603 WSA lands.  *Id.* at 1200.  This Court enjoined the re-inventory after concluding that BLM lacked authority for the inventory and that, even if such authority existed, BLM had failed to provide sufficient public participation.  *Id.* at 1200-1201.  The Tenth Circuit vacated the injunction on the grounds that Utah lacked standing to challenge the re-inventory and instructed this Court to dismiss Utah's seven inventory-related claims.  *Id.* at 1214-15.

Utah's sole non-inventory-related cause of action was its allegation that BLM was illegally imposing "de facto wilderness management" on non-Section 603 WSA lands. The Tenth Circuit allowed that claim to survive because, for the time being, Utah's "general allegations of injury based on a legally cognizable right" sufficed to carry it over the standing hurdle exclusively on the "threshold issue of whether Plaintiffs' claim c[ould] survive a motion to dismiss." *Id.* at 1216. Following the Tenth Circuit's decision, the State's claim lay dormant for the next five years.[4]

### C.      The 2003 BLM and Utah Consent Decree and Settlement

On March 31, 2003, Utah filed a third amended complaint in which it offered a fresh spate of statutory and constitutional challenges to BLM's management of the wilderness-eligible lands identified in the re-inventory. *See Utah v. Norton*, 396 F.3d 1281, 1284 (10th Cir. 2005). At the time, BLM and Utah were on the verge of finalizing a settlement. That settlement was finalized and submitted to the court as a proposed consent decree just nine business days after the filing of the amended complaint. *Id.*

The decree fundamentally re-interpreted FLPMA's wilderness-related provisions in several important respects: First, BLM agreed that its "authority . . . to conduct wilderness reviews, including the establishment[] of new WSAs, expired no later than October 21, 1993," the deadline for the President's wilderness recommendations to Congress under § 603(b), and the agency was therefore "without authority to establish Post-603 WSAs." *See U.S. Dep't of Interior*, 535 F.3d at 1190. Second, BLM agreed not to "establish, manage or otherwise treat

---

[4] BLM continued its re-inventory efforts and concluded in 1999 that nearly 84% of the re-inventoried land qualified for wilderness designation. *See* Utah Wilderness Inventory Acreage Summary Table (attached as Exh. 6).

public lands . . . as WSAs or as wilderness pursuant to the Section 202 process absent

congressional authorization." *See id.* This despite the fact that at the time, BLM had previously

created a total of 148 § 202 WSAs across the country. *See* U.S. GEN. ACCOUNTING OFFICE,

GAO/RCED-93-151, FEDERAL LAND MANAGEMENT: STATUS AND USES OF WILDERNESS STUDY

AREAS 18-40 (Sept. 23, 1993) (attached as Exh. 4) (listing 148 WSAs created under FLPMA §

202). To implement the new restrictions on its land management practices, BLM agreed to

expunge any possibility of WSA designation from certain management plans in process. *See*

*U.S. Dep't of Interior*, 535 F.3d at 1190. The agency also agreed to withdraw its 2001

Wilderness Inventory Handbook and related guidance under which wilderness-eligible lands

identified during the re-inventory and elsewhere were being temporarily protected while BLM

was deciding whether to impose more lasting protection through its § 202 planning process. *See*

*id.*

    SUWA moved to intervene to challenge the consent decree. Neither Utah nor BLM

opposed the motion, and Judge Benson, relying on the same interests described here, granted that

motion. *See* Mem. in Supp. of Mot. to Intervene by S. Utah Wilderness Alliance, The

Wilderness Soc'y, N.M. Wilderness Alliance, Ariz. Wilderness Coal., Friends of Nev.

Wilderness, and Colo. Envtl. Coal. at 14-17, *Utah v. Norton*, No. 2:96-cv-00870-DB (Dist. Utah

filed Apr. 9, 2003; lodged Apr. 29, 2006) (attached as Exh. 7); Order, No. 2:96-cv-00870-DB

(Dist. Utah June 12, 2003) (attached as Exh. 8) (SUWA's interests are sufficient for

intervention). Once a party, SUWA objected to the consent decree because, among other

reasons, it purported to bind future administrations to a particular interpretation of FLPMA. *See*

*Utah v. Norton*, 396 F.3d at 1286 n.3. Judge Benson agreed, and on August 8, 2005, he

temporarily vacated the agreement.  *See* Transcript of Mot. Hr'g at pp. 14-17, 34-35, *Utah v. Norton*, No. 2:96-cv-00870-DB (Dist. Utah Aug. 8, 2005) (attached as Exh. 9) ("My inclination is to believe that [i]t is improper for the Court to be giving an executive branch agency or agencies the ability to bind future agencies."); *U.S. Dep't of Interior*, 535 F.3d at 1191.

Rather than defend a consent decree of dubious constitutionality, in September 2005 BLM and Utah re-filed their consent decree as a settlement agreement.  *See U.S. Dep't of Interior*, 535 F.3d at 1191.  The new agreement, which was "not a consent decree," eliminated any request for judicial approval or continuing enforcement of the settlement, but otherwise restated the terms of the consent agreement.  *See* Joint Mot. of Pls. & Fed. Defs. to Dismiss 3d Am. & Supplemented Compl. at 1, *Utah v. Norton*, No. 2:96-cv-00870-DB (Dist. Utah Sept. 9, 2005) (attached as Exh. 10); Settlement Agreement Between Pls. and Fed. Defs. at 11-13, *Utah v. Norton*, No. 2:96-cv-00870-DB (Dist. Utah Sept. 9, 2005) (attached as Exh. 11).  At an October 4, 2005 status conference, Judge Benson granted Utah and BLM's joint motion to dismiss Utah's complaint without prejudice to SUWA's right to challenge the settlement.

SUWA subsequently amended its cross claims and brought a facial challenge to the settlement, alleging, *inter alia*, that: (1) the settlement institutionalized an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language; (2) the settlement violated FLPMA's land use plan amendment regulations by declaring that BLM would not accord existing § 202 WSAs the protection they received under the existing governing land use plans; and (3) the settlement violated the National Environmental Policy Act ("NEPA") by committing BLM to eliminating potential designation of § 202 WSAs from its choice of reasonable alternatives when making land use decisions.  *See U.S. Dep't of Interior*, 535 F.3d at

1193-94.  That challenge was ultimately dismissed by the Tenth Circuit on ripeness grounds.  *Id.*
at 1191-98.

In the intervening years, Federal Defendants have implemented the Wilderness
Settlement by removing any possibility of further WSA designation from new management plans
and withdrawing guidance documents that protected non-WSA wilderness-eligible lands while
Congress decided whether to impose more lasting protection.  *See, e.g.*, 68 Fed. Reg. 33,528
(June 4, 2003) (revising notices of intent to prepare resource management plans in BLM's
Vernal and Price field offices, in light of the Wilderness Settlement, to reflect that BLM will not
consider designating new WSAs).

BLM has relied on the Settlement when allowing increased oil and gas development in
Western states.  *See, e.g.*, *S. Utah Wilderness Alliance v. Norton*, 457 F. Supp. 2d 1253, 1257-59,
69 (D. Utah 2006) (discussing Wilderness Settlement and remanding BLM decision to sell 16 oil
and gas leases in BLM identified wilderness quality lands); *The Wilderness Soc'y v. Wisely*, 524
F. Supp. 2d 1285, 1291-92, 1310 n.15 (D. Colo. 2007) (discussing Wilderness Settlement and
implementation of Wilderness Settlement by BLM in Colorado); *see also* Bill Barrett Corp.,
IBLA 2007-193, 1-3 (April 28, 2010) (attached as Exh. 12)  (citing *S. Utah Wilderness Alliance
v. Norton*, 457 F. Supp. 2d 1253).  Federal Defendants have also relied on the Settlement to
justify BLM's refusal to even consider creating § 202 WSAs or extending similar protections to
wilderness-quality lands in National Monuments.  *See* Compl. for Decl. & Inj. Relief at ¶¶ 137-
40, 159-62, *Wilderness Soc'y v. U.S. Bureau of Land Mgmt.*, No. 2:09-cv-00151-HRH (D. Ariz.
Jan. 26, 2009) (attached as Exh. 13)  (challenge to management plan for the Canyon-Parashant

and Vermillion Cliffs National Monuments).  This practice has given rise to pending as-applied

challenges to the Settlement.  *See*, *e.g.*, *id.* at 34-35.

**D.    SUWA's Challenge to Oil and Gas Leasing Under the Vernal Resource Management Plan**

In October 2008, BLM approved Resource Management Plans for the Moab, Price, and

Vernal planning areas.  Compl. for Decl. & Inj. Relief at ¶¶ 49, 62, 76, *S. Utah Wilderness*

*Alliance v. Allred*, No. 1:08-02187 (D.D.C. Dec. Dec. 17, 2008) (attached as Exh. 14).  Together,

those plans provided a blueprint for the management of nearly seven million acres of BLM lands

in eastern and central Utah.  *Id.* at ¶ 35.  On December 12, 2008, BLM further announced that it

would make 163,935 acres of property in  Utah for available for oil and gas leases.  *See id.* at ¶

97. The lease sale occurred on December 19, 2008.

On December 17, 2008, SUWA filed a lawsuit in the United States District Court for the

District of Columbia challenging the Moab, Price, and Vernal RMPs.  *See id.* at ¶¶ 1-6.  In

particular, SUWA targeted BLM's decision to offer for lease 22 parcels of land for oil and gas

development under the Vernal RMP.  *See id.* at ¶ 1, 79.  Among other things, SUWA argued that

BLM's analysis of the impact of the proposed leases was inadequate under NEPA and the

National Historic Preservation Act ("NHPA").  *Id.* ¶¶ 113-134.

SUWA filed its Motion for a temporary restraining order ("TRO") and preliminary

injunction of the oil and gas leases on December 22, 2008.  On January 17, 2009, the court

granted SUWA's motion and prohibited BLM from issuing the leases.  *See* Mem. Order at 1-2, 5,

*S. Utah Wilderness Alliance v. Allred*, No. 08-2187 (D.D.C. Jan. 17, 2009) (attached as Exh. 15).

The court held that SUWA was likely to succeed on its NEPA claim because BLM's air quality

analysis in the RMP Environmental Impact Statement was flawed.  *Id.* at 3.  The court also held

that SUWA was likely to succeed on its claim that BLM violated the NHPA because the agency

failed to consider the impacts of oil and gas leasing on cultural resources in the Nine Mile

Canyon area.  *Id.* at 3-4.

On February 4, 2009, Secretary of the Interior Salazar announced that he was directing

BLM not to accept the bids on the challenged parcels in Utah.  *See* U.S. Dep't of Interior

Teleconference about Restoring Balance in Controversial Last-Minute Oil & Gas Lease Sale

near Utah Nat'l Parks (Feb. 4, 2009) (attached as Exh. 16) (transcript of teleconference).

Secretary Salazar expressed concern about the proximity of leases to national icons, including

Arches National Park, Canyonlands National Park, Dinosaur National Monument, and Nine Mile

Canyon as well as the degree and timing of consultation with the National Park Service.  *Id.*  He

also expressed concerns about the environmental analysis and noted that it had already been

deemed inadequate by the D.C. District Court in its trial ruling.  *Id.*  Secretary Salazar did not

withdraw the lands from future leasing.  Rather, he indicated that DOI would take a "fresh look"

at the leases to determine whether they should be made available for leasing. *Id.*

On February 6, 2009, Secretary Salazar went further, directing the Utah BLM State

Director to withdraw the 77 parcels subject to the TRO from further consideration in the

December 2008 lease sale.  Mem. from Sec'y Salazar to Selma Sierra, State Dir. Utah BLM

(Feb. 6, 2009) (attached as Exh. 17).  Secretary Salazar based his decision on the "considerable

controversy" surrounding the lease sale, including questions about the degree of coordination

between BLM and other Federal agencies, and the adequacy of the environmental review and

analysis performed in connection with both the underlying RMPs and particular parcels.  *Id.*  He

also acknowledged the existing TRO.  *Id.*  Given these concerns, Secretary Salazar decided that

the Department of the Interior needed to engage in "further review." *Id.* He instructed BLM to

promptly notify the high bidders and return any money paid for the leases. *Id.* On February 12,

2009, Utah BLM Deputy State Director Kent Hoffman sent letters to all the bidders notifying

them of the withdrawal and authorizing the refund of any money paid. *See* Letters from Kent

Hoffman to High Bidders (Feb. 12, 2009) (attached as Exh. 18). Although Federal Defendants

have withdrawn the lease parcels at issue in *Southern Utah Wilderness Alliance v. Allred*, the

broader litigation continues as a challenge to the Moab, Vernal, and Price RMPs and EISs. *See*

2d Am. Compl. for Decl. & Inj, Relief at ¶¶ 1-6, *S. Utah Wilderness Alliance v. Allred*, No. 08-

2187 (D.D.C. Mar. 13, 2009) (attached as Exh. 19).

**E.      The Instant Challenge to BLM's Authority to Protect its Wilderness-Quality Lands**

On October 1, 2010, Uintah County filed the instant action challenging the protective

management of BLM lands within its borders. *See* Pls.' Compl. for Decl., Mandatory, & Inj.

Relief, *Uintah County v. Salazar*, No. 2:10-cv-00970 (Dist. Utah Oct. 1, 2010) ("Uintah County

Complaint"). The complaint alleges that BLM's management of these lands and, in particular,

the agency's alleged refusal to issue additional oil and gas leases: (1) conflicts with the RMP; (2)

amounts to a mineral leasing withdrawal for which none of the procedural requirements have

been met; and (3) violates the 2003 Settlement. *See id.* at ¶¶ 1-2. To remedy these alleged

wrongs, Uintah County seeks declaratory judgment in favor of its interpretation of federal law

and the RMP, as well as injunctive relief that would eliminate Federal Defendants' authority to

fully protect the millions of acres of BLM lands included in the Red Rock Wilderness Act. *See*

*id.*, Prayer for Relief at ¶¶ 1-5.

SUWA and other proposed intervenors have long-standing interests in the management and protection of the lands that would be harmed if Uintah County prevails in this case. Because BLM cannot be relied upon to defend those interests, this court should, like Judge Benson in the related litigation that gave rise to the 2003 Settlement, grant SUWA's motion to intervene as of right. Alternatively, SUWA should be granted permissive intervention.

## ARGUMENT

I.   **SUWA IS ENTITLED TO INTERVENE AS A MATTER OF RIGHT.**

> [A]n applicant may intervene as of right if: (1) the application is "timely"; (2) "the applicant claims an interest relating to the property or transaction which is the subject of the action"; (3) the applicant's interest "may as a practical matter" be "impaired or impeded"; and (4) "the applicant's interest is [not] adequately represented by existing parties."

*Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1249 (10th Cir. 2001) (quoting *Coalition of Arizona/New Mexico Counties v. Dep't of Interior* ("*Coalition of Counties*"), 100 F. 3d 837, 840 (10th Cir. 1996) (quoting Fed. R. Civ. P. 24(a)(2)). These factors are "not rigid, technical requirements." *San Juan County v. United States*, 503 F.3d 1163, 1195 (10th Cir. 2007) (en banc). Rather, they are "intended to capture the circumstances in which the practical effect on the prospective intervenor justifies its participation in the litigation." *Id.* In assessing these factors, the Tenth Circuit, like many others, "has tended to follow a somewhat liberal line in allowing intervention."[5]  *Nat'l Farm Lines v. Interstate Commerce Comm'n*, 564 F.2d 381, 384 (10th Cir. 1977). *See also Neusse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995); *Fed. Sav. & Loan Ins. Corp. v.*

---

[5] The Tenth Circuit has also been clear that "the right to file a brief as amicus curiae is no substitute for the right to intervene as a party in the action under Rule 24(a)(2)." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 295 F.3d 1111, 1115 (10th Cir. 2002) (quoting *Coalition of Counties*, 100 F.3d at 844).

*Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993); *Sierra Club v. Robertson*, 960 F.2d 83, 86 (8th Cir. 1992).  Because SUWA satisfies each of the Rule 24(a) requirements, it is entitled to intervene in this action as a matter of right.

A.      **SUWA's Motion to Intervene is Timely.**

The most important consideration in deciding whether a motion to intervene is timely is whether the failure to move sooner prejudiced the existing parties.  *See* 7C WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3d § 1916 (2010); *Utah Ass'n of Counties*, 255 F.3d at 1250 ("[t]he requirement of timeliness is not a tool of retribution to punish the tardy would-be intervenor, but rather a guard against prejudicing the original parties by the failure to apply sooner") (quoting *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994)).  The timeliness requirement is assessed "in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances." *Utah Ass'n of Counties*, 255 F.3d at 1250 (quoting *Sanguine, Ltd. v. U.S. Dep't of Interior*, 736 F.2d 1416, 1418 (10th Cir. 1984)).

Uintah County filed its complaint on October 1, 2010.  Federal Defendants have not yet filed an answer, and this Court has issued no substantive orders or rulings.  Because SUWA's intervention at this early stage would not prejudice the other parties, it is clearly timely.

B.      **SUWA Has a Direct, Substantial, and Legally Protectable Interest in the Subject Matter of This Litigation.**

An applicant for intervention must possess a "direct, substantial, and legally protectable" interest in the proceedings.  *Coalition of Counties*, 100 F.3d at 840.[6]  SUWA *et al.* are national

---

[6] The Tenth Circuit has explained that "the 'interest' test is essentially a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with

and regional conservation organizations dedicated to the preservation of America's wilderness-quality lands.  *See* Exh. 1 at ¶¶ 2-4.  Their members and staff use and enjoy undeveloped BLM lands in Uintah County and elsewhere in Utah for hiking, camping, bird-watching, study, contemplation, solitude, photography, and other activities.  *See id.* at ¶ 7; Exh. 2 at ¶¶ 3-4, 12, 25-26.

Under Tenth Circuit precedent, those interests satisfy Rule 24(a).  *See Utah Ass'n of Counties,* 255 F.3d at 1252 ("[E]nvironmental organizations . . . have a sufficient interest for purposes of intervention as of right in cases in which their particular interests [a]re threatened. . . . The interest of the intervenor is . . . measured by whether the interest the intervenor claims is *related to the property that is the subject of the action*."); *Coalition of Counties*, 100 F.3d at  841 (activist's involvement with imperiled species in its habitat and "persistent record of advocacy" on its behalf entitled him to intervene in suit affecting its protection).

Following the Tenth Circuit, judges in this Court have repeatedly recognized that threats to these conservation groups' interests entitle them to intervene as of right.  *See, e.g., Impact Energy Res., LLC v. Salazar*, Nos. 2:09-cv-435, 2:09-cv-440, 2010 WL 610283, at *3 (D. Utah Feb. 17, 2010) (Benson, J.) (granting intervention based on SUWA's interest in the protection of public lands); Mem. Decision & Order, *Impact Energy Res., LLC v. Salazar*, Nos. 2:09-cv-435, 2:09-cv-440 (Feb. 17, 2010) (attached as Exh. 20) (same); *Utah v. United States*, No. 2:05-CV-714-TC, 2008 WL 4170017, at *4 (D. Utah Sept. 3, 2008) (Campbell, J.) (allowing intervention

---

efficiency and due process."  *Utah Ass'n. of Counties*, 255 F.3d at 1251-52 (quoting *Coalition of Counties*, 100 F.3d at 841) (additional citations omitted).

based on SUWA's interest in "creating and preserving wilderness areas"); *see also Kane County v. Kempthorne*, 495 F. Supp. 2d 1143, 1145-48 (D. Utah 2007) (Jenkins, J.) (SUWA successfully intervened in a case involving damaging off-road vehicle activity on BLM lands); *Williams v. Bankert*, No. 2:05CV503DAK, 2007 WL 3053293, at *1-3 (D. Utah Oct. 18, 2007) (Kimball, J.) (same).[7]

Furthermore, SUWA has advocated on behalf of its interests by intervening in earlier and closely related litigation.  In *Utah v. Norton*, the case that gave rise to the 2003 Wilderness Settlement at issue in this case, Judge Benson approved SUWA's motion to intervene based on the same land use and conservation interests described here.  *See* Exh. 7 at 14-17 (SUWA's conservation interest and interest in the use and observation of wilderness-quality lands entitles it to intervention as of right); Exh. 8 (SUWA's interests are sufficient for intervention).  SUWA subsequently opposed the 2003 Wilderness Settlement and argued in favor of preserving BLM's public lands inventory and land use planning discretion under FLPMA §§ 201 and 202.  *See U.S. Dep't of Interior*, 535 F.3d at 1190-91.

It is "indisputable" that prior litigation, combined with this type of conservation interest, satisfies Rule 24(a)(2)'s interest requirement.  *San Juan County*, 503 F.3d at 1199 ("environmental concern" for public lands at issue and prior litigation to protect those lands

---

[7] Indeed, SUWA's aesthetic and other interests are so great that they would be sufficient to meet Article III's standing requirements, which are more stringent than the Rule 24(a) standard for intervention.  As the Tenth Circuit emphasized in *Coalition of Counties*, use or observation of environmental features such as wildlife, even for purely aesthetic purposes, "is undeniably a cognizable interest for purpose of standing."  100 F.3d at 842 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992)).  Because Article III standing requirements are more demanding, the determination that SUWA's interests are sufficient for standing under Article III "compels the conclusion that they have an adequate interest under the rule."  *Id.* (quoting *Yniguez v. Arizona*, 939 F.2d 727, 735 (9th Cir. 1991)).

supported SUWA's interest for intervention purposes); *see also Coalition of Counties*, 100 F.3d

at 841-44 (advocate's conservation interest in species and prior litigation to protect it were

sufficient to support intervention in Endangered Species Act case).

### C. SUWA's Interests May Be Impaired As a Result of This Litigation.

Rule 24(a)'s "impairment" requirement concerns whether, as a practical matter, the

denial of intervention may impair or impede the prospective intervenor's ability to protect its

interests in the subject of the action. *San Juan County*, 503 F.3d at 1193. As the Advisory

Committee Notes for the 1966 amendments to Rule 24(a) explain, "[i]f an absentee would be

substantially affected in a practical sense by the determination made in an action, he should, as a

general rule, be entitled to intervene." The would-be intervenor need only show that impairment

of its interest is *possible* if intervention is denied. *WildEarth Guardians v. U.S. Forest Serv.*, 573

F.3d 992, 995 (10th Cir. 2009) (quoting *Utah Ass'n. of Counties*, 255 F.3d at 1253). This burden

is minimal. *Id.* Moreover, the court "may consider any significant legal effect on the applicant's

interest," *Natural Res. Def. Council v. Nuclear Regulatory Comm'n*, 578 F.2d 1341, 1345 (10th

Cir. 1978) (court "is not restricted to a rigid res judicata test").

SUWA easily satisfies the impairment prong in the instant case. First, SUWA has a clear

interest in the protection of the lands at issue in their undeveloped state. *Supra* at 17-20. These

interests are in obvious danger in this case because the County explicitly challenges Federal

Defendants' authority to keep BLM lands undeveloped. *See* Uintah County Complaint at ¶¶ 95-

106. There "can be no serious dispute" regarding potential impairment of interest where a

Uintah County victory in this lawsuit would undermine the protection of lands that SUWA has

long worked to protect. *See Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527-28 (9th Cir.

1983); *Coalition of Counties*, 100 F.3d at 844 (impairment requirement is satisfied when plaintiffs seek relief enjoining DOI from acting to protect applicant's conservation interests).

### D.     Federal Defendants Do Not Adequately Represent SUWA's Interests.

The final prong of the intervention as-of-right test is "satisfied if the applicant shows that representation of his interest 'may be' inadequate." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972); *see also Utah Ass'n of Counties*, 255 F.3d at 1254-56. "[T]he burden of making that showing should be treated as minimal." *Trbovich*, 404 U.S. at 538 n.10  An intervenor "need only show the *possibility* of inadequate representation." *WildEarth Guardians*, 573 F.3d at 996 (quoting *Utah Ass'n of Counties*, 255 F.3d at 1254). As the Tenth Circuit has explained, "[t]he possibility of divergence of interest need not be great in order to satisfy the burden of the applicants." *Coalition of Counties*, 100 F.3d at 845 (quoting *Natural Res. Def. Council*, 578 F.2d at 1346). SUWA satisfies this minimal burden.

As representatives of the public at large, Federal Defendants work to promote a diverse set of broad values and cannot provide the vigorous advocacy that is needed to represent SUWA's interest in this case. Federal Defendants have an "obligation . . . to represent not only the interest of the intervenor but the public interest generally." *WildEarth Guardians*, 573 F.3d at 995 (quoting *Utah Ass'n of Counties*, 255 F.3d at 1254). Moreover, Federal Defendants carry an "obligat[ion] to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor." *WildEarth Guardians*, 573 F.3d at 996 (quoting *Utah Ass'n of Counties*, 255 F.3d at 1255-56). This inherent conflict compromises the government's ability to provide SUWA with adequate representation.

This principle is particularly true in the case of BLM, which manages public lands under a statutory "multiple use mandate" that requires careful balancing of a wide range of public interests, including "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values."  43 U.S.C. § 1702(c); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. at 58 ("'Multiple use management' . . . describes the enormously complicated task of striking a balance among the many competing uses to which land can be put.").  This broad concern for the public interest is not coextensive with SUWA's particularized interest in protecting wilderness-quality lands, wildlife, air quality, and archeological values from harm.  Because Federal Defendants must consider potential interests of other members of the public – such as energy development – that may directly conflict with SUWA's conservation interests, Federal Defendants cannot adequately represent SUWA.  *See Coalition of Counties*, 100 F.3d at 845 ("We have here . . . the familiar situation in which the governmental agency is seeking to protect not only the interest of the public but also the private interest of the petitioners in intervention, a task which is on its face impossible.") (quoting *Nat'l Farm Lines*, 564 F.2d at 384).  This clear divergence of interests is more than sufficient to satisfy the minimal burden imposed by Rule 24(a)(2).

It is especially apparent that Federal Defendants cannot be relied upon to represent SUWA's interests here because much of this case hinges upon the interpretation, enforcement, and implementation of the 2003 Settlement.  SUWA has challenged the enforceability and legality of that agreement before and will do so again here.  *See supra* at 10-12.  For its part, the federal government is a party to the agreement, has defended it aggressively, and has worked to implement it across the nation.  This was so in SUWA's facial challenge to the Settlement, and it

has been so in the pending as-applied challenges.  *See*, *e.g.*, Defs.' Mem. in Supp. of Their Mot.

for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. at 23-29, *Wilderness Soc'y v. U.S. Bureau of*

*Land Mgmt.*, No. 3 08010-PCT-PGR (D. Ariz. Dec. 3, 2010) (attached as Exh. 21).

BLM has relied on the Settlement when allowing increased oil and gas development in

Western states.  *See, e.g.*, *S. Utah Wilderness Alliance v. Norton*, 457 F. Supp. 2d at 1257-59, 69

(discussing Wilderness Settlement and remanding BLM decision to sell 16 oil and gas leases in

BLM identified wilderness quality lands); *Wisely*, 524 F. Supp. 2d at 1291-92, 1310 n.15

(discussing Wilderness Settlement and implementation of Wilderness Settlement by BLM in

Colorado); *see also* Exh. 12 at 1-3 (citing *S. Utah Wilderness Alliance v. Norton*, 457 F. Supp. 2d

1253).[8]

Given these conflicts between SUWA's conservation interests and the interests BLM is

working to promote, Federal Defendants cannot adequately represent SUWA's interests in this

case.

## II.   ALTERNATIVELY, THIS COURT SHOULD GRANT SUWA PERMISSIVE INTERVENTION.

In addition to qualifying for intervention as of right, SUWA satisfies the prerequisites for

permissive intervention.  An applicant may be allowed permissive intervention if it can show

that: (1) it has a claim or defense that shares a common question of law or fact with the main

action; (2) the intervention will not cause undue delay or prejudice; and (3) the application to

intervene is timely.  *See* Fed. R. Civ. P. 24(b).  *See also Utah v. Kennecott Corp.*, 801 F. Supp.

---

[8] Indeed, BLM would have issued the leases implicated in Uintah County 's suit if not for SUWA's challenge to the leases in *Allred*.  *See* Exh. 14. at ¶¶ 1, 79.  BLM opened those lands to development and fought to uphold the proposed leases until SUWA's suit resulted in a TRO against the issuance of the leases.  *See* Exh.15; Exh. 17.  In this context, BLM can hardly provide adequate representation for SUWA's interests in this case.

553, 572 (D. Utah 1992)  (reviewing factors to be considered for permissive intervention).

Those factors weigh in SUWA's favor.[9]

Uintah County's allegations clearly share common questions of fact and law with

SUWA's defense of Federal Defendants' ability to protect wilderness-quality lands.  Uintah

County's suit attempts to enforce the Settlement that SUWA previously intervened to oppose,

and the relief it seeks would impair or eliminate the ability of SUWA group members to continue

their use and enjoyment of these lands.  In addition, the relief that Uintah County seeks for its

assertions that BLM's management of its lands conflicts with the Vernal RMP and amounts to an

improper mineral leasing withdrawal would effectively read additional requirements into the

RMP and FLPMA and prohibit Federal Defendants from the equitable balancing of the full range

of competing multiple use interests.  Likewise, as demonstrated above, this motion is timely and

SUWA's intervention will not prejudice the rights of the existing parties.  *Supra* at 17.

In addition to these factors, the Court may consider whether the intervenors will

significantly contribute to the "full development of the underlying factual issues in the suit and to

the just and equitable adjudication of the legal questions presented."  *Kennecott*, 801 F. Supp. at

572.  Because of its direct involvement with the land and resources at stake in this action, as well

as its long advocacy of the measures challenged by Uintah County's complaint, SUWA satisfies

this criterion.  *See* Exh. 1 at ¶ 2-8.  As noted above, SUWA's specific interest in the proceedings

is not represented by any other party.  Furthermore, as in the previous case under Judge Benson,

SUWA's intervention would allow it to advocate on behalf of a legal interpretation that will not

---

[9] SUWA's briefing will confront and rebut the County's factual claims and counter its legal
arguments.

be presented by any of the other parties.  Accordingly, even if the Court were to conclude that

SUWA is not entitled to intervene as a matter of right, permissive intervention is warranted here.

## CONCLUSION

For the foregoing reasons, SUWA respectfully requests that it be allowed to intervene in

this litigation as a matter of right.  Alternatively, if this Court denies SUWA's motion to

intervene as of right, SUWA requests that it be granted permissive intervention.

Respectfully submitted December 22, 2010.

/s/ Stephen Bloch

Stephen H.M. Bloch #7813
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
Telephone:  (801) 486-3161

James S. Angell
Albert B. Sahlstrom
EARTHJUSTICE
1400 Glenarm Place, Suite 300
Denver, CO  80202
Telephone:  (303) 623-9466

Attorneys for Proposed Defendant-Intervenors
Southern Utah Wilderness Alliance, *et al.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of December, 2010 I caused a true and correct copy of the following: **MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANT** to each of the following persons through the Court's electronic case filing system:

Constance E. Brooks
Michael Marinovich
C. E. Brooks & Associates P.C.
303 East 17th Avenue, Ste. 650
Denver, CO 80203
Telephone: (303) 297-9100
connie@cebrooks.com
mike@cebrooks.com


J. Mark Ward
Utah Association of Counties
5397 South Vine Street
Salt Lake City, UT 84107
Telephone: (801) 265-1331
mark@uacnet.org


/s/ Stephen H.M. Bloch