CONSTANCE E. BROOKS connie@cebrooks.com
MICHAEL MARINOVICH mike@cebrooks.com
C. E. Brooks & Associates P.C.
303 East 17th Avenue, Ste. 650
Denver, CO 80203
(303) 297-9100 (telephone)
(303) 297-9101 (facsimile)

J. MARK WARD #4436  mark@uacnet.org
Utah Association of Counties
5397 South Vine Street
Salt Lake City, UT 84107
(801) 265-1331 (telephone)
(801) 265-9485 (facsimile)

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UINTAH COUNTY, UTAH, a Utah political subdivision; UINTAH COUNTY BOARD OF COMMISSIONERS; and UTAH ASSOCIATION OF COUNTIES, on behalf of its impacted members, including named member Uintah County, | Civ. No.  2:10-cv-00970-CW |
| Plaintiffs, | **PLAINTIFFS' FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY, MANDATORY AND INJUNCTIVE RELIEF** |
| vs. | |
| KEN SALAZAR, in his official capacity as SECRETARY OF THE INTERIOR; *et al*. | |
| Defendants; and | |
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.* Applicants in Intervention. | |

Comes now, Plaintiffs, the Utah Association of Counties (UAC) and UAC member Uintah County Board of Commissioners and Uintah County (hereafter Uintah County), by and through counsel, to file their First Amended and Supplemental Complaint for Declaratory, Mandatory and Injunctive Relief against Defendants, Ken Salazar, in his official capacity as the Secretary of the U.S. Department of the Interior (DOI), the DOI, Robert V. Abbey in his official capacity as the Director of the U.S. Bureau of Land Management (BLM), and the BLM, and allege as follows:

## INTRODUCTION

1.      Plaintiffs Uintah County initially filed this lawsuit to challenge the Defendants' unlawful *de facto* wilderness management policy that has been applied to an estimated 385,000 acres of public lands primarily located in Uintah County, Utah and managed by the BLM in the Vernal Resource Area.  These lands are also within the boundaries of proposed wilderness legislation, H.R. 1925, "America's Red Rock Wilderness Act," (Red Rock bill) that was introduced in the 111th Congress on April 2, 2009 but never enacted.

2.      On December 22, 2010, the Secretary of the DOI signed Secretarial Order 3310 ("the Order"), which 1) makes wilderness protection the land management priority for all public lands administered by the BLM, notwithstanding statutory enumeration of principal or major multiple uses for public lands, which directly conflict with wilderness management; 2) establishes a new public land designation of "Wild Lands" that is indistinguishable from Wilderness Study Areas (WSA) that were authorized in Section 603 of the Federal Land Policy and Management Act (FLPMA);   3) establishes a new

classification of public lands thought to have wilderness character (Lands with Wilderness Character or LWCs) that are also managed effective immediately to avoid impairing their claimed wilderness character; and 4) requires a mandatory review of all project level decisions to identify lands with wilderness character and manage for non-impairment of those claimed wilderness characteristics, even if it means denying projects and other statutorily legitimate uses.  Unlike the previous Utah litigation when DOI contended it only gathered information but did not change management, Secretarial Order 3310 changes land management for at least an estimated 6 million acres of public land in Utah. which have already been inventoried and identified as having wilderness characteristics.

3.    Secretarial Order 3310 is *ultra vires* and unlawful because (1) it usurps Congress' authority to alter the statutory principal multiple use priorities in the FLPMA and attempts to extend wilderness management to all public lands when FLPMA and the Wilderness Act limit wilderness management to designated WSAs or congressionally designated wilderness; and (2) fails to follow the procedures established in FLPMA for implementing its provisions through rulemaking, amending resource management plans (RMPs), withdrawing public lands from mineral development, coordinating with state and local governments, evaluating and ensuring consistency with state and local government plans, and examining the possible environmental impacts of a federal action before it is adopted.  The actions of the Secretary also arbitrarily and capriciously violate the terms and commitments made in the April 11, 2003 Settlement Agreement reached between the DOI and the State of Utah, School and Institutional Trust Lands Administration (SITLA) and UAC, of which Uintah County is a member.  *See* D. Civ. Ut. 2:96cv0870B at Document

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

185; *see also* September 9, 2005 revised Settlement Agreement, *id.*, at Document 264 exhibit 1 (collectively referred hereafter as the "Settlement Agreement").

4.    Plaintiffs ask this Court to find the Defendants' actions unlawful, to declare Secretarial Order 3310 null and void, and to further find that the Defendants have violated the Settlement Agreement and that its repudiation is arbitrary and capricious. The Plaintiffs further ask that this Court enjoin implementation of the Order, set aside the manuals adopted to implement Secretarial Order 3310 and enjoin Defendants from managing the non-WSA public lands as if they were WSAs or Wild Lands and to declare Defendants must manage the public lands in accordance with the RMPs.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction under 28 U.S.C. §1331 [federal question], 28 U.S.C. §2201 [declaratory judgment], 28 U.S.C. §1361 [mandamus], and the Administrative Procedure Act (APA), 5 U.S.C. §§701-706.  The claims asserted herein arise under the U.S. Constitution's separation of powers doctrine, the Property Clause, ART. IV, SECTION 3, CL. 2, the Tenth Amendment to the U.S. Constitution, FLPMA, 43 U.S.C. §§1701-1784, the National Environmental Policy Act (NEPA), 42 U.S.C. §4332(2)(C); and the APA, 5 U.S.C. §706.

6.    Judicial review of Defendants' actions is also available under the doctrine of non-statutory judicial review of agency action because Defendants have acted without statutory authority in violation of the doctrine of separation of powers and the challenged actions are *ultra vires.*

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

7.    The APA authorizes judicial review of Defendants' actions because Defendants have acted contrary to law and without lawful authority, 5 U.S.C. §706(2)(C), arbitrarily, capriciously, and not in accordance with law, 5 U.S.C. §706(2)(A), and have unlawfully withheld agency action, 5 U.S.C. §706(1).

8.    Venue is proper under 28 U.S.C. §1391(e), as the lands, which are the subject of this lawsuit, are located in Utah.

## PARTIES

9.    UAC is a non-profit Utah corporation whose membership is comprised of the counties of Utah and brings this case on behalf of all counties in Utah, including Uintah County, which contain BLM lands that are subject to the Order ("impacted counties"). UAC is qualified to represent the interests of the impacted counties in this action, all of whom are UAC members.  The impacted counties, including Uintah County, have standing to bring this case.  As alleged below, the purposes of UAC are germane to the issues raised in this case.  None of the claims asserted nor the relief requested requires the participation of the individual impacted counties because Plaintiffs do not seek monetary damages and the claims are common to all impacted counties.

10.    One of the purposes of UAC is to represent and defend the interests of its member counties concerning questions of law having statewide and nationwide implications.  In particular, the UAC Board of Directors have repeatedly directed UAC to address questions of law, which have a direct impact upon the constitutional and statutory authority of the several counties of the State of Utah, including the authority and ability of county government to provide for public access to and across federal lands, and continued

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

utilization of federal and private lands within the borders of each county.  Since 1980, Plaintiff UAC has been a key player in helping member counties develop and revise county comprehensive land use plans, as well as lobby the State to develop parallel land use plans, in order for the Utah counties to take advantage of FLPMA's requirement that "[l]and use plans of the Secretary under this section shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act." 43 U.S.C. §1712(c)(9).

11.     Pursuant to Utah law, the UAC member counties have joint and undivided title to all rights-of-way for all county Class B and D roads within their respective counties and are responsible for their maintenance, construction, and reconstruction.  The UAC member counties are authorized under Utah law to perform various governmental functions, including the management and maintenance of roads within the respective county boundaries, law enforcement, fire suppression and control, and emergency search and rescue.  The unobstructed right to maintain all public roads within each county is essential to perform these governmental functions.  The shared revenues that the UAC member counties receive from commercial uses of the public lands, including oil and gas development and livestock grazing are also necessary to perform these functions.

12.     Pursuant to state and federal laws, the UAC member counties with BLM lands have adopted comprehensive land use plans, which incorporate Defendants' original WSA decisions.  Relevant provisions of FLPMA and NEPA require Defendants to consult and coordinate with UAC member counties  to manage the public lands to avoid conflicts with local government land use plans, recognize the UAC member counties as cooperating

agencies and to agree on road administration and maintenance.  Pursuant to the Council on Environmental Quality policy, many of the impacted UAC member counties have agreements with Defendants which expressly provide for UAC members to be cooperating agencies for the revision and implementation of BLM RMPs.  Uintah County has an memorandum of understanding with BLM under which it is a cooperating agency for all projects and is to be consulted with respect to day-to-day BLM activities.  Thus, Defendants' actions, including Secretarial Order 3310,  adversely affect the interests the UAC members in RMPs, the related land management agreements and their coordination rights, by Defendants' failure to manage Utah public lands in accordance with the RMPs or to properly coordinate with the UAC members.

13.   Plaintiff Uintah County is a member of UAC.  Uintah County is located in northeastern Utah within the BLM Vernal Resource Area. Plaintiff Uintah County Board of Commissioners exercises governmental authority for and on behalf of Uintah County pursuant to state law. As a political subdivision of the State of Utah, Uintah County, acting through its Board of County Commissioners, is duly vested with governmental power and authority to provide for and protect the public health, safety and welfare of its citizens and those who travel county roads within its boundaries. The great majority of the public lands managed for *de facto* wilderness management by the BLM Vernal Field Office lie within the boundaries of the County.

14.   Uintah County's land use plan identifies the county's interests in protecting the environment and natural resources in the county. *E.g.* General Plan for Uintah County, ¶3d.2, 3d.3, 3d.4 (development evaluated against "impacts on soils, water, natural

resources, and historic and cultural resources"). In 2004, Uintah County spearheaded the

Uintah Basin Partners in Conservation and Development Group (UBPCD) that is chaired

by Commissioner McKee and vice-chair is Commissioner Kirk Wood of Duchesne County.

This group is part of the Utah Partners in Conservation and Development (UPCD) which

meets monthly to discuss conservation issues and also participates with several agencies

on watershed improvement projects every year. These projects are designed to improve

vegetation resources for livestock grazing, sage grouse habitat and wildlife habitat

improvement. The proposed projects are presented to the group by the different agencies

and then ranked from highest to lowest and whether they meet the criteria for funding.

Funding has come through the State for these projects as well as from other agencies.

The Utah counties are also active in the Sage Grouse group, which supports habitat

conservation measures for the sage grouse.

15. Secretarial Order 3310 and the challenged BLM *de facto* wilderness

management of Utah public lands interfere with these objectives by limiting the County's

authority to protect soil and water resources by prohibiting or delaying undefined 'large

projects' which would otherwise benefit vegetation, soil and water resources in Uintah

County. Manual 6302.13; 6303.14. The changed management also interferes with county

efforts to maintain roads necessary to reduce erosion and nonpoint source water pollution.

Manual 6302.13; 6303.13., 6303.15.

16. UAC member Uintah County was a cooperating agency in the development

of the Vernal RMP and FEIS. Uintah County officials devoted more than 15 years to

addressing public land management issues, first as part of the Bookcliffs coordinated

resource management planning process and later with the Vernal RMP which was signed in October 2008.

17.     More than half of all of the natural gas and oil produced in the State of Utah is produced in Uintah County. Under Utah law, the royalties paid from the U.S. Treasury to the State of Utah pursuant to the Mineral Leasing Act are split between the state and the respective counties.   Uintah County receives about 40% of the Mineral Leasing Act revenues paid to the State of Utah based on oil and gas production within the county boundaries.

18.     Defendant Ken Salazar is the Secretary of the DOI. In his official capacity, the Secretary is responsible for upholding the Constitution of the United States and for setting public land policy in accordance with the provisions and requirements of federal law, including FLPMA.

19.     Defendant DOI is the department of the federal government to which Congress delegated the authority to administer the public lands in accordance with the Constitution of the United States and federal law.

20.     Defendant Robert V. Abbey is the Director of the BLM.  In his official capacity, Director Abbey is responsible for managing the public lands in accordance with the U.S. Constitution and federal law.

21.     Defendant the Bureau of Land Management is the federal agency within DOI responsible for the management of public lands and minerals in Utah. The BLM manages approximately 22.9 million acres of federal surface and 23 million acres of mineral estate in Utah. Currently, BLM has leased approximately 4.3 million acres of the approximately

17 million acres classified as suitable and available for oil and gas leasing in Utah under applicable land use management plans.

## STATEMENT OF FACTS

*Utah Wilderness Controversy*

22.    The issue of which public lands have wilderness character and should be recommended for wilderness designation is designated by Congress has a contentious 33-year history in Utah. Pursuant to Section 603 of FLPMA, 43 U.S.C. §1782, BLM inventoried the 22.9 million acres of public lands for their wilderness character and designated 2.5 million acres of public lands as WSAs on November 14, 1980. BLM increased the WSA designations to 3.2 million acres after protests and administrative appeals led BLM to review and revise its decisions for more than 64 specific wilderness inventory units or parts of those units. From 1985 to this day, BLM manages 3.2 million acres of public lands in Utah as WSAs.

23.    BLM completed the wilderness review program in October 1991 with publication of the Utah Statewide Wilderness Review Final Environmental Impact Statement. Secretary of the Interior Manual Lujan, Jr. signed the Record of Decision recommending to President George H.W. Bush that approximately 1.9 million acres of the 3.2 million acres of WSAs in Utah be designated as wilderness. In June, 1992, President Bush submitted Secretary Lujan's wilderness recommendations to Congress. The submission of the wilderness recommendations completed the wilderness review program within the 15-year deadline.

24.    Based on the erroneous premise that Utah's wilderness inventory and WSA designations were flawed and erroneous, in September of 1996, DOI began a reinventory of certain Utah public lands which were included in pending wilderness legislation to 'prove' that these areas were roadless and qualified for wilderness designation by Congress.  The Interior Secretary justified his actions on the basis that the Utah wilderness inventory was flawed and a reinventory was necessary to correct the errors. Secretary Babbitt wrote to Cong. Hansen on Sept. 9, 1996 and stated:

> The degree and duration of controversy surrounding the original wilderness inventory of Utah BLM lands is unparalleled in forty years of national engagement over what areas of federal land ought to be considered for legal protection as wilderness.  This debate has been a Utah-specific one, and we are carrying out a narrowly focused, Utah-specific exercise in response.

The Secretary also stated he was not going to reinventory public lands in other western states.

25.    In 1996, Secretary Babbitt did not acknowledge that the errors made in the inventory were corrected by 1985.  The 1996 reinventory was both rushed and subjective. Secretary Babbitt directed that the work be completed by December 1996, giving BLM less than four months to finish.  Moreover, Utah BLM worked from a book compiled by the Utah Wilderness Coalition called *Wilderness at the Edge*.

26.    On October 15, 1996, the State of Utah, the SITLA, and UAC, of which Uintah County is a member, challenged the legal authority of the Secretary to revisit or revise the original wilderness review because BLM's authority to identify and designate new WSAs had expired.  Utah also challenged the BLM's interim management or *de facto*

wilderness management of public lands, which, as explained above, were not WSAs established pursuant to the original FLPMA section 603 wilderness review but instead were included in pending wilderness proposals before Congress.

27.    BLM defended its Utah reinventory as only an inventory or data-gathering process pursuant to Section 201(a) of FLPMA and further swore that BLM's reinventory would not change public land management without a revision of the land use plans. BLM further argued that other changes in land management were traced to separate and independent BLM policies.

28.    The Tenth Circuit vacated the preliminary injunction because Utah lacked standing to challenge the reinventory, based on BLM's sworn statements that it was only collecting information and had not changed public land management pursuant to the reinventory. The Court concluded that Utah had standing to challenge the *de facto* wilderness claim. *State of Utah v. Babbitt*, 137 F.3d 1193, 1205-1214 (10th Cir. 1998).

29.    Utah and the Defendants entered into settlement discussions in early 2001 and after two years of negotiation, the parties announced a settlement on April 11, 2003. The findings set forth in the Settlement Agreement stated that the Interior Department's authority under FLPMA §603 to conduct wilderness reviews terminated no later than 1993, or two years after the Interior Secretary forwarded the BLM wilderness recommendations to the President, that the authority granted in §603 to establish WSAs expired, and that management of Post-603 Lands to preserve their alleged wilderness character is inconsistent with FLPMA's Section 603 limited delegation of authority. The Settlement Agreement, thus, stipulates that because BLM's FLPMA wilderness review authority has

**Plaintiffs' First Amended and Supplemented Complaint for
Declaratory, Mandatory and Injunctive Relief**

terminated, BLM lacks the authority to "establish, manage, or otherwise treat public lands, other than Section 603 WSAs and Congressionally designated wilderness, as WSAs or as wilderness pursuant to the Section 202 process absent congressional authorization."

30.     Defendants further agreed that the Settlement Agreement is (1) consistent with the language of FLPMA and other applicable law and regulation, (2) respects the right of Congress to reach a final resolution of Utah wilderness issues, and (3) returns public land management decisions to the FLPMA land use planning process. The Settlement Agreement also acknowledges that BLM actions adversely affected the interests of the plaintiffs in that action, including UAC, and sets out the concrete reasons to settle the litigation and documents the public interests supporting the settlement, including improving federal-state relations and resolving an ongoing and thorny controversy that would mire RMP revisions for several years.

31.     In accordance with the Settlement Agreement, BLM rescinded (a) the August 2001 Utah Instruction Memorandum that required special management for non-WSA BLM lands in Utah known as Wilderness Inventory Areas (WIAs), (b) the 2001 Instruction Memorandum directing BLM to consider administrative designation of new WSAs, (c) and the BLM wilderness inventory and study procedures handbook, H-6300 issued January 17, 2001.

32.     More than 10 environmental organizations led by the Southern Utah Wilderness Alliance (SUWA) unsuccessfully challenged the Settlement Agreement in both the Tenth Circuit, *State of Utah v. Norton*, 396 F.3d 1281, 1287 (10th Cir. 2005) (remanded

for lack of final judgment) and the District Court for the District of Utah. *Utah v. Norton*, 2:96-cv-00870, 2006 WL 2711798 (D. Ut 2006).

33.     This Court dismissed for lack of standing, ripeness and final agency action, the environmental groups' cross-claims challenging the Settlement Agreement.  The Court further found that even if there was standing, it would find the cross claims to be without legal support because "the plaintiffs and the present embodiment of the defendants clearly have the better interpretation of the law." Thus, the Court concluded that the Settlement Agreement "is consistent with the law and restores the proper interpretation of FLPMA." On appeal, the Tenth Circuit affirmed the dismissal of SUWA's cross-claims because they were not ripe for adjudication. *Utah v. U.S. Dept. of the Interior*, 535 F.3d 1184 (10th Cir. 2008).

*Change in Management of Public Lands In Utah*

34.     Before President Obama took office, a coalition of environmental groups identified the Settlement Agreement and the Utah RMPs as priority items for revocation by the new administration. *Transition to Green: Leading the way to a healthy environment, a green economy and a sustainable future*, Nov. 2008 p. 9-7.

35.     On May 20, 2009, Interior Secretary Salazar responded to questions posed by Senator Robert F. Bennett regarding the administration's position on the Utah Settlement Agreement.  Secretary Salazar stated the Interior Department would honor the Settlement Agreement.  Then, in an arbitrary about-face, on March 18, 2010, the Interior Secretary testified to the House Subcommittee on Interior and Environment that he

'disagreed' with the Settlement Agreement, and that the Interior Department was weighing options for an alternative policy, including the outright repeal of the Settlement Agreement.

36.     The first indication that BLM adopted the environmental groups recommendations for Utah public land management occurred when a coalition of environmental groups sued the BLM and other federal defendants in the District Court for the District of Columbia to set aside 77 Utah BLM oil and gas leases that were offered for sale in December 2008. After the Interior Secretary retroactively revoked those leases, the environmental group plaintiffs amended the complaint to then challenge the Utah Settlement Agreement and the Utah 2008 RMPs for the Vernal, Price and Moab Resource Areas.

37.     The Secretary's retroactive withdrawal of the 77 oil and gas leases signaled a renewal of the Utah wilderness controversy because the leases were offered and sold on Utah public lands classified as suitable and available for leasing under the Vernal, Moab and Price RMPs, yet several of the leases were in areas proposed for wilderness designation in an East Coast Congressman's perennially introduced and perennially rejected in the 'Red Rock Wilderness Bill.'

38.     The State of Utah, SITLA, Uintah, Duchesne, Carbon, Emery and San Juan Counties moved to intervene as defendants in that action to defend the Utah RMPs and the Settlement Agreement. The D.C. District Court litigation has been stayed pending action on the intervenors' September 2009 motion to transfer venue. The same coalition of environmental groups brought a second lawsuit against BLM in the D.C. District Court to challenge the 2008 RMPs for the Richfield, Monticello and Kanab Resource Areas in

November 2010.  The State of Utah, San Juan and Kane Counties and SITLA again sought intervention in that matter to defend those RMPs.  The intervenors in this subsequent action D.C. District Court action are seeking to transfer venue of that action as well.  The second action is stayed based on settlement negotiations.

39.    While the District of Columbia litigation was stayed, SUWA met with BLM on several occasions to discuss settlement terms.  By January 11, 2010, the parties reached an agreement to rescind the Settlement Agreement through secretarial action rather than a court-approved settlement.  The District of Columbia case has not been resolved due to the environmental plaintiffs' insistence that BLM redo all six of the 2008 BLM RMPs in Utah and delineate the specific Utah public roads and rights-of-way to be closed.  The environmental plaintiffs also demanded that motorized vehicle use be prohibited in all Red Rock areas.

40.    In October 2009, Defendants assured the Utah intervenors in the D.C. District Court litigation that they would involve them in settlement discussions with SUWA once the settlement parameters were defined.  Although the Defendants and SUWA had a fully developed settlement matrix before January, 2010, Defendants did not inform the intervenors and proposed intervenors in both D.C. Court actions, which include several Utah counties, including Uintah, Duchesne, Carbon, Emery, Kane and San Juan Counties, about the settlement terms or consult with the State of Utah, UAC or SITLA regarding their positions on the decision to rescind the Settlement Agreement.

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

*De facto Wilderness Management*

41.     BLM determines which public lands are available for oil and gas leasing through the land use planning system as mandated by FLPMA. The Vernal RMP classifies public lands as one of four leasing categories: an estimated 750,131 acres open with standard stipulations, an estimated 890,280 acres available open with timing or controlled surface use terms or conditions, an estimated 86,789 acres are available open but no surface occupancy allowed, and approximately 190,434 acres closed to leasing.

42.     This is also true for the Moab, Price, Monticello, Kanab and Richfield RMPs.

a.      For the Moab Resource Area, an estimated 1.45 million acres of the 2.76 million acres of the federal mineral estate are suitable and available for oil and gas leasing. Of the 1.45 million acres, an estimated 427,273 acres can be leased under standard lease terms; an estimated 806,994 acres are subject to Controlled Surface Use or Timing Limitation stipulations; and an estimated 217,480 acres are available subject to a No Surface Occupancy stipulation.  The Moab RMP closes approximately 370,250 acres as unavailable for oil and gas leasing.

b.      The Price RMP classifies an estimated 1.161 million acres as suitable and available to oil and gas leasing subject to standard lease terms; an estimated 467,000 acres are subject to controlled surface use, timing limitation, or lease notices; and an estimated 282,000 acres may be leased subject to no surface occupancy stipulation. Another estimated 569,000 acres are unavailable for oil and gas leasing.

c.      The Monticello RMP authorizes leasing under standard lease terms and conditions 484,217 acres; leasing subject to controlled surface use and timing limitations

- 740,594 acres; leasing with no surface occupancy - 66,108 acres; and unavailable to leasing - 493,400 acres.

      d.     The Kanab RMP classifies an estimated 475,000 acres of the 554,000 acres of federal mineral estate available for oil and gas leasing.  Of these, an estimated 95,400 acres are available for oil and gas leasing under standard lease terms; an estimated 296,200 acres available subject to Controlled Surface Use or Timing Limitation stipulations; and an estimated 83,400 acres available subject to No Surface Occupancy (NSO) stipulations.  The Kanab RMP closes approximately 79,000 acres closed to oil and gas leasing, and recommends a withdrawal for approximately 9,500 acres from locatable mineral entry.

      e.     The Richfield RMP makes an estimated 1.7 million acres of the 2.1 million acres of federal mineral estate available for oil and gas leasing: an estimated 608,700 acres will be available for oil and gas leasing under standard lease terms; an estimated 917,500 acres available subject to Controlled Surface Use or Timing Limitation stipulations; and an estimated 154,500 acres available subject to NSO stipulations.  The Richfield RMP closes approximately 447,300 acres to oil and gas leasing and recommends a withdrawal of approximately 21,500 acres from locatable mineral entry.

      43.    Since January 2009, in the Vernal Resource Area, numerous companies have nominated parcels that are classified in the 2008 Vernal RMP as suitable and available for leasing in accordance with BLM policy for identifying public lands that should be offered at quarterly sales.  Because these parcels were located within the boundaries

of the Red Rock bill, Utah BLM received instructions from the Office of the Secretary or the secretarial level in Washington D.C. to not place these parcels on the quarterly sale list. Instead, these parcels are in limbo, where they have not been offered for sale or otherwise evaluated.

44.     From January to June of 2009, Utah BLM provided the Secretarial officials with detailed documentation of the RMP process and the decisions made. Plaintiffs are of the information and belief that in early 2009 officials at the secretarial level told Utah BLM employees that the 1999 wilderness reinventory and report was the key milestone to guide public land management in Utah, not the RMPs that were written as part of a public and cooperative process in accordance with FLPMA rules and procedures.

45.     Plaintiffs are of the information and belief that the DOI issued direction to Utah BLM in 2009 to impose these *de facto* wilderness management policies on all Red Rock bill lands throughout Utah regardless of the land use planning decisions made in the governing RMPs or FLPMA.  This direction is corroborated by other agency documents, including the revised NEPA Interdisciplinary Team Checklist for proposed land use authorizations, wherein the BLM Vernal Field Office lists the Red Rock bill as a resource consideration to deny proposed actions.  No law, rule or policy provides that pending wilderness legislation is a basis to exclude proposed actions authorized under the current BLM RMPs.

46.     Plaintiffs are of the information and belief that in virtually every case, BLM declined to offer the nominated parcels for lease sale or renewal for the sole reason that

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

the affected lands are within the boundaries of the Red Rock bill.  Plaintiffs are also of the

information and belief that Defendants at the secretarial level gave this direction to not

place lands within the boundaries of Red Rock bill on the quarterly lease sales.  BLM

employees, who pointed out that these lands were classified as available for lease based

on the RMP and FEIS were reproved and feared job-related retaliation.

47.    Plaintiffs are of the information and belief that all proposed land use

authorizations permitted under the Vernal RMP are now categorically reviewed to

determine whether they are within Red Rock bill boundaries, and they are accordingly

denied if they do. These *de facto* wilderness management actions include blanket refusals

to offer for sale the public lands nominated for the mineral lease sales, denials of pipeline

rights-of-way and Applications for Permits to Drill (APD) on oil and gas leases, where by

law, an Operator has the right to drill on the existing leaseholds.

48.    Following revocation of the 77 oil and gas lease parcels, a Washington D.C.

team of BLM, Forest Service, and National Park Service employees also reviewed the

December 2008 lease sale and the 77 lease parcels.  On October 7, 2009, the team issued

its report and recommended deferral of all leases in the Red Rock bill, while acknowledging

that the Utah BLM RMPs authorized these leases and the Utah BLM staff had competently

reviewed and analyzed the parcels before putting them on the sale list.  Thereafter,

Defendants directed that any leases issued in the Red Rock bill areas be deferred pending

a case by case parcel review using a soon-to-be released Wilderness Characteristics

Inventory Manual.  No leases were issued on these lands.  The DOI team acknowledged

**Plaintiffs' First Amended and Supplemented Complaint for
Declaratory, Mandatory and Injunctive Relief**

that the lease parcels were in those Red Rock bill areas that, after an exhaustive review as a wilderness alternative, BLM specifically chose to not protect for wilderness characteristics in the respective RMPs.  In several cases, lease parcels are deferred where there are existing leases and adjacent SITLA lands.  The deferral prevents the lessees from developing because they do not have control over the play, which is necessary before committing the investment to drill.

49.     Also following the lease revocation, the Inspector General opened an investigation into allegations that Utah BLM had rushed the December 2008 lease sale in anticipation of the change in administrations and had deliberately excluded the National Park Service from an opportunity to review parcels proposed for sale.  The October 7, 2009 report found no evidence to support the allegations and instead determined that BLM employees followed the protocols and procedures in accordance with FLPMA and NEPA. The omission of later-added parcels to the NPS notification was an innocent error that was rectified by subsequent meetings and an agreement between BLM and NPS officials.

*Master Lease Program Halts Mineral Leasing to Protect LWCs*

50.     As part of the same pattern and practice of *de facto* wilderness management on non-WSA BLM lands, on May, 17, 2010, the BLM Director issued a new Oil and Gas Leasing Reform Policy for Land Use Planning and Lease Parcel Reviews (IM 2010-117) without rulemaking and without public, state or local agency consultation or involvement. The instruction memorandum sets out mandates that supersede the resource allocations and management decisions made in the respective Utah RMPs. Contrary to the RMP

decisions, the instruction memorandum states that BLM shall defer parcels from leasing while additional resource information, such as wilderness qualities, is collected and analyzed.

51.    The master lease planning (MLP) program is described as a reform of mineral leasing on federal lands even though BLM did not undertake mandatory rulemaking or other procedures before implementing it.  The same day, BLM issued a second instruction memorandum eliminating the use of categorical exclusions even though they are authorized by statute.

52.    The MLP program overrides the land use planning process and is used to effect a rescission of the RMP mineral leasing decisions.

53.    There was no coordination or consultation with Utah counties, notwithstanding agreements and procedures that would otherwise require such consultation for such a significant change in public land plans and programs.

54.    Plaintiffs are of the information and belief that in August 2010 the Utah BLM recommended to the BLM Washington Office no additional areas undergo master lease planning because the 2008 RMPs already analyzed the mineral leasing impacts on public land resources, including citizen wilderness proposals and Red Rock lands, and provided for stipulations based on site-specific resources.  The Washington Office instead consulted with environmental groups regarding nominations of public land areas for the MLP program.  The environmental groups, including SUWA and The Wilderness Society, provided nominations to Deputy Under Secretary Ned Farquhar and BLM.

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

55.     In January 2011, Director Abbey approved six such nominated areas for Utah totaling 3.9 million acres.  The environmental group recommendations justified the inclusion of the Red Rock lands or citizen wilderness proposals in the MLP program to protect the areas' wilderness character.  The nominations from SUWA included Dinosaur Lowlands and East Bookcliffs or Bookcliffs Divide, which encompass the Red Rock lands and other citizen proposals, such as Diamond Breaks, Sid's Mountain, Bourdette Draw, Bull Canyon, Westwater Creek, Mexico Point, Hideout Canyon, Coal Canyon, Diamond Canyon, Flume Canyon and Westwater Canyon.

56.     Because the master lease planning instruction memorandum described the nomination process as internal, UAC members did not submit comments.  The BLM did not confer with or ask the opinions of the  state or local government agencies or alert the State and local governments of the opportunity to comment.

57.     Uintah County officials met with the Utah State Director at his request in December to be briefed about the MLP program in late fall of 2010.  At that meeting the State Director denied that BLM was deferring mineral leases in Red Rock lands.  His denials are contradicted by a Utah BLM sale list for May 2010 showing two leases in the Vernal Resource area that were deferred due to being in a Red Rock area.

58.     At the same meeting, the Utah State Director admitted to Uintah County officials that he asked SUWA to come in and participate in MLP program nominations. Shortly after the December 2010 meeting, Uintah County requested the same opportunity. The Utah State Director left a voice mail for Uintah County Chairman Burns on March 21,

2011 to the effect that the MLP program would go forward without any additional

consultation. While the Utah MLP program was approved on February 10, 2011, the State

Director did not notify the counties until the late afternoon of March 21, 2011, a day before

this amended complaint was due.

59.     BLM will also shut down all new leasing in the MLP areas until the plan

amendments are complete which will take several years.

*Secretarial Order 3310: Wild Lands*

60.     On December 23, 2010, citing the Wilderness Act of 1964, 16 U.S.C. §1131-

1134, and FLPMA, excluding Section 603, and the Reorganization Plan of 1950, as

amended, 5 U.S.C.§301, 43 U.S.C. §§1451, 1453, Interior Secretary Salazar announced

Secretarial Order No. 3310, *Protecting Wilderness Characteristics on Lands Managed by*

*BLM*. (December 22, 2010.)

61.     Under Secretarial Order 3310:

[T]he protection of the wilderness characteristics of public lands is a high
priority for the Bureau of Land Management (BLM), and is an integral
component of its multiple use mission. . . All BLM offices shall protect these
inventoried wilderness characteristics when undertaking land use planning
and when making project-level decisions by avoiding impairment of such
wilderness characteristics unless the BLM determines that impairment of
wilderness characteristics is appropriate and consistent with applicable
requirements of law and other resource management considerations. Where
the BLM concludes that authorization of uses that may impair wilderness
characteristics is appropriate, the BLM shall document the reasons for its
determination and consider measures to minimize impacts on those
wilderness characteristics. Where the BLM concludes that protection of
wilderness characteristics is appropriate, the BLM shall designate these
lands as "Wild Lands" through land use planning.

**Plaintiffs' First Amended and Supplemented Complaint for**
                                        **Declaratory, Mandatory and Injunctive Relief**

62.     The Secretarial Order 3310 management mandate took effect on December 22, 2010 and specifically and concretely changes the management of public lands in Utah, including the non-WSA lands identified in the Red Rock Wilderness legislation.  "All BLM offices shall protect these inventoried wilderness characteristics when undertaking land use planning and when making project-level decisions by avoiding impairment of such wilderness characteristics." Sec. Order 3310 (also requiring BLM "to preserve its discretion to protect wilderness characteristics through subsequent land use planning" and to prepare a NEPA analysis for any proposed project within areas with wilderness characteristics).

63.     Interior Secretarial Order No. 3310 makes the protection of the wilderness characteristics of public lands a "high priority" as "an integral component" of BLM's multiple use mission. In ordering BLM to inventory lands with purported wilderness characteristics that are outside of the areas designated as WSAs, (LWCs), the Secretarial Order states that: "[a]ll BLM offices shall protect these inventoried wilderness characteristics when undertaking land use planning and when making project-level decisions by avoiding impairment of such wilderness characteristics."  Where "BLM concludes that protection of wilderness characteristics is appropriate, the BLM shall designate these lands as 'Wild Lands' through land use planning."

64.     The Secretarial Order 3310 is a land use program affecting the management of the public lands. Indeed, because Secretarial Order 3310 gives unfettered discretion to determine which public lands will be considered as LWC areas, the scope of the

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

Secretarial nonimpairment mandate is even broader than the *de facto* wilderness management being applied to the Red Rock bill lands.

65.     Designated Wild Lands and LWCs are to be managed to avoid impairing wilderness character.  This direction mirrors the language found in FLPMA Section 603(c) ("so as to not impair the suitability of such areas for preservation as wilderness") and was further developed in H-8550-1 the Interim Management Policy for WSAs (IMP).

66.     In the interim, for project-level decisions in areas where the "BLM determines that the land appears to have wilderness characteristics that have not been both inventoried and analyzed in a land use planning process conducted in accordance with this Order, the BLM shall preserve its discretion to protect wilderness characteristics through subsequent land use planning."  Secretarial Order 3310, §5.

67.     On February 25, 2011, pursuant to the Secretarial Order and without public notice or comment or consultation with state and local agencies, BLM issued Manuals implementing Secretarial Order 3310, 6301, Wilderness Inventory, 6302, Consideration of Land with Wilderness Characteristics in the Land Use Planning Process, and 6303, Consideration of LWCs for Project-Level Decisions in Areas Not Analyzed in Accordance with BLM Manual 6302.  BLM considered 'internal comment' from State Offices but did not provide for public comment.

*Wild Lands / LWCs Same as WSAs*

68.     The Secretarial Order and Manuals require BLM to manage administratively designated Wild Lands and LWCs under the same legal criteria as it currently manages

the WSAs under the IMP, BLM Manual H-8550-1.  *See e.g.*, Order 3310 ("All BLM offices shall protect these inventoried wilderness characteristics when undertaking land use planning and when making project-level decisions by avoiding impairment of such wilderness characteristics"), Manual 6302.06 ("The BLM shall protect LWCs when undertaking land use planning by avoiding impairment of their wilderness characteristics. . . "). The same is true with respect to BLM's interim management of LWC areas pending inventory and Wild Lands designation through land use planning.  Manual 6303.06.

69.    There is no discernible or measurable difference between Wild Lands or LWCs and WSAs or the applicable management criteria.

70.    BLM statements that Secretarial Order 3310 does not create new WSAs are contradicted by Secretarial Order 3310 and the Manuals implementing Secretarial Order 3310.  BLM employs the same criteria to identify LWCs and Wild Lands as it used to identify WSAs in 1978.  BLM Manual 6301.14.  The identification and evaluation criteria for Wild Lands or LWCs are also very similar to the Wilderness Inventory and Study Procedures Handbook adopted by BLM in January 2001, just before President Bush took office. BLM Manual H-6310-1 (2001 *withdrawn May 2003*).  The Handbook was withdrawn pursuant to the Settlement Agreement.

71.    For LWCs, the only specific projects that may be purportedly approved are: (a) actions to control the expansion of invasive exotic species; (b) actions necessary for the exercise of valid existing rights; (c) renewal of livestock grazing permits (but not including new range projects); (d) temporary facilities for wild horse and burro gathering

activities or recreation events; and (e) projects that are anticipated to create only minor surface disturbance or minor impacts to wilderness characteristics, e.g., installation and maintenance of some wildlife guzzlers, minor restoration projects, or some projects to maintain range facilities, trails or primitive recreation facilities. Manual 6303.14.

72.    The limited allowance of only the foregoing actions also applies in WSAs under the IMP. *See* BLM Manual H-8550-1, Ch.1B.9, Ch. IIIC-E, J.  Therefore, WSAs authorized in Section 603 of FLPMA and "Wild Lands" and "LWC areas,"  are virtually the same except for the name.  In the context of land use planning for designated Wild Lands, additional activities are permitted but only after weighing whether to protect the wilderness character or allow the nonconforming activity, such as for renewable energy and rights-of-way. Manual 6302.13.D ¶¶8, 9.  If the development proposal is allowed in an LWC or Wild Lands, the area is no longer managed 'so as to not impair wilderness.'  Travel and transportation are evaluated based solely on whether the use is compatible with wilderness. *Id.* ¶11.  Other uses are managed consistent with the IMP, such as livestock grazing, recreation, fire control and recreation permits.

73.    Manual 6301 employs the same wilderness inventory criteria as BLM used to identify WSAs in 1978 during the now-expired wilderness inventory and review. *Cf.* Manual 6301.14 *with* 1978 BLM Wilderness Inventory Handbook, pp. 11-14 (September 27, 1978); Glossary definition of LWCs.  Manuals 6302 and 6303 employ the same criteria to manage Wild Lands and LWCs as BLM currently applies to WSAs.

74.    The requirement that public land management avoid impairing wilderness

characteristics also applies with full force and effect for all proposed projects when "(1) the project area appears to have wilderness characteristics that have not been inventoried and analyzed consistent with Secretarial Order 3310 and (2) the proposed project may impair those apparent wilderness characteristics." Manual 6301.12.

75.     Both the Secretarial Order and Manual 6303 also immediately change public land management in Utah by imposing nonimpairment management for all proposed projects and land use authorizations in areas that may have wilderness character or LWCs. Even if a proposed project is in conformance with an existing land use plan but is located in an LWC area where wilderness characteristics are clearly not lacking, "BLM shall determine whether the project could be implemented in a manner that would not impair wilderness characteristics," and only if the project can be so implemented, the project may be considered without conducting a wilderness inventory." Manual 6303.11(B). "Impair" is defined as to "preclude the BLM from exercising its discretion to designate an LWC or a portion of an LWC as a Wild Land." Manual 6303.2; Manual Glossary 6302, 6303.

76.     Lands with wilderness character (LWC) must also be managed to protect the wilderness character so as to preserve BLM's discretion to classify the public lands as Wild Lands. Manual 6302.3 (definition of "impair"); 6302.06, Manual 6303.2 (definition of "impair") 6303.06, 6303.14.

77.     When LWCs are determined to exist, Manual 6303 requires that LWC lands be managed to avoid impairing the wilderness character or "preclude the BLM from exercising its discretion to designate an LWC or a portion of an LWC as a Wild Land."

Manual 6303.14, 6303.2.   BLM must consider LWCs in land use plans, land use plan amendments or revisions, and manage LWCs as administratively designated Wild Lands. Manual 6302.02, 6302.06, 6302.11, 6302.13(D).

78.    The BLM Manual defines LWCs as "Lands that have been inventoried and determined by the BLM to contain wilderness characteristics as defined in Section 2(c) of the Wilderness Act."   Manual 6303 glossary.   The Manual may update a wilderness inventory 1) when the public or the BLM identifies wilderness characteristics as an issue during scoping in NEPA analysis; 20 land use planning under Manual 6302; 3) BLM has new information concerning resource conditions, including wilderness characteristics information submitted by the public that meets the BLM's minimum threshold, *see* 6301.13; 4) BLM determines the land appears to have wilderness characteristics and a proposed project may impair those apparent characteristics; or 5) Additional lands are acquired. Manual 6301.06

79.    Non-WSA BLM lands in Utah subject to management as LWCs are already identified with more areas likely to follow.   Manual 6301.13(A), 6301.14, 6302.13(A), (C). Utah BLM previously identified LWCs in the respective BLM RMPs for Vernal, Price, Moab, Monticello, Kanab and Richfield Resource areas.   The LWCs were supplemented by citizen-proposed wilderness (CWPs) submitted by SUWA and The Wilderness Society. These lands meet the Manual definition of LWCs and nonimpairment the management criteria of Secretarial Oder 3310 and the management mandate applies.  The SUWA letter to Department of Justice confirms the intent of DOI and SUWA to immediately protect the

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

Red Rock lands pursuant to Secretarial Order 3310.

80.    The Utah public lands have been inventoried twice, once in 1996 and a second time in 2007 as part of the land use plan revisions for the Vernal, Price, Richfield, Moab, Monticello and Kanab Resource Areas.  Therefore Secretarial Order 3310 and the Manual already changes management so as to not impair the wilderness character effective December 22, 2010, for about six million acres of public land in Utah, with potentially millions of more acres to follow.

81.    These LWCs are to be managed to protect their wilderness character until BLM makes a classification decision in the land use plan revision.  Manual 6303.06, 6303.14, 6303.2.  The Utah LWCs will include, at a minimum, those non-WSA lands that were subjected to potential wilderness characteristics evaluation in the 2008 RMP revisions and total at least six million acres for the Vernal, Price, Moab, Richfield, Monticello and Kanab Resource Areas.  The Utah LWCs will also include other lands that were part of the BLM reinventory in 1996 or have been proposed for wilderness in the Red Rock bill.  A straightforward application of Secretarial Order 3310 and the implementing BLM manuals will, on the face of those documents, also threaten to include as LWCs those public lands in Washington County that were part of the 1996 BLM reinventory and/or proposed Red Rock bill but were not designated by Congress as wilderness in March 2009.  BLM has tried to tell Washington County officials that this will not occur but the manual does not support the BLM's assurances.  Manual 6302.12.D.  These lands are not released until a plan amendment but BLM may still manage the lands as wilderness as well.

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

82.     BLM evaluated non-WSA BLM acres for the presence of potential wilderness characteristics in the 2008 RMP revisions for the Vernal, Price, Moab, Richfield Monticello and Kanab Resource Areas and CWPs and the 1996 reinventory.  The following lands are therefore apparently subject to LWC management under Secretarial Order 3310 and the implementing BLM manuals because they have been nominated or inventoried recently:

Vernal RMP (Daggett, Duchesne and Uintah Counties): 411,319 acres

Price RMP (Carbon and Emery Counties): 1,094,030 acres

Richfield RMP (Sevier, Piute, Wayne and Garfield Counties): 930,200 acres

Moab RMP (Moab and San Juan Counties): 558,807 acres

Monticello RMP (San Juan County): 805,686 acres

Kanab RMP (Garfield and Kane Counties): 132,915 acres

Total:                3,932,957 acres

83.     The number of non-WSA BLM acres that were evaluated for potential wilderness characteristics in the 2008 RMP revisions for the Vernal, Price, Moab, Richfield Monticello and Kanab Resource Areas, and which the BLM found to possess wilderness characteristics and are apparently subject to LWC management under Secretarial Order 3310 and the implementing BLM manuals, are as follows:

Vernal RMP (Daggett, Duchesne and Uintah Counties): 171,418 acres (106,178 acres of which were carried forward by the RMP for protective management);

Price RMP (Carbon and Emery Counties): 840,340 acres (97,100 acres of which were carried forward by the RMP for protective management);

Richfield RMP (Sevier, Piute, Wayne and Garfield Counties): 435,700 acres (78,600 acres of which were carried forward by the RMP for protective management);

Moab RMP (Moab and San Juan Counties): 218,724 acres (47,761 acres of which were carried forward by the RMP for protective management);

Monticello RMP (San Juan County): 582,360 acres (88,871 acres of which were carried forward by the RMP for protective management);

Kanab RMP (Garfield and Kane Counties): 89,780 acres (27,770 acres of which were carried forward by the RMP for protective management); and

Total:   2,338,322 acres (439,800 acres of which were carried forward by the six 2008 RMPs for protective management).

84.    Outside of emergency actions that may impair wilderness characteristics, which are already authorized by the IMP for WSAs, Manual §6303 identifies specific projects that may be approved.  These include projects that may "impact" wilderness characteristics but not those that "impair."  More specifically, for proposed projects that may impact but not impair wilderness characteristics (i.e., not preclude the BLM from exercising its discretion to designate an LWC or portion of an LWC as a Wild Land), District and Field Managers may approve the following types of projects in LWCs: (a) actions to control the expansion of invasive exotic species; (b) actions necessary for the exercise of valid existing rights; (c) renewal of livestock grazing permits (not including new range projects); (d) temporary facilities for wild horse and burro gathering activities or recreation events; and (e) projects that are anticipated to create only minor surface disturbance or minor impacts to wilderness characteristics, e.g., installation and maintenance of some wildlife guzzlers; minor restoration projects; or some projects to maintain range facilities, trails, or primitive recreation facilities. Manual 6303.14. This is the same standard and criteria that governs for such actions in WSAs under the IMP. *See* BLM

Manual H-8550-1, Ch.1B.9, Ch. IIIC-E, J.

85.    With respect to projects that are proposed in LWC areas, BLM must conduct a separate NEPA wilderness impairment impacts analysis and either (1) deny the action, (2) approve the action, (3) approve the action with measures to minimize impacts on wilderness characteristics, or (4) postpone the decision until wilderness characteristics can be addressed through a land use planning process.  Manual at 6303.13.

86.    Any "discretion" to "approve the action" as proposed is very limited in LWC areas, as much as BLM's authority to approve actions in a WSA is limited.  Secretarial Order 3310 places a "high priority" on the protection of LWCs and requires that BLM "avoid impairing such wilderness characteristics unless, as part of its decision-making process, the BLM concludes that impairment of wilderness characteristics is appropriate and consistent with applicable requirements of law and other resource management considerations." Secretarial Order 3310, §1, Manual 6303.14.

87.    All LWC decisions must be referred to the Washington Office of BLM.  This procedure also eliminates any local government coordination and consultation or consideration of consistency with local government land use plans.

*Defenses Advanced for Secretarial Order 3310*

88.    In recent months including the March 1, 2011 hearing before the House Resources Committee, Defendants have cited BLM's authority to inventory resources and to prepare land use plans as authority for Secretarial Order 3310.  43 U.S.C. §§1711(a), 1712.  In response to a specific question as to which FLPMA section authorizes

administration protection of wilderness, Director Abbey admitted it was not specifically in the law.

89.     Defendants claim Secretarial Order 3310 is a return to previous BLM policies without adding that the policy directing BLM to identify WSAs outside of Section 603 existed for only two years between 2001 and 2003 until it was abolished pursuant to the Settlement Agreement.

90.     In interviews, Defendants have promoted the Wild Lands policy as a multiple use management that allows livestock grazing, outdoor recreation, such as hunting and fishing and mountain biking.  Defendants do not explain that all of these uses are allowed in WSAs and that aside from mountain biking, grazing, hunting and fishing are also allowed in congressionally designated wilderness.

91.     There is no substantive difference between LWC areas, Wild Lands and WSAs, except Interior's use of a different name.  In signing Secretarial Order 3310, the Interior Secretary circumscribed BLM's authority to manage public lands for uses other than wilderness.

92.     Only through a subsequent land use planning process or NEPA review may BLM even consider allowing any resource uses in LWC or Wild Land public lands unless the use is like one of those limited uses allowed in WSAs under the IMP.  Manual 6302.13 also lists the IMP-type management actions needed to achieve Wild Land protection, or conversely, what BLM is required to do in preserving its discretion to designate Wild Lands. *Cf*. BLM Manual 6302.13(D) (commercial uses, fire maintenance, rangeland management,

Native American uses, recreational uses, rights-of-way, scientific research, limited or

existing motorized or mechanized access) with BLM Manual H-8550-1 Ch.I.B.11

(mechanical transport along existing ways), Ch.I.B.13 (maintenance of range

improvements), Ch.III.A.3 (rights-of-way), Ch.III.D (grazing), Ch.III.H (recreation and

commercial uses), Ch.III.I (cultural and paleontological resource inventories, studies and

research), Ch.III.J (fire management).    93.    Rights-of-way, renewable energy,

transportation and travel in LWCs and Wild Lands are not allowed unless BLM determines

that the relative scarcity of the resource use outweighs the impairment of wilderness

characteristics.  Manual 6302.13; 6303.14.

94.    Renewable energy projects, including solar, wind, and geothermal rights-of-

way in LWCs and Wild Lands must be weighed against the quality and availability of

appropriate sites for production of renewable energy and the value of the wilderness

characteristics. BLM Manual 6302.13(D).  The direction establishes a presumption in favor

of Wild Lands designation or *de facto* wilderness management: "For any LWCs that are

not designated as Wild Lands in the preferred alternative, the NEPA document must

include the underlying rationale." *Id*.  Indeed, in areas that are not designated as Wild

Lands, BLM must still "consider measures to minimize impacts on wilderness

characteristics." *Id*.

95.    Defendants incorrectly state that Secretarial Order 3310 will not adversely

affect renewable energy, citing to solar and wind energy projects.  Defendants' statements

omit that renewable energy projects require permanent structures, involve surface

disturbance, and alter the visual landscape permanently.  None of these activities is provided for in LWCs or Wild Lands, and if allowed, then the areas are not managed to avoid impairing wilderness character.  The BLM Manuals only permit such construction after BLM has made the decision to allow the impairment notwithstanding the loss of wilderness character.  Manual 6302.13; 6303.14.

96.    The TransWest Express wind energy transmission line proposes a 765 mile right-of-way through Wyoming, Colorado, Utah and Nevada.  The project will be delayed for the additional step of a wilderness inventory along the proposed and alternative corridors.  Its proposed route runs through affects LWCs (Red Rock lands) in the Price Resource Area and the transmission line can only be approved if the BLM Director elects to exclude these LWCs from wilderness management.

97.    Secretarial Order 3310 also precludes the Factory Butte Special Recreation Management Area (Factory Butte SRMA) in Wayne County which was approved in the 2008 approved Richfield RMP.  Factory Butte SRMA will provide an open cross-country motorized recreation zone on 8,500 acres of non-WSA lands, an 11,300 acre motorized touring zone (existing roads and trails) and a 4,600 acre non-motorized landmarks recreation zone.  The 8,500 acre OHV open cross-country area includes the 5,800 acre Factory Butte Play Area, the 100 acre Caineville Cove Play Area, and the 2,600 acre Swing Arm City Play Area to provide a unique OHV riding experience in an open, cross-country setting, thereby making it less likely that OHV riders will illegally stray from existing roads and trails and damage public lands in other parts of the State because they now have an

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

open area in the Factory Butte SRMA in which to ride cross country legitimately.

98.    The Richfield RMP provides that a 2006 OHV restriction order preventing open cross-country OHV travel in the 5,800 acre Factory Butte Play Area and the 100 acre Caineville Cove Play Area will be lifted, and the RMP approved Factory Butte SRMA will be fully operational, when appropriate infrastructure and a monitoring plan are in place to protect threatened and endangered plant species open area will be operational.

99.    The 8,500 acre Factory Butte Play Area is situated on non-WSA BLM lands which have been included in the Red Rock bill and which the BLM evaluated for wilderness characteristics as part of the Richfield RMP EIS process.  The Richfield BLM RMP found that these lands were not suitable for wilderness characteristics management.

100.    The Richfield RMP was approved nearly two and one half years ago and completion of the RMP required infrastructure and the monitoring plan for the Factory Butte Play Area is languishing, with no apparent progress toward completion evident and no apparent completion date in sight.

101.    On information and belief, in anticipation of Secretarial Order 3310, BLM delayed implementation of the RMP required infrastructure and monitoring plan for the Factory Butte Play Area.  This work should have been completed within two and one half years following issuance of the Richfield RMP and ROD.  Now Secretarial Order prohibits an OHV use and BLM cannot lift the OHV restriction order and allow the Factory Butte SRMA.  Thus, what was previously *de facto* wilderness in response to the demands of environmental groups, is now LWC management under the authority of Secretarial Order

3310 and its implementing manuals.

102.   Defendants have used first *de facto* wilderness management and now Secretarial Order 3310 to override implementation the Richfield RMP approved Factory Butte SRMA.  These actions frustrate the plans, policies and desires of local governments and citizens of Wayne, Garfield, Sevier and Emery Counties, as well as citizens from around the state for whom the Factory Butte area is a renowned OHV riding area.  Such arbitrary inaction harms the local economy of Wayne County.  Such arbitrary refusal by BLM to provide at least one modest open OHV area out of hundreds of thousands of acres closed to open OHV use, only makes it that much more difficult for the BLM to police illegitimate cross-country OHV use in other parts of the state.

103.   On information and belief, this arbitrary refusal by BLM to finish the infrastructure and monitoring plan in order to open the Factory Butte Play area as envisioned and approved under the RMP is the result of an unwarranted and *ultra vires* desire and strategy in the current BLM to effect a *de facto* wilderness management policy in the lands which comprise the Factory Butte SRMA, now bolstered by Secretarial Order 3310 and its implementing manuals.

*BLM RMP Process and the Vernal RMP*

104.   Defendants and Uintah, Duchesne and Daggett Counties worked toward the completion of the Vernal RMP following a BLM decision to combine and revise the Diamond Mountain and Book Cliffs RMPs.  66 Fed. Reg. 14415 (Mar. 12, 2001).  Uintah, Duchesne and Daggett Counties were cooperating agencies and participated in an earlier

coordinated management planning effort with BLM, environmental groups and state agencies to amend the Book Cliffs and Diamond Mountain RMPs.

105.    The Vernal RMP addressed the management of public lands that were WIAs and other lands in 'citizen-proposed' wilderness areas in a separate wilderness alternative. The RMP classified some of the lands for additional protection and classified other public lands for energy development and other multiple uses.  These decisions reflected a record documenting the lack of wilderness character for these disputed areas that, in some cases, contradicted the earlier 1999 findings.  The decisions also documented other resource qualities and public comment, including that of environmental groups and Uintah County.

106.    Under the Vernal RMP, the public lands that were considered for wilderness management and were rejected due to lack of wilderness character and/or other resource considerations, are to be managed with emphasis on oil and gas development and other extractive resource values.  Those public lands were also available for outdoor recreation and fish and wildlife development

107.    The public lands in the Vernal Resource Area now subject to Secretarial Order 3310 and/or *de facto* wilderness management include 277,596 acres of non-WSA lands evaluated and found to have wilderness characteristics, of which 171,418 acres were not selected for management of those characteristics in the final Approved RMP.  These lands were not selected for wilderness character management in the 2008 Vernal RMP Record of Decision are identified as the following individual units: Bitter Creek, Cripple Cowboy, Desolation Canyon, Hells Hole Canyon, Hideout Canyon, Lower Bitter Creek,

Mexican Point, Rat Hole Ridge, Sweet Water Canyon, White River (a part thereof) and Wolf Point.

108.    The Secretarial Order and the *de facto* wilderness management also apply to nine areas totaling an estimated 77,400 acres that were found to not contain wilderness character.  These lands include but are not limited Red Creek Badlands (3,600 acres), Dragon Canyon (19,900 acres), Goslin Mountain (4,900 acres), Seep and Cliff Dweller Canyons (21,000 acres), Dinosaur Adjacent ( a total of 10,000 acres in three separate parcels, each of which is less than 5,000 acres) (formerly Stone Bridge Draw, Split Mountain Benches and Split Mountain Benches South) and Sunday School Canyon (18,000 acres).

109.    Defendants have also imposed *de facto* wilderness management on at least another 28,500 acres added in Red Rock bill to the boundaries of the lands evaluated in the Vernal RMP and determined to lack wilderness character.  *See e.g.,* Bourdette Draw (*cf.* 13,335 acres with wilderness character and 2,174 acres without wilderness character in Vernal RMP *with* approx. 15,000 acres proposed by the Utah Wilderness Coalition (UWC)), O-Wi-Yu-Kuts/Cold Spring Mountain (*cf.* 8,764 acres with wilderness character and  4,412 acres without wilderness character in Vernal RMP *with* approx. 13,000 acres proposed by UWC), Dead Horse Pass/Grouse Canyon (*cf.* 6,994 acres with wilderness character and 1,124 acres without wilderness character in Vernal RMP *with* approx. 8,000 acres proposed by UWC), Desolation/Desbrough Canyon (63,118 acres with wilderness character and 6,993 acres without wilderness character in Vernal RMP), Lower Bitter Creek

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

(*cf.* 11,417 acres with wilderness character and 2682 acres without wilderness character in the Vernal RMP *with* 14,000 acres proposed by UWC), Lower Flaming Gorge (*cf.* 17,810 acres with wilderness character and 3,360 acres without wilderness character in the Vernal RMP *with* aprrox. 21,000 acres proposed by UWC), Mountain Home (7,083 acres with wilderness character and 2,201 acres without wilderness character in the Vernal RMP *with* approx. 9,000 acres proposed by UWC), White River (21,210 acres with wilderness character and 8,564 acres without wilderness character in the Vernal RMP *with* approx. 24,500 proposed by UWC), and Wolf Point (11,802 acres with wilderness character and 2,764 acres without wilderness character in the Vernal RMP *with* approx. 15,000 acres proposed by UWC).

110.    Because these lands meet the definition of LWCs, they must now be managed to avoid impairing any wilderness character and BLM's alleged discretion to designate Wild Lands under Secretarial Order 3310 and Manuals 6301 and 6303.  Most of these lands are also included in the leasing moratorium imposed under the MLP program.

111.    The Vernal RMP documented the fact that the areas are located in oil and gas development areas with moderate to high potential for further development. Given the resource potential, level of past and present production, that existing leases and rights-of-way that must be recognized as valid existing rights and ongoing exploration and development, BLM reasonably concluded in the Vernal RMP that the resource potential and evidence disputing wilderness character supported the decision to manage these

public lands for multiple uses, including the principal multiple uses.

112.   There are another 15 units of public lands in Uintah and Daggett Counties totaling 106,178 acres that will be managed under the Vernal RMP for alleged wilderness characteristics as so-called Natural Areas, totaling 106,178 acres.

113.   Uintah and Daggett Counties provided clear evidence that the alleged Natural Areas also failed to meet the definition of wilderness character and urged BLM to not manage these lands for their alleged wilderness character, especially when weighed against other high value uses, including energy development. Uintah County protested, on a legal and factual grounds, the Vernal RMP decisions to adopt *de facto* wilderness management for an estimated 106,178 acres of public land.

114.   All of the areas discussed in the foregoing paragraphs fall within the definition of LWCs and under Secretarial Order 3310 must be managed to avoid changes in wilderness character, notwithstanding the provisions of the Vernal RMP.

*Reduced Revenues to Utah Counties*

115.   Almost 85% of the land within the Uintah County boundaries is owned by state, federal and tribal governments and 47.6% of the government-owned lands are public lands managed by BLM.  Tribal lands are about 16.4%, SITLA lands are 8.3%, the Forest Service administers 9.4% and the National Park Service administers 2.1%.  The State of Utah receives one-half of all mineral lease revenues paid to Defendants under the Mineral Leasing Act, 30 U.S.C. §191.  Under Utah state law, about 40% of the state's share of the federal mineral lease revenues is paid to the county where the leased federal lands are

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

located.  A portion of federal mineral lease revenues benefits all counties in the State through various funding mechanisms and programs.

116.   The non-fluid mineral resources explored in Uintah County include phosphate, gilsonite, oil shale and other minerals. Fluid mineral resource activities include oil production, natural gas exploration and related mineral exploration.  The highest revenue generator in the county is natural gas.  Energy resource production is also a significant source of revenue statewide.  In 2001, oil and gas production accounted for 21% and 32%, respectively, of the state total revenues.  About 64% of the natural gas produced in Utah comes from Uintah County.  About 60% of the county's economy is tied to the extraction of oil and gas and related industries and 50% of the wages and jobs are derived from the oil and gas industry.

117.   Uintah County relies on the revenues received from commercial uses of the public lands, including oil and gas development and livestock grazing, because so little of the land (15.1%) within the county is privately owned.  These revenues are necessary to fund the County governmental functions, because property taxes apply only to land not owned by a governmental entity.  A special service district administers the mineral lease revenues to fund transportation, roads, recreation, law enforcement, search and rescue, parks and other public services in Uintah County. As recognized by BLM in the Vernal RMP, "[t]his income is vital to the local economy."

118.   Uintah County revenue interests are directly and adversely affected by Defendants' actions, including Secretarial Order 3310, *de facto* wilderness management,

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

and *de facto* withdrawals.  Most of the disputed public lands have high resource potential and several affected areas are adjacent to state trust lands or other lands subject to federal leases.  The Vernal RMP expressly concluded that the high potential for oil and gas resources and the large portion of the lands already under lease supported not managing 11 of the citizen-proposed areas as wilderness.

119.   Oil and gas royalties paid to Utah from production in Uintah County have dropped almost 50% between the 2008 calendar year and the 2009 calendar year.  In the 2008 calendar year, Uintah County received about $112.5 million.  In the 2009 calendar year, Uintah County received only $54.34 million.  Natural gas production also declined in 2010.

120.   Since initiation of *de facto* wilderness management, several oil and gas companies operating in Uintah County put their development on hold and moved the exploration budgets to other non-public land states.  That survey crews, which are the best evidence of exploration activity, in Uintah County have dropped from five to one, thus corroborates the companies' statements.  Following the announcement of Secretarial Order 3310, a well services company told the Uintah County Commission that Defendants' policies persuaded the company to forego a planned investment of significant size in Uintah County and to consider alternative sites, such as Dubai.  The real life responses of these companies to the regulatory uncertainty and likelihood that Defendants will actively obstruct energy development in these public land counties demonstrates that but for the Defendants' actions, Uintah County would have been the beneficiary of these projects

through revenues, jobs, and overall community growth and stability.

121.    The pattern of reduced revenue and fewer higher paying jobs is repeated throughout Utah and can be traced to Defendants' actions.  Other research suggests that Defendants' actions have cost the energy industry in Utah $1.8 million last year.

*County and State Plans Provide Standard for Consistency*

122.    Uintah County is entitled to protect its legitimate interest as a political subdivision of the State in seeing that all reasonable steps are taken to preserve, maintain, enhance and, where reasonable, to develop water resources;  maintain existing authorized motorized access to traditional recreation uses and provide additional access where need is demonstrated, ensure that all public roads and trails that are part of Uintah County's duly adopted transportation plan remain open to motorized travel, that none of them be closed, and that Uintah County has the continued ability to maintain and repair those roads, and where reasonably necessary, make improvements thereon; and manage these lands so as to not interfere directly or indirectly with the property rights of private landowners located within said lands; manage these lands so as to not interfere directly or indirectly with the fiduciary responsibility of SITLA with respect to trust lands located near those lands.

123.    Pursuant to state and federal laws, Uintah County has adopted a comprehensive public land use plan.  Uintah County revised the plan to expressly reject any and all interim *de facto* wilderness management standards on public lands that were not classified as WSAs pursuant to the wilderness review process authorized in Section 603 of FLPMA.  Uintah County submitted its comprehensive land use plan to the BLM

Vernal Field Office so that it is part of the RMP administrative record.

124.   The Uintah County Public Land Use Plan revised and adopted in 2007 defines the county land use plan and policy to ensure that public land management is consistent with these policies.  The management objectives provide that development of the solid, fluid and gaseous mineral resources in the Uintah County are important to the economy of Uintah County.  Accordingly management objectives seek to ensure: (1) physical and administrative access to these mineral resources; (2) the expeditious permitting and granting of APDs; (3) the removal of unlawful mineral leasing restrictions; and (4) achieving and maintaining livestock grazing at the highest reasonably sustainable levels.  These objectives are set out in the Uintah County Public Lands Plan.

125.   In addition to Uintah County, the following county members of UAC, also acting pursuant to state and federal laws, have adopted and/or revised their comprehensive land use plans to clearly state their positions against managing non-WSA lands including WIAs, Citizens' Proposed Lands, non-WSA lands proposed for wilderness characteristics, and Red Rock bill lands, as wilderness, WSAs, wild lands, lands with wilderness characteristics or the like:

In the Vernal BLM Resource Area: Daggett and Duchesne Counties

In the Price BLM Resource Area:    Carbon and Emery Counties

In the Richfield BLM Resource Area: Sevier, Garfield and Wayne Counties

In the Monticello BLM Resource Area: San Juan County

In the Kanab BLM Resource Area:   Garfield and Kane Counties

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

These county plans expressly reject any and all interim *de facto* wilderness management standards on public lands that were not classified as WSAs pursuant to the wilderness review process authorized in Section 603 of FLPMA.   These counties submitted their comprehensive land use plans to the respective BLM Field Offices so that they are part of the respective RMP administrative records.

126.   Earlier this year, in response to issuance of the December 22, 2010 Secretarial Order, the following additional county members of UAC, also acting pursuant to state and federal laws, have adopted and/or revised or soon will adopt and/or revise their comprehensive land use plans and/or county resolutions to clearly state their positions against managing non-WSA lands including WIAs, Citizens' Proposed Lands, non-WSA lands proposed for wilderness characteristics, and Red Rock bill lands, as wilderness, WSAs, wild lands, lands with wilderness characteristics or the like:

In the St. George BLM Resource Area:   Washington County

In the Cedar City BLM Resource Area:   Beaver and Iron Counties

In the Fillmore Resource Area: Juab and Millard Counties

In the Salt Lake BLM Resource Area: Box Elder and Tooele Counties

These county plans expressly reject any and all interim *de facto* wilderness management standards on public lands that were not classified as WSAs pursuant to the wilderness review process authorized in Section 603 of FLPMA.   These counties will shortly submit their comprehensive land use plans  to the respective BLM Field Offices.

127.   The plans of the UAC member counties listed above were written to

implement and enforce BLM's obligation to ensure that BLM public land management is consistent with these plans and policies.  The management objectives of these counties provide for, among other things, the full range and breadth of traditional multiple use, non-wilderness policies in each county consistent with FLPMA.

128.    In 2011, the State of Utah, also acting pursuant to state and federal law, and also in response to Secretarial Order 3310, codified a land use plan which clarifies the State's  opposition managing non-WSA lands, including WIAs, Citizens' Proposed Lands, non-WSA BLM  lands proposed for wilderness characteristics, and Red Rock bill lands, as wilderness, WSAs, wild lands, lands with wilderness characteristics and similarly situated lands. *See* State of Utah Resource Management Plan for Federal Lands, codified at Utah Code Sections 63J-8-101 through 63J-8-106 (2011), signed into law by the Governor of Utah on  March 16, 2011.  The State of Utah Resource Management Plan for Federal Lands defines State plans and policy to ensure that BLM public land management is consistent therewith.

129.    The State of Utah Resource Management Plan for Federal Lands specifically identifies every specific Red Rock bill land area by name and by county and expressly declares  that no area identified in the Red Rock bill should be managed as wilderness or anything like it.  The State land use plan expressly adopts a pro-multiple use policy for all such lands and all other non-WSA BLM lands in the State, based on the following land management principles:

(a)    Oppose the federal designation, management, or treatment of the specified

lands in a manner that resembles wilderness or wilderness study areas, including the use of the non-impairment standard applicable to WSAs;

(b)     Achieve and maintain at the highest reasonably sustainable levels continuing yields of energy, hard rock and natural resources;

(c)     Achieve and maintain livestock grazing at the highest reasonably sustainable levels;

(d)     Manage watershed to achieve and maintain water resources at the highest reasonably sustainable levels;

(e)     Achieve and maintain traditional access to outdoor recreational opportunities;

(f)     Manage the public lands to protect prehistoric rock art, artifacts and other culturally important items;

(g)     Manage the public lands to not interfere with the property rights of adjacent landowners.

*See Utah Code Sections 63J-8-102 - 63J-8-104.*

130.    State of Utah Resource Management Plan for Federal Lands expressly rejects any and all interim *de facto* wilderness management standards on public lands that were not classified as WSAs pursuant to the wilderness review process authorized in Section 603 of FLPMA.

*Impacts of Defendants' Actions*

131.    Defendants' issuance of Secretarial Order 3310 and the *de facto* wilderness management described above harm the interests of Uintah County and other UAC

members by reducing or preventing the generation of revenues that would otherwise flow from mineral development on these Red Rock bill lands. The loss of these revenues and related land management interfere with Uintah County's ability and that of other UAC members to perform governmental functions, including but not limited to, implementation of county-wide land use and transportation plans, providing for public health and safety and continuation of its other resource programs.

132.   The injuries to the economic and governmental interests of Uintah County and those of other UAC members caused by Defendants' actions are not limited to public lands and include reducing or precluding generation of revenue from Trust lands due to the restrictions on land uses on the adjacent federal lands. As a result of Defendants' actions as set forth, SITLA lessees have been unable to proceed with development because the nearby public lands cannot be leased. This prevents development of the Trust lands, which are surrounded by the alleged LWCs (Red Rock bill lands) and the adjacent federal lands which may already be leased.

*Transportation and Governmental Services*

133.   The governmental services provided by the Utah Counties depend on continuing access along passable public roads located within the Red Rock bill areas, which are the subject of this litigation, and adequate funds to provide these services. Adequate roads and trails or transportation corridors are needed in these areas to facilitate reasonable access to a broad range of resources and opportunities including livestock operations and improvements; solid, fluid and gaseous mineral operations; energy;

transportation; recreational opportunities and operations; search and rescue needs; other public safety needs; access to public lands for people with disabilities and the elderly; and access to SITLA trust lands to accomplish the purposes of those lands.

134. Utah BLM officials have also told Uintah County that BLM will not process Title V rights-of-way on existing county roads located within the boundaries of Red Rock bill proposals, even though BLM policy calls for issuance of Title V permits for county roads that BLM has not documented and, up until January 2009, BLM routinely issued such Title V permits. As a result of the policy of not processing such requests, BLM has not issued any Title V permits that correspond to Red Rock lands.

135. In accordance with DOI interpretative rule and secretarial memorandum, BLM must work with counties regarding their R.S. 2477 rights-of-way. Issuance of a Title V is the preferred method to document road reconstruction. Departmental Implementation of *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735 (10th Cir. 2005); Revocation of January 22, 1997, Interim Policy; Revocation of December 7, 1988, Policy.

136. In 2009 and 2010, BLM told Uintah County officials and employees that BLM could not process Title V rights-of-way for road segments within Red Rock Wilderness boundaries and this failure to process precluded a decision on Title V rights-of-way. On several occasions in 2009 and 2010, Uintah County requested Title V rights-of-way for roads that are located in or have segments within the boundaries of the Red Rock bill. In those instances, Utah BLM told Uintah County commissioners or county employees that

the Title V rights-of-way for the roads or those segments, would not be processed and thus could not be issued because Secretarial Departmental Implementation of *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735 (10th Cir. 2005); Revocation of January 22, 1997 Interim Policy; Revocation of December 7, 1988, was under review.  The oral reason given was that these segments are within pending wilderness legislation and Utah BLM has been instructed not to take any action.  In at least one instance, BLM issued the Title V right-of-way up to the boundary of a proposed wilderness area.

137.   Following issuance of Secretarial Order 3310, Vernal BLM explained that because of Secretarial Order 3310, it will process the Title V request under the Wild Lands Policy.  The applicable manual provisions do not provide for issuance of Title V rights-of-way in LWCs.  Manual 6303.13 (list of permitted activities).  As a result, if the road segment runs through an area thought to have wilderness character, then the Wild Lands Manuals do not authorize approval of Title V rights-of-way.

138.   The Southam Canyon road is a right-of-way claimed by Uintah County under R.S. 2477 and is maintained by the county.  Portions of this road run through a citizen proposed wilderness area.  The Roads Department proposes to grade and realign two segments to stop erosion and failure of the road and to grade and stabilize the rest of the route within the right-of-way.  The roads department has determined the road work is necessary to remedy a serious public health and safety issue, as road segments are at risk for sloughing and the current alignments are unsafe.

**Plaintiffs' First Amended and Supplemented Complaint for
Declaratory, Mandatory and Injunctive Relief**

139.   Uintah County would ordinarily seek a Title V right-of-way for the realigned segments of Southam Canyon road and BLM would review the work solely to assess the impacts, if any, on adjacent public lands, because the work is within the right-of-way.  This practice reflects implementation of FLPMA and case law regarding public road maintenance and reconstruction.

140.   In February of 2011, BLM told Uintah County officials that the proposed realignment of the Southam Canyon road was subject to the Wild Lands policy, since a portion runs through or next to a citizen wilderness proposal.  BLM sent Uintah County a decision diagram clearly showing that any request for an activity affecting a BLM LWC would be processed in accordance with BLM manuals.  Manual 6303 does not provide for approval of Title V rights-of-way or even road maintenance.   Thus, Uintah County understands that such a request must be reviewed in Washington BLM.  Manual 6303.15.

141.   After Uintah County and BLM discussed the proposed road work and its necessity, Uintah County told BLM that due to the safety and environmental concerns, it would proceed under its R.S. 2477 rights to do work within the right-of-way, BLM advised that Uintah County be very, very careful, because 'they will come after you.'

142.   Based on Secretarial Order 3310 and the implementing manuals, Uintah County cannot perform road maintenance work on roads through or next to Red Rock bill lands without the threat of legal action.  Because there is no provision to address the critical rights-of-way permits sought by the County pursuant to Title V of FLPMA, 43 U.S.C. §1764, Uintah County is left with contradictory agency policy notwithstanding the risk to

human health and safety.  Prior to 2009, these authorizations had been routinely granted, and but for Secretarial Order 3310 and previous *de facto* wilderness management, would have been approved.

143.    The proposed actions are consistent with the Vernal RMP and, prior to recent changes in land management, the BLM approved Title V rights-of-way.  For lands not classified for wilderness protection under the Vernal RMP but located within the boundaries of Red Rock bill, the RMP authorized BLM to provide for road construction and improvements. New permitted roads were to be rehabilitated after serving their intended purposes. In the short-term, it was anticipated that new roads constructed in non-WSA lands with wilderness characteristics managed for other resource uses would reduce the roadless character of the non-WSA lands with wilderness characteristics.

144.    Defendants admitted the concrete injury from the previous *de facto* wilderness management: "Management of Post-603 Lands to preserve their alleged wilderness character. . . have affected the interests of Plaintiffs by (a) interfering with UAC member counties' ability to perform governmental functions, (b) reducing or precluding generation of revenue from state school Trust Lands due to the lack of access to state and private lands based on land use restrictions on adjacent federal lands, and (c) reducing or preventing the generation of revenues." 2003 Settlement Agreement ¶¶17-18.

145.    As was true for the management of post-603 lands, the management changes effected by Secretarial Order 3310 and the earlier interim *de facto wilderness* also adversely affect development of rights-of-way for electrical transmission lines and

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

pipelines, mining and mineral leasing, popular forms of outdoor recreation, such as snowmobiles and ATVs, and imposes additional restrictions on rangeland projects that are needed to meet rangeland health standards and to address vegetation resources, including sagebrush habitat.

146.    Secretarial Order 3310 unlawfully validates and perpetuates the foregoing harms and concrete injuries to Uintah County caused by the previous *de facto* wilderness management.  While in 2009 and 2010, the change in public land management had been internally directed within DOI, the Secretarial Order 3310 imposes immediately effective land management decisions that directly conflict with the BLM RMPs and are inconsistent with the county land use plans.

## FIRST CAUSE OF ACTION

### (SECRETARIAL ORDER 3310 IS *ULTRA VIRES* AND VIOLATES THE SEPARATION OF POWERS DOCTRINE)

147.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 146.

148.    The constitutional authority to act for the U.S. Government on matters of classifying and managing public lands resides with Congress.  United States Constitution, Article IV, Section 3 cl. 2.  In various federal laws, including but not limited to the Taylor Grazing Act (TGA), 43 U.S.C. §§315-315q, FLPMA, 43 U.S.C. §§1701 et seq., the 1872 Mining Law, as amended, 30 U.S.C. §§20, et seq., and the Mineral Leasing Laws (MLA), 30 U.S.C. §§181, et seq., Congress has delegated defined and limited authority to

Defendants to manage public lands based on the terms of the respective federal statute.

149.     Secretarial Order 3310 violates the constitutional doctrine of separation of powers by rewriting federal law contrary to the Constitution.  As among the three branches of the U.S. Government, Congress has exclusive power to speak for the Government on matters concerning public lands, and has delegated only limited, specific authority to the Interior Secretary.  That authority does not include the power to amend or write federal law.

150.     Secretarial Order 3310 usurps the authority that Congress expressly reserved to itself in the 1964 Wilderness Act, 16 U.S.C. §1131(a) to designate, convert or preserve public lands as wilderness, and the limited authority given to Defendants in FLPMA §603, 43 U.S.C. §1782(b), to identify and recommend areas for Congress to designate, convert or preserve as wilderness.

151.     Secretarial Order 3310 cites FLPMA, 43 U.S.C. §§1701-1783 (excluding 1782), the Wilderness Act of 1964, 16 U.S.C. §§1131-1134, and the Reorganization Plan No.3 of 1950, as amended 5 U.S.C. §301, 43 U.S.C. §§1451, 1453, as authority for the issuance of Secretarial Order No. 3310.  None of the cited laws authorizes the Interior Secretary to amend the land management priorities set forth in FLPMA and other laws, or authorizes the Interior Secretary to undertake an administrative process to designate, convert or preserve public lands as wilderness outside what Congress has already specified in §603.

152.     The Wilderness Act does not authorize a federal agency to identify and manage new wilderness areas.  The Wilderness Act, instead, expressly reserves this

power to Congress alone.  16 U.S.C. §1131(a) ("no Federal lands shall be designated as 'wilderness areas' except as provided for in this chapter or by a subsequent Act.").

153.    The term wilderness is defined as FLPMA in terms of Section 603 and the Wilderness Act.  43 U.S.C. §1702(j).  Only Section 603 of FLPMA authorizes BLM to manage lands so as to not impair their wilderness character, and this nonimpairment standard is reserved for WSAs.  All other public lands are to be managed so as to not unduly and unnecessarily degrade the resources.  43 U.S.C. §1732(b) (undue and unnecessary degradation standard).

154.    Defendants cite to a FLPMA policy to "preserve and protect certain public lands in their natural condition;" 43 U.S.C. §1701(a)(8).  The same provision further states:

> (b) The policies of this Act shall become effective only as specific statutory authority for their implementation is enacted by this Act or by subsequent legislation and shall then be construed as supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law.

43 U.S.C. §1701(b).  No other provision in FLPMA or other federal law, other than Section 603, can be said to direct BLM to "preserve and protect public lands in their natural condition."

155.    Defendants cannot rely on select excerpts of FLPMA declarations of policy unless another statute clearly authorizes the designation of Wild Lands and the management of Wild Lands and LWCs as if they are wilderness.

156.    Other than Section 603 of FLPMA which is excluded from Secretarial Order 3310, no other law authorizes the Interior Secretary to identify and manage wilderness

potential lands.  Director Abbey admitted as much in response to questions from House Resources Chairman Hastings on March 1, 2011.  In response to questions as to which provision in FLPMA authorized BLM to make wilderness a priority use of public lands, Director Abbey stated: "I'm not sure it exists statutorily."

157.    Although unspecified in Secretarial Order 3310 but confirmed in Director Abbey's testimony, DOI relies rely on FLPMA's inventory authority (Section 201), "land use planning" (Section 202) and "multiple-use" (Section 302) authority in FLPMA, 43 U.S.C. §§1712, 1732.  Section 201 expressly states that an inventory cannot be the basis to change land management.  43 U.S.C. §1711(a).  Neither Sections 202 nor 302 of FLPMA supports BLM's claimed authority to create new WSAs under the name Wild Lands, or to manage LWCs or Wild Lands to avoid impairing their wilderness character as if they were designated WSAs.

158.    Section 202 of FLPMA provides for the development and revision of land use plans.  43 U.S.C. §1712, and requires BLM to manage for multiple use and sustained yield which includes FLPMA's principal multiple uses.  43 U.S.C. §§1702(c), 1702(e), §1702(l).  None of these enumerated uses is 'wilderness.'

159.    Section 302 of FLPMA states that BLM shall manage the public lands for multiple use and sustained yield and in accordance with the land use plans.  43 U.S.C. §1732(a).  It also provides that the management standard for public lands shall be 'undue and unnecessary degradation' except for §603 WSAs, which are to be managed to avoid impairment of wilderness.

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

160.   The Reorganization Act, which is often called the "Housekeeping Act," provides that "[t]he head of an Executive department or military department may prescribe regulations for the government of his department." 5 U.S.C. §301.   The term regulations refers to rules issued in accordance with the APA.  5 U.S.C. §551(4).  Because Secretarial Order 3310 and implementing Manuals were adopted without compliance with APA rulemaking procedures, Section 301 does not delegate valid authority for the issuance of the Secretarial Order 3310.

161.   The other referenced statutory provisions with respect to the 1950 Reorganization Plan also did not create new public land management authority that would supersede FLPMA. The Reorganization Act of 1949, 5 U.S.C. §901, under which the Reorganization Plan was submitted, limits the use of the Secretary's authority to organizational changes.  Through Secretarial Order, the Secretary has exclusively used the authority of Reorganization Plan No.3 to effect organizational or housekeeping changes within DOI, such as agency redelegation, realignment or restructuring.

162.   Interior Department policy is in accord: "Secretary's Orders are limited to temporary delegations of authority, emergency directives, special assignments of functions, and initial policy and functional statements on the establishment of new units."   012 Departmental Manual 1.1 (emphasis added).

163.   Consistent with the limited authority in the Reorganization Act, the Reorganization Plan No. 3, and DOI policy, there has not been one occasion wherein the Interior Secretary changed FLPMA public land management policies through Secretarial

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

Order.  The Secretary, therefore, acted *ultra vires* in effecting changes to public land management pursuant to his reorganization authority, and Secretarial Order 3310 and the implementing Manuals must be set aside.

164.   Defendants' usurpation of Congressional authority through Secretarial Order 3310 has adversely affected Plaintiffs' interests by reducing revenues paid to the counties, adversely affecting local economies and jobs, interfering with their governmental functions, including road maintenance, denying their rights to consultation and coordination with respect to public land management and failing to provide for consistency with local county plans.

165.   Secretarial Order 3310 and the implementing manuals are final agency action.  Because the Utah BLM RMPs identify LWCs, the Order and manuals are in effect and Plaintiffs' claims are ripe.  Plaintiffs' injuries are traced to the Secretarial Order 3310 and the implementing manuals. The requested relief of setting aside Secretarial Order 3310 and enjoining its enforcement will require BLM to honor the Wilderness Act and FLPMA's restrictions against administrative self-willed processes to designate, convert, create or manage public lands as wilderness and eliminate the adverse effect to Plaintiffs' interests.

## SECOND CAUSE OF ACTION

### (SECRETARIAL ORDER 3310 IS ARBITRARY AND CAPRICIOUS)

166.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 165.

167.   The APA authorizes judicial review when agencies act contrary to law or and without lawful authority, 5 U.S.C. §706(2)(C), or arbitrarily, capriciously, and not in accordance with law.  5 U.S.C. §706(2)(A).

168.   Secretarial Order 3310 assumes that the Secretary has the authority to identify and also manage public lands for wilderness independent of Congressional direction.  Because there is no authority to implement Secretarial Order 3310 the Secretary has acted in excess of his statutory authority and because Secretarial Order 3310 contradicts the law, it is contrary to law and thus arbitrary and capricious.

169.   Aside from the management of Section 603 WSAs under the nonimpairment standard of the IMP, FLPMA directs Defendants to manage all public lands in accordance with the principles of multiple use and sustained-yield and consistent with land use plans, unless another provision of law directs otherwise.  43 U.S.C. §§1701(a)(7), 1712(c)(1), 1732(a).  This is in stark contrast to the limited selection of projects and actions allowed under Manual 6303.14, a selection just as limited as the IMP for WSAs.

170.   The Secretarial Order 3310 unlawfully establishes a priority and presumption in favor of wilderness or Wild Lands, while excluding the statutory principal or major multiple uses established in FLPMA.  43 U.S.C. §§1702(l); 1712(e).  This contradicts FLPMA's establishment of principal or priority multiple uses for timber production, domestic livestock grazing, mining and mineral development, outdoor recreation, fish and wildlife habitat, and rights-of-way.  43 U.S.C. §1702(l).

171.   FLPMA also provides that the Secretary shall manage all public lands to

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

avoid undue and unnecessary degradation, except for WSAs which are to be managed 'so as not to impair the suitability of such areas for preservation as wilderness.' 43 U.S.C. §§1732(b); 1782(c).

172.    The extension of the nonimpairment management to non-WSA public lands violates FLPMA's mandate that all public other lands be managed for multiple use and to avoid undue and unnecessary degradation.  43 U.S.C. §1732(a), (b).

173.    With respect to multiple use management under which the public lands are managed, 43 U.S.C. §1732, unlike the definition of multiple use for National Forests, 16 U.S.C. §529, FLPMA does not include wilderness as one of the statutory multiple uses. 43 U.S.C. §1702(c).   FLPMA does not authorize wilderness as a priority for public land management and does not even include wilderness in its definition of multiple use.   43 U.S.C. §1702(c).

174.    FLPMA separately defines the term 'wilderness' but only with respect to Section 603: "The term 'wilderness' as used in section 1782 of this title shall have the same meaning as it does in section 1131(c) of Title 16." 43 U.S.C. §1702(I).   The term "wilderness" is found only in the definition section, 43 U.S.C. §1702(i), and the wilderness review provisions of Section 603, 43 U.S.C. §1782. *See also* 43 C.F.R. §1601.0-5(i) (defining multiple use without including the term wilderness).

175.    FLPMA's direction to maintain an ongoing inventory of public land resources also does not authorize Secretarial Order 3310.  Section 201 of FLPMA states that: "The preparation and maintenance of such inventory or the identification of such areas shall not,

of itself, change or prevent change of the management or use of public lands." 43 U.S.C. §1711(a).

176.    Sections 202 and 302 of FLPMA also do not authorize the Secretarial Order 3310 and the implementing manuals.

177.    Secretarial Order 3310 also represents a material and arbitrary departure from the contemporaneous interpretation of the Secretary's wilderness review mandate that was adopted shortly after FLPMA's enactment in 1976 to identify, study and make wilderness recommendations.

178.    The planning regulations that implement the public land use planning process, 43 C.F.R. Part 1600, removed wilderness study from Section 202 planning in 1979.  When BLM promulgated its land use planning rules, the definition of a resource management plan was revised to delete reference to wilderness study area recommendations. 44 Fed. Reg. 46386 (1979). Thus, BLM planning regulations under Section 202 do not authorize establishment of wilderness type areas and do not authorize managing non-WSA public lands to avoid impairing their wilderness character.

179.    Based on the foregoing, the Secretarial Order 3310 violates the plain language of FLPMA and must be set aside under the APA as excess of statutory authority, 5 U.S.C. §706(2)(C). DOI's's failure to provide any contemporaneous legal interpretation to explain or support its dramatic reversal of policy also renders the Secretarial Order 3310 arbitrary and capricious under the APA, 5 U.S.C. 706(2)(A). As such, Secretarial Order 3310 and the implementing Manuals must be set aside.

180.    Secretarial Order 3310 is, by virtue of the Secretary's signature, final agency action.  The implementation of Secretarial Order 3310 adversely affects the interests of the Utah counties, because it imposes nonimpairment management on previously inventoried lands now LWCs and overrides the land use plan classification and management decisions in the RMPs.  Counties have already seen the effects of this Order through delays or deferral of projects that would routinely be approved and, thus, the claims are ripe for judicial review.

181.    Setting aside Secretarial Order 3310 and enjoining its implementation would remedy Plaintiffs' injuries by returning public lands management to the duly adopted standards of FLPMA and would remove identified barriers to current public land projects authorized under current RMPs.

### THIRD CAUSE OF ACTION

### (ARBITRARY AND CAPRICIOUS BREACH OF THE SETTLEMENT AGREEMENT)

182.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 181.

183.    The Wild Lands designation or LWC classification is substantially the same as a WSA.  Only the name has changed.  The management criteria to avoid impairing alleged wilderness characteristics on LWCs and Wild Lands is substantially the same as the IMP which applies to management of WSAs.  The direction in Secretarial Order 3310 and the Manuals that implement Secretarial Order 3310 is also substantially the same as the IMP that governs management of WSAs.

184.   The Settlement Agreement restored the proper and long-standing interpretation of FLPMA from which the 2001 Handbook 6300 and the Interior Secretary's 1996 - 2003 Utah non-WSA *de facto* wilderness management campaign had radically departed. Settlement Agreement (2003) ¶¶17,19(e),(f). The interpretation in the Settlement Agreement mirrors the language in FLPMA, the statutory structure and legislative history. It also conforms to BLM's long-standing interpretation and implementation of FLPMA from 1976 to 2001, and is consistent with the decisions of the Interior Board of Land Appeals dating from 1981 to the present.

185.   As agreed to in the Settlement Agreement upheld by this Court, BLM's wilderness review authority under §603 of FLPMA, 43 U.S.C. §1782(c), has terminated, and as a result, BLM must "refrain from applying the IMP. . . to BLM lands other than §603 WSAs" and to "not manage or otherwise treat public lands, other than §603 WSAs. . . as WSAs or as wilderness pursuant to the [FLPMA] §202 process." Settlement Agreement (2003) ¶5.

186.   Under the Settlement Agreement, therefore, BLM may not create WSAs under Section 202 or any other provision of FLPMA and may not "treat" public lands as WSAs through its land use planning process.   Secretarial Order 3310 and *de facto* wilderness management "treat" the non-WSA Red Rock bill lands, which are now LWCs and may be Wild Lands, as if they were WSAs in violation of the commitments in the Settlement Agreement and the underlying legal interpretation of FLPMA based on the specific language in the Act.

187.   Paragraph 5 of the Utah Settlement Agreement (2003) states that "Defendants will not establish, manage or otherwise treat public lands, other than Section 603 WSAs and Congressionally designated wilderness, as WSAs or as wilderness pursuant to the Section 202 process absent congressional authorization."

188.   The Secretarial Order 3310 directly contradicts this provision.  No law has authorized the Interior Secretary to treat public lands as WSAs [LWCs or Wild Lands] or as wilderness, except for the WSAs established pursuant to the Section 603 wilderness review program or the areas designated by Congress.  The Secretary, nevertheless, has taken it upon himself to do so.

189.   In Paragraph 6 of the Utah Settlement Agreement (2003), the Secretary agreed that "Defendants will refrain from applying the IMP, H-8550-1, to BLM lands other than the WSAs established during the Wilderness Review pursuant to §603."  The Secretarial Order 3310 manuals specifically apply nonimpairment management, which is substantially identical to the IMP, to the identified Wild Lands and to LWC areas, which unquestionably are "lands other than the WSAs established during the Section 603 wilderness review."

190.   Secretarial Order 3310 violates the Settlement Agreement commitment to manage non-WSA lands under the standard to avoid undue and unnecessary degradation that applies to all public land, except WSAs, which are managed to the 'avoid impairing wilderness characteristics' that applies to WSAs established pursuant to Section 603.

191.   As shown in the guidance governing implementation, Secretarial Order 3310

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

is not merely an inventory.  Manual 6303 adopts interim management of unlimited duration that requires BLM to manage all LWCs as if they were WSAs until the land use plan is amended.  Manual 6302 provides for creating the functional equivalent of WSAs just using a new name, Wild Lands.

192.   The Interior Secretary has also misrepresented his commitment to the law.  Notably, when the current Deputy Secretary of the Interior testified before Congress on this issue, he assured Congress that "BLM does not have authority to apply the non-impairment standard to non-WSAs."  Less than two years later, the Interior Department has adopted a Wild Lands policy that mandates nonimpairment management for the new Wild Lands and LWC areas that are not WSAs.  This policy has been adopted without any stated basis for the 180-degree change in the interpretation of the law as embodied in the Settlement Agreement regarding the authority of the agency.

193.   Secretarial Order 3310 implements an agreement between DOI and environmental plaintiffs to revoke the Utah Settlement Agreement through secretarial action.  SUWA wrote on January 11, 2011:

> In previous discussions, the Plaintiffs' agreed to address their claims regarding the Norton-Leavitt settlement and BLM's authority to designate wilderness study areas outside the context of these settlement negotiations, a substantial concession by Plaintiffs and demonstration of good faith. Accordingly we are proposing steps to be taken to address substantial wilderness-quality lands put at risk by decision in the Vernal RMP through other administrative authority that the BLM acknowledges under FLPMA.

Thus, Defendants' claims that Secretarial Order 3310 does not revoke the Settlement Agreement are disingenuous and materially inaccurate.  Secretarial Order 3310 represents

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

Defendants' agreement made more than a year ago to revoke the Utah Settlement Agreement and to further provide for protection of non-WSA lands proposed for wilderness.

194.    Defendants' sweeping management alteration of the public lands as if they were WSAs, therefore, violates the Settlement Agreement and the sound, legally-supported interpretation of FLPMA agreed to by BLM.  An order of this Court setting aside Secretarial Order 3310 and implementing manuals will also leave intact the Settlement Agreement, thereby protecting the Plaintiffs' interests in the underlying agreement that protects the revenue, governmental functions and the well being of the Utah counties.

### FOURTH CAUSE OF ACTION
### (UTAH RMPs IN PART ARE *ULTRA VIRES* AND
### VIOLATE THE SETTLEMENT AGREEMENT)

195.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 194.

196.    While the BLM 2008 Utah RMPs do not use the terms "WSA" or "IMP" terms to define the altered standard of management for alleged wilderness characteristics of non-WSA lands, there is no question that the direction by Defendants in the Utah BLM 2008 RMPs to manage nearly 450,000 acres of non-WSA lands for alleged wilderness characteristics established and implemented WSA-type management in violation of the Settlement Agreement and Defendants' statutory authority in FLPMA.

197.    The parallels between WSA management and the wilderness characteristics management in the Utah BLM 2008 RMPs are clear.  For example, under the IMP, WSA

visual resources are managed under the VRM Class II, which is also true for the areas managed in the 2008 RMPs for wilderness characteristics.  WSAs are closed to oil and gas leasing, as is true for the areas managed in the 2008 RMPs for wilderness characteristics, with a few exceptions, such as the exception of White River area in the Vernal Field Office resource area which is subject to a no-surface occupancy major constraint.  WSAs are closed to other mineral development, logging and new road construction, all of which also apply to the areas managed in the 2008 RMPs for wilderness characteristics. WSAs and the areas managed in the 2008 RMPs for wilderness characteristics are closed to Off-Highway Vehicle (OHV) use except on designated routes.  In addition, vegetation and fuel treatments using prescribed fire, the construction of wildlife water and livestock facilities and minimal recreation in the areas managed in the 2008 RMPs for wilderness characteristics are permitted only when compatible with the goals and objectives for management of the non-WSA lands with alleged wilderness characteristics.

198.   The management goals for the areas managed in the 2008 RMPs for wilderness characteristics are identical to WSA management in every material way.  They are to protect, preserve and maintain the wilderness characteristics (i.e., appearance of naturalness, outstanding opportunities for primitive and unconfined recreation or solitude) of non-WSA lands with wilderness characteristics and manage these landscapes for their undeveloped character and provide opportunities for primitive recreational activities and experiences of solitude.

199.   Because, other than the §603 WSAs, the Defendants lack the authority to

manage public lands as if they were wilderness, the Utah BLM 2008 RMPs are unlawful and invalid to the extent they purport to manage nearly 450,000 acres of non-WSA lands as of they were wilderness.  As is true for Claims I-III, this wilderness type management has adversely affected the Plaintiffs' interests.  A decision setting aside the wilderness characteristics management provisions of the 2008 RMPs would redress the injuries by removing impediments to multiple use and access, assure revenue to the Counties and facilitate management of their transportation systems.

## FIFTH CAUSE OF ACTION

## (UNLAWFUL *DE FACTO* WILDERNESS MANAGEMENT)

200.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 199.

201.   Defendants have acted *ultra vires*, arbitrarily and capriciously, and not in accordance with law by changing the management of the Red Rock bill areas to close the public lands to mineral development, access and other land use authorizations, without following the procedures mandated by law, 5 U.S.C. §706(2)(C), and is, thus, arbitrary and capricious.

202.   Congress reserved to itself the sole authority to designate wilderness.  16 U.S.C. §1131(a).  Congress granted the Interior Secretary specific and limited authority to identify lands meeting the definition of wilderness and studying those lands to make recommendations to Congress.  43 U.S.C. §1782.  This wilderness inventory and study program expired in 1993 and has not since been expanded or reauthorized by Congress.

Thus, BLM lacks the legal authority to implement wilderness type management.

203.    Before Secretarial Order 3310, Defendants changed the management of the Red Rock bill lands to not impair their alleged wilderness character, although no delegated authority allows them to do so.  Only Section 603 of FLPMA authorizes BLM to manage lands so as to not impair their wilderness character and that nonimpairment standard was and is reserved for WSAs. 43 U.S.C. §1782.

204.    The *de facto* wilderness management actions also unlawfully change public land management without amending the RMPs as required by FLPMA. 43 U.S.C. §1712(a); 43 C.F.R. §1610.5-5. All resource management actions must conform to existing land use plans unless and until amended. 43 U.S.C. §§1732(a), 1712; 43 C.F.R. §§1610.5-3, 1610.5-5.  Returning to the requirements of and abiding by FLPMA's  land use planning procedures was a central tenet of the 2003 Settlement Agreement.   Moreover, no amendment to an RMP is valid if the amendment authorizes management of non-WSA lands for alleged characteristics (like the 2008 RMPs have done on nearly 450,000 acres of non-WSA lands), or authorizes conversion of non-WSA lands into LWCs or Wildlands (like Secretarial Order 3310 and the implementing manuals purport to excuse).

205.    The above-described *de facto* wilderness management actions on lands which the Utah 2008 RMPs did *not* designate for wilderness characteristics management, not only violate FLPMA and the Settlement Agreement, but run inconsistent and contrary to the Utah RMPs themselves, and therefore violate  FLPMA for the additional reason that such management decisions stray from the FLPMA Section 202 process.  Those 2008

Utah RMPs, in many instances, direct that non-WSA public lands not carried forward for wilderness characteristics management, be managed with emphasis on oil gas development and other extractive resource values. BLM may not implement a change in land management that changes the land use plan without adherence to procedures required by FLPMA, including meaningful public and state and local agency involvement and the completion of environmental analyses under the National Environmental Policy Act. 43 C.F.R. §1610-5.5. This Court has so held. *Uintah County et al. v. Norton et al.*, Civil No. 2:00-CV-04282J (October 26, 2001). But again, no amendment to an RMP is valid if the amendment authorizes management of non-WSA lands for alleged characteristics (like the 2008 RMPs have done on nearly 450,000 acres of non-WSA lands), or authorizes conversion of non-WSA lands into LWCs or Wildlands (like Secretarial Order 3310 and the implementing manuals purport to excuse).

206.   For similar grounds, the MLP program violates FLPMA. BLM has deferred or adopted a mineral lease sale moratorium affecting at least 3.9 million acres of Utah public land. The areas selected for the MLP program are very similar, if not identical, to those nominated by environmental groups, including SUWA and The Wilderness Society. The nominations submitted justified putting these areas into the MLP program in order to protect Red Rock proposals and other citizen wilderness proposals. Defendants freely admit that they did not give the public, the state or local governments an equal opportunity to comment.

207.   The subsequent mineral lease sale deferrals occurring in Uintah County do

**Plaintiffs' First Amended and Supplemented Complaint for
Declaratory, Mandatory and Injunctive Relief**

not conform to the Vernal BLM RMP which went final in October 2008.  Similarly, BLM has adopted additional procedures for mineral leasing analysis outside the RMP process that override the RMP decisions by deferring all oil and gas leasing until another EIS is written to assess the impacts of mineral leasing.  BLM claims that this action is necessary to stem the overwhelming tide of appeals by environmental groups, which appeal virtually all of the BLM mineral and other resource decisions.  But Defendants' rationale cannot support their failure to follow procedures.

208.   Pursuant to Secretarial Order 3310, BLM must make wilderness protection the overriding priority and new mineral lease sales, mining and construction of transmission lines are not on the list of permitted actions.  Manual 6303.14.  Thus, Secretarial Order 3310 puts an official, albeit unlawful gloss, on an already unlawful push by the BLM to repeatedly disregard and ignore the 2008 Utah RMPs.

209.   Defendants' actions have caused and will cause future loss of revenue to the Utah counties from oil and gas leases payments and royalty payments from production.  The loss of revenues is also reflected in the impacts of the *de facto* lease moratorium which precludes development royalties where lessees could not complete their land position and begin drilling.  Many of these leases are located in Red Rock bill areas.

210.   UAC member Uintah County has been directly harmed by Defendants' imposition of the *de facto* wilderness management.  These actions effect an unlawful amendment to the 2008 Vernal RMP.  FLPMA §202, which governs land use plans, provides for a formal plan amendment process complete with well noticed and organized

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

public participation throughout the land use planning amendment process and the statutory right of coordination with the county. Uintah County was denied an opportunity to comment on the amendment and has been injured because imposition of these standards interferes with its ability to perform governmental functions and reduces or precludes the receipt of revenues that would otherwise have been paid to the county.

211.   But again, not even a formal plan amendment process could excuse Defendants' *de facto* wilderness imposition, since such an amendment would authorize management of non-WSA lands for alleged characteristics in violation of the Separation of Powers Doctrine, FLPMA and the Settlement Agreement.  At the very least, however, Defendants' *de facto* wilderness imposition is unlawful at least for the reason that Defendants failed to follow the plan amendment process under FLPMA.

212.   The adoption and implementation of the *de facto* wilderness protection actions are both final and ripe for judicial review and represent the consummation of Defendants' decision making regarding interim management of the Red Rock bill public lands pending congressional action.  Defendants' actions affect the rights and obligations of Uintah County by preventing mineral development and interfering with the performance of governmental functions, such as road maintenance and reconstruction.  There are legal consequences which flow from Defendants' actions including the cancellation of Trust Land leases, interference with otherwise valid rights and reduced revenues and interference with otherwise lawful governmental functions.  There are no administrative remedies to exhaust

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

because Defendants continue to implement their actions without issuing an appealable decision.

213.     Plaintiffs' concrete injuries caused by Defendants' unlawful implementation of *de facto* wilderness management will be redressed by a Court order declaring that Defendants adopted said policies without following the procedures mandated by law and enjoining Defendants from changing public land management without amending the RMPs.

214.     Plaintiffs seek a judicial determination that Defendants have acted arbitrarily and capriciously, unlawfully and *ultra vires* by undertaking the foregoing actions.  A favorable decision from this Court will redress the legal injuries of the impacted UAC members and remove the immediate barriers to multiple use of the affected public lands, including mineral development, and leave intact key components of the County's land use and transportation plans. Such a determination and permanent injunction will leave the Utah wilderness debate where it belongs as provided for law, with the United States Congress.  An end to the change in management effected by the Secretarial Order 3310 and *de facto* IMP policies would also reduce the burden on the counties' governmental functions caused by these challenged actions.

## SIXTH CAUSE OF ACTION

### (UNLAWFUL *DE FACTO* MINERAL LEASING WITHDRAWAL )

215.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 214.

216.     FLPMA defines a withdrawal as: "withholding an area of Federal land from

settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program;  or transferring jurisdiction over an area of Federal land."  43 U.S.C. §1702(j).

217.   When an agency adopts a policy of not allowing mineral development in areas that meet certain criteria, such as roadless areas in the National Forest System, Red Rock lands or MLP areas, it is a *de facto* withdrawal that is also subject to FLPMA's procedures.  FLPMA does not prohibit the actions, but requires that Defendants weigh the costs and benefits of precluding this important principal use of the public lands through the process set out in Section 204 of FLPMA, 43 U.S.C. §1714.

218.   Any decision to withdraw public lands from mineral development must be documented by a public land order signed by the Secretary or his delegate and issued in accordance with the procedures set forth in Section 204 of FLPMA.  43 U.S.C. §1714. When more than 5,000 acres are affected, Defendants must follow additional procedures, including notification to the respective natural resource committees in Congress, preparing a report which documents the reasons for the withdrawal, the economic impacts of the withdrawal, the respective costs and benefits and must hold a public hearing.  Congress has 120 days to adopt a joint resolution disapproving the withdrawal.  *Id.* at §1714(c).

219.   A mineral lease is a sale of an interest in public lands and, thus, decisions not to allow mineral leasing within a given class of public lands falls within FLPMA's definition of a withdrawal.  The Mineral Leasing Act is a general land law that applies to

mineral interests owned by the United States.

220.   Defendants' imposition of Secretarial Order 3310, *de facto* wilderness characteristics management policy, and the MLP program which is based on LWCs and citizen proposed wilderness, effectively prohibit mineral lease sales for lands included in the Red Rock bill or similar proposals.  This management is a *de facto* withdrawal of more than 385,000 acres of public land in Uintah County, and an estimated six million acres of public lands statewide.

221.   When Defendants decide to prohibit a principal or major use (as defined in FLPMA), which is called a "management decision," Defendants must also amend the land use plan to disclose the decision and its consequences.  43 U.S.C. §1712(e).  If Defendants exclude a principal use such as mineral development, from more than 100,000 acres of public lands for more than two years, this management decision must be reported to Congress and be made a matter of public record.  *Id.*  Congress also has 120 days in which to veto a management decision.  Any management decision must be pursuant to a land use plan or to implement a land use plan.  *Id.* §1712(e)(1).

222.   Oil and gas development is a form of mineral development that is one of the principal uses of public lands.  43 U.S.C. §1702(l).  Decisions to close areas of public land to new oil and gas leases or to delay development within public lands included in the Red Rock bill in Utah or LWCs and Wild Lands are "management decisions" under FLPMA, affect more than 100,000 acres of public land, are to be in effect for more than two years, and must be reported to Congress.  43 U.S.C. §1712(e).

Plaintiffs' First Amended and Supplemented Complaint for
                                Declaratory, Mandatory and Injunctive Relief

223.    Secretarial Order 3310 and Defendants' management of WSA lands for wilderness characteristics, LWCs, Wild Lands and the like, preclude several of the principal multiple uses, including mineral development and rights-of-way. Thus, Defendants' actions amount to a land use classification that cannot be implemented without complying with land use decision procedures as well.  Because the affected acreage exceeds 100,000 acres, it must also be reported to Congress.

224.    Defendants have declined to offer public lands for sale under the MLA within Red Rock bill lands even though many of those lands have been nominated for lease and are classified in the respective RMPs as suitable and available for mineral leasing. Defendants have also declined to process drilling permits or to approve mining plans in Red Rock bill lands and such development is not permitted in LWCs or Wild Lands unless it involves valid existing rights.

225.    Defendants rely on claimed discretion to review lease areas on a case-by-case basis.  This rationale does not apply when the same policy is applied to all lands meeting certain criteria, whether it is roadless review areas or Red Rock lands.  Following FLPMA withdrawal procedures does not diminish Defendants' discretion, it only requires Defendants to follow an open and public process.

226.    Public lands within these areas that would have been leased and would have been drilled have not seen any commercial uses and the lease payments and additional royalties that would otherwise have been paid to the State and the Utah counties have not been paid. Oil and gas companies have also withdrawn their exploration budgets to

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

Plaintiffs' economic detriment.

227.   Defendants have acted *ultra vires*, arbitrarily and capriciously, and not in accordance with law by changing the management of the Red Rock bill lands to preclude mineral development through its *de facto* withdrawal without complying with statutory procedures, including notifying Congress of the land use decisions, and without issuing a formal report justifying this significant withdrawal of high energy potential lands.

228.   Plaintiffs' injuries caused by Defendants' unlawful *de facto* mineral leasing withdrawal will be redressed by a Court order enjoining its enforcement and requiring Defendants to comply with the withdrawal and land classification procedures mandated by FLPMA.

## SEVENTH CAUSE OF ACTION

### *(INTERIOR SECRETARY MAY NOT IMPLEMENT PUBLIC LAND MANAGEMENT CHANGES WITHOUT RULEMAKING PROCEDURES)*

229.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 228.

230.   Even assuming that the Secretary had the legal power to adopt Secretarial Order 3310, it was unlawfully issued and is being implemented without notice and comment rulemaking procedures under the APA, 5 U.S.C. §§551(5), 553.   Similarly, Defendants have reformed the mineral leasing program without rulemaking or notice and public comment.   Instead, Defendants chose to implement this significant program reform by a mere instruction memorandum that is only internal guidance and is effective for only two years.   The MLP program changes land management for almost 4 million acres,

overrides the properly adopted Utah RMPs, and represents a significant program changes for mineral leasing on public lands.

231.    FLPMA expressly provides that its provisions shall be implemented through APA rulemaking. 43 U.S.C. §1740 ("The Secretary, with respect to the public lands, shall promulgate rules and regulations to carry out the purposes of this Act and of other laws applicable to the public lands... The promulgation of such rules and regulations shall be governed by the provisions of chapter 5 of title 5... ").

232.    Consistent with this mandate in FLPMA, in 1970, the Administrative Conference of the United States recommended that governmental agencies agree to follow rulemaking procedures, even if the subject matter would fall within APA exceptions. Of special significance, the Office of the Interior Secretary adopted the same requirement for it and its agencies: "Notice is hereby given of the policy of the Department of the Interior to give notice of proposed rulemaking and to invite the public to participate in rulemaking in instances where not required by law."  36 Fed. Reg. 8336 (May 4, 1971).

233.    Rulemaking is especially necessary because, as in this case, an agency may not dramatically break from a longstanding interpretation, including the interpretation of FLPMA embodied in the Settlement Agreement, through policy guidance without first engaging in APA notice and comment rulemaking. The Interior Department failed to revise its previous definitive interpretation of FLPMA and implementing regulations without first engaging in APA rulemaking.

234.    Similarly, Defendants embarked on reform of the mineral leasing system

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

without rulemaking or any public process.  A comparison can be drawn to the livestock grazing reform, which was effected through rulemaking and an environmental impact statement by former Interior Secretary Babbitt.  Defendants instead chose to take unlawful shortcuts to implement these actions immediately, despite clear statutory direction that rulemaking was required.

235.    The MLP program conflicts with existing rules and program direction.  Due to the high potential in the Uintah Basin, it was identified as a high priority area. The Vernal Field Office is a pilot office to facilitate processing of permits for energy and transmission lines pursuant to the Energy Policy Act.  Secretarial Order 3310 and the MLP deferrals contradict that direction to facilitate energy production and transmission.

236.    The Secretarial Order and Manuals were not issued by way of a proper APA process in violation of FLPMA and Secretarial policy. The IMP, like the Secretarial Order 3310, changed land management and implemented FLPMA direction, which is why BLM effectively followed APA notice and comment rulemaking procedures before implementing the IMP, including publication in the Federal Register, 5 U.S.C. §553. 44 Fed. Reg. 9 (January 12, 1979).

237.    Defendants' procedural violations have caused concrete injuries to Plaintiffs because the Secretarial Order 3310 changed land management from the day Interior Secretarial Order 3310 was issued: "All BLM offices shall protect these inventoried wilderness characteristics when undertaking land use planning and when making project-level decisions by avoiding impairment of such wilderness characteristics." Sec. Order

3310 (also requiring BLM "to preserve its discretion to protect wilderness characteristics through subsequent land use planning" and to prepare a NEPA analysis for any proposed project within areas with wilderness characteristics).  The Manuals effect the significant changes in land management, with resulting injuries to Plaintiffs as documented herein.  Therefore, Secretarial Order 3310 must be set aside for noncompliance with FLPMA's rulemaking requirement.

238.    The MLP program has put mineral leasing on hold for several years while land use plans are revised.  The significant changes in the mineral leasing program on public lands and the fact that the changes are said to implement both MLA and FLPMA require rulemaking.

239.    The failure of the Defendants to engage in rulemaking violates the Plaintiffs' rights to due process and public comment embodied in the rulemaking process.  An order finding that the Secretarial Order 3310 implementing manuals and the MLP Instruction Memoranda were unlawfully adopted in lieu of rulemaking and enjoining implementation until rulemaking occurs would redress the lost opportunity to use the APA procedures to alert Defendants of the limits of their legal authority and the costs of the program and land management changes to the state and communities, and the conflicts with existing laws, rules and programs.

## EIGHTH CAUSE OF ACTION

### *(FLPMA'S PROCEDURAL PUBLIC COMMENT AND COORDINATION WITH STATE AND LOCAL GOVERNMENT REQUIREMENTS VIOLATED)*

240.    Plaintiffs reallege and incorporate by reference the allegations contained in

paragraphs 1 through 239.

241.   As required by FLPMA, the Interior Secretary must "allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give Federal State, and local governments and the public, adequate notice and opportunity for comment upon and participate in the formulation of plans and programs relating to the management of the public lands." 43 U.S.C.§1712(f). *See also* 43 U.S.C. §1739(e) (same).

242.   DOI must also coordinate with and provide for meaningful involvement of state and local governments in the development of land use programs, land use regulations and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-federal lands. 43 U.S.C. §1712(c)(9).

243.   BLM regulations implementing FLPMA are in accord. The public "shall be provided opportunities to meaningfully participate in and comment on the preparation of plans, amendments and related guidance and be given early notice of planning activities." 43 C.F.R. §1610.2 (emphasis added).  The term "guidance" for preparation of resource management plans includes "National level policy which has been established through legislation, regulations, executive orders or other Presidential, Secretarial or Director approved documents." 43 C.F.R. §1610.1. Secretarial Order 3310 which provides for the protection of wilderness characteristics in the land use planning process fits within this category.

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

244.   The Secretary recognized his obligation to coordinate with state and local governments last August when he met with the Utah Governor's Balanced Resource Council to discuss proposed national monuments and other public land controversies.  At that meeting, Interior Secretary stated that he would not adopt significant public land management changes without first returning to the Council members to thoroughly discuss any changes.

245.   The Secretary did not honor his promise to coordinate with state or local governments before signing and announcing Secretarial Order 3310.  Instead, Director Abbey placed a call to the Utah Governor after the news wires had already released the story.

246.   Defendants have consistently failed to honor the coordination and consultation obligations that are mandated by law and regulation and memorialized in memoranda of understanding.  This has occurred with the MLP program as well, where BLM had coordinated with environmental organizations and has actively excluded state and local governments.  The BLM coordination has been limited to environmental group nominations while deliberately refusing to give state and local governments a voice.

247.   In his 2009 State of the Union address, President Obama said, "Let me say it as simply as I can – transparency and the rule of law will be the touchstones of this presidency."  Interior Secretary Salazar also echoed the President's pledge to conduct an open and transparent administration.  These promises contrast sharply with the actions in Utah, where the Interior Department has authorized a course of action lobbied for by well-

funded environmental groups and implemented by public land management program policy changes without following the public procedures mandated by law and deliberately excluding the governmental entities entitled to participate.

248.    The deliberate and calculated preclusion of public comment and coordination with state and local governments in the development and issuance of the Secretarial Order 3310 violates FLPMA's legislative and regulatory mandates. There was also no "early public notice" to Plaintiffs of the Secretarial Order 3310 even though it has a "significant impact" on the state trust lands and revenues from those lands. 43 U.S.C. §1712(c)(9).

249.    Secretarial Order 3310 establishes a land use management program and decision that affects the management of public lands, and with respect to state and local governments, the resultant concrete injury documented throughout this Complaint is particularly pronounced under principles of federalism. Executive Order 13132, 64 Fed. Reg. 43255, 43256 (August 4, 1999) (with respect to policies that have substantial direct effects on states and local governments, consultation is required prior to implementation, including whether federal objectives can be attained by other means where national action limits the policymaking discretion of state and local governments).

250.    In contrast, both the 1979 IMP and 1978 Wilderness Inventory Handbook (WIH) were developed and issued pursuant to extensive notice and comment. On January, 12, 1979, for example, BLM released the Draft IMP for notice and comment. 44 Fed. Reg. 9 (January 12, 1979) ("Members of the public are invited to submit written comments on the draft. . . BLM will hold a national workshop in Washington D.C. and each BLM State

Office will sponsor a public meeting or workshop"). It took almost a year for BLM to issue the final IMP and publish it in the Federal Register. 44 Fed. Reg. 72014 (December 12, 1979). Similarly, BLM issued the draft WIH on February 27, 1978. That document was intensively reviewed by the public. It was discussed at more than 60 meetings held throughout the western states and in Washington D.C. Some 5,000 letters and written comments were sent to BLM on the proposed review procedures. The final WIH was not issued until September 27, 1978.

251. Defendants' implementation of the MLP program is equally flawed. It is a land use planning and public land management program. Yet there has been no consultation or coordination, other than BLM's solicitude for the views of SUWA and The Wilderness Society.

252. DOI, therefore, failed to provide for public involvement or coordinate with state and local governments in the development and issuance of the Secretarial Order 3310, the implementing manuals, and the MLP program changes in violation of FLPMA's direct commands. An order setting aside Secretarial Order 3310, the implementing manuals, and the MLP instruction memoranda for noncompliance with FLPMA's procedural public comment and coordination with state and local government requirements would redress Plaintiffs' injuries by assuring the opportunity to coordinate with BLM and to require BLM to consider their comments.

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

## NINTH CAUSE OF ACTION

### *(NEPA VIOLATION)*

253.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 252.

254.    Secretarial Order 3310 significantly affects the human environment under NEPA, which required the Secretary to prepare an environmental impact statement (EIS), including an analysis of the economic impacts of the action, before undertaking the action. 42 U.S.C. §4332(2)(C); 40 C.F.R. §§1501.4, 1508.27; BLM NEPA Handbook H-1790-1.3.2.1.

255.    Defendants' MLP program and *de facto* wilderness management are also major federal actions with potentially significant impacts.  The Utah counties are entitled to participate as cooperating agencies under CEQ policy and memoranda of understanding that BLM has signed.  Defendants have failed to follow NEPA's policy to coordinate with state and local governments.

256.    While NEPA compliance is procedural, it imposes "action-forcing" procedures that require that agencies take a " `hard look' at environmental consequences," and "provide for broad dissemination of relevant environmental information."

257.    Secretarial Order 3310 requires that all public land projects must be delayed for an inventory and study of wilderness character on the affected public lands. BLM Manual 6300-1.07.11, 6300-2.24.  Thus, current energy projects, including "clean energy projects" must be halted or delayed until the inventory and study of potential Wild Lands

are completed.   It is likely that transmission lines, such as the TransWest Express transmission line proposed to carry wind power from Wyoming to California and wind turbines will impair wilderness character, thus conflicting with the Secretarial Order 3310. The transmission line will cover 725 miles over public lands located in four states including Utah.   The proposed transmission line right-of-way and alternatives affect the LWCs authorized in Secretarial Order 3310.   As the NEPA process has only begun for this project, it will certainly be delayed for wilderness inventory and impairment issues.

258.   Utah counties would also benefit from this transmission line.   If it cannot be built or construction is delayed, because Defendants failed to consider how Secretarial Order 3310 would adversely affect renewable energy projects, then the counties lose the opportunities to make use of this transmission system and other renewable energy projects.

259.   Wind and solar energy require installation of permanent structures, like turbines, solar panels and transmission lines.   This development is inconsistent with preserving BLM's discretion to designate the lands as Wild Lands or interim management policy for LWCs.   The additional transmission lines necessary for wind and solar energy require rights-of-way that far exceed the relatively small sites currently identified for renewable energy.   They must be located outside of existing natural gas pipeline rights-of-way for safety reasons and, thus, require separate environmental review. Requiring these projects to bury transmission lines across thousands of miles would also impair the economics of clean energy that currently rely on tax incentives and government funding.

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

260.    If these clean energy projects are to go forward, BLM must decide to impair the alleged wilderness characteristics.   Secretarial Order 3310, Sec.5; BLM Manuals 6302.13.D; 6303.13.   The additional time for a wilderness inventory and study with public comment will add years to the approval process for these supposedly "fast track" projects. The clean energy industry is already suffering due to project delays, government delays in distribution of funds and loans and reallocation of funds to other programs.   These delays and the associated costs represent a significant regulatory burden.

261.    Secretarial Order 3310 also limits 'large' vegetation and range improvement projects and does not provide for road maintenance and reconstruction.  The preclusion of these and similar projects interferes with the efforts of the Utah counties to protect and improve public land resources.  Defendants also failed to consider these impacts before adopting Secretarial Order 3310.

262.    Due to these significant and other additional environmental impacts, the Interior Department's failure to prepare an EIS prior to adoption of the Secretarial Order 3310 violated NEPA. 42 U.S.C. §4332(2)(C).   "Major federal actions" triggering NEPA analyses, include "new or revised" agency "plans, policies, or procedures," including, as in this case, those that will "result in or substantially alter agency programs," and those "which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based." 40 C.F.R. §1508.18.

263.    As a federal agency, "the BLM must meet NEPA requirements whenever it is the BLM's decision that would result in an effect on the human environment, even when

the effect would be beneficial and regardless of who proposes the action or where it would take place." BLM NEPA Handbook H-1790-1.3.1.  Secretarial Order 3310, therefore, must be set aside and remanded with direction that BLM conduct the required NEPA analyses and make a reasoned determination as to whether the Secretarial Order 3310 is of such significance as to require preparation of an EIS.

264.    Defendants deprived Plaintiffs of the opportunity to evaluate and communicate the environmental impacts of Secretarial Order 3310 to Defendants.  NEPA provides for these procedures and the environmental analysis and public comment opportunities may well have caused Defendants to rethink the Secretarial Order.  A judgment finding a violation and directing Defendants to comply will provide a tangible benefit to Plaintiffs by allowing them to use these procedures.

## TENTH CAUSE OF ACTION

### (VIOLATION OF FLPMA COORDINATION AND CONSISTENCY REQUIREMENTS  - IMPROPER ASSERTION OF EXCLUSIVE JURISDICTION)

265.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs1 through 264.

266.    The Constitution delegates power to Congress to make needful rules and regulations respecting the public lands, *see* U.S. Constitution, Art IV. Sec. 2.  This particular delegation is not a grant of jurisdiction that excludes the jurisdictional powers of the states over the lands within their borders.  To the contrary, the Constitution's express grant of *exclusive* jurisdiction to Congress is limited and applies only to a finite list of certain enumerated lands, Art I, Sec. 8, clause 17.  This enumerated list does not include any of

the BLM lands which are the subject of this matter.  Absent an express Constitutional delegation of exclusive Congressional jurisdiction over the lands which are subject to Secretarial Order 3310 and the Manuals, no such exclusive jurisdiction may be inferred. U.S. Constitution, Amendment X, and thus the federal agency to whom Congress delegates land management authority must also account for the states' powers.

267.   Consistent with the foregoing Constitutional principles, Congress in FLPMA gave the Secretary of Interior a mandate to coordinate with state and local governments and to ensure to the extent possible that federal land management plans were consistent with those of state and local governments.

(a)   Coordination Mandate:   In the development and revision of land use plans, Congress, in FLPMA, directed the Secretary, among other things, to coordinate the inventory, planning and management of public lands with the planning and management programs of States and local governments, and provide for meaningful public involvement of State and local government officials in the development of land use programs, land use regulations, and land use decisions for public lands.   43 U.S.C. § 1712(c)(9).

(b)   Consistency Mandate:  Congress in FLPMA directed: "Land use plans of the Secretary under this section shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act."  *Id.*

268.   Uintah County and other UAC member counties, as well as the State of Utah, have lawfully established federal land and resource management plans, which clearly and pointedly oppose *de facto* wilderness management of non-WSA BLM lands in the Redrock

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

Bill, WIA's, citizen's proposed lands, and lands evaluated for wilderness characteristics in the six 2008 Utah BLM RMPs whether found to possess wilderness characteristics or not and whether carried forward for so-called wilderness characteristics management or not.

269.  Secretarial Order 3310 and the manuals imposed on Uintah County and the other member counties of UAC, without the above-state FLPMA coordination mandate usurps any jurisdictional input by local governments of Utah with respect to large land masses in Utah.  Due to the failure to coordinate and to assure that their actions were consistent with local government land use plans, Defendants' actions violate FLPMA procedures and are an *ultra vires* and unconstitutional assertion of exclusive Federal jurisdiction over large land masses in Utah to the immediate injury of Uintah County and the other UAC member counties.

270.  Secretarial Order 3310 and the Manuals violate the above-stated consistency mandate of FLPMA and the above-stated Constitutional provisions, because the Order and Manuals mandate a program, policy and decision matrix which are diametrically opposed to and inconsistent with the duly established written resource management plans of Uintah County, other UAC member counties and the State of Utah of which the counties are political subdivisions.  The federal programs and decisions override any jurisdictional input by local governments of Utah on large land masses in Utah, and thus amount to an *ultra vires* and unconstitutional assertion of exclusive Federal jurisdiction over large land masses in Utah to the immediate injury of Uintah County and the other UAC member counties.

271.  Accordingly the Secretarial Order and Manuals must be set aside.

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request relief and judgment against Defendants as follows:

1.    Declare and set aside Secretarial Order 3310 and implementing manuals as unlawful and *ultra vires* because the Order violates the Separation of Powers doctrine by rewriting federal law and no federal law authorizes the actions directed by the Order and implementing manuals;

2.    Declare and set aside Secretarial Order 3310 and the implementing manuals as contrary to law and without lawful authority, and arbitrary and capricious and not in accordance with law;

3.    Declare that Defendants have acted unlawfully and arbitrarily and capriciously and contrary to proper procedures to revoke the Utah Settlement Agreement using the Secretarial Order 3310;

4.    Declare that Defendants adoption of *de facto* wilderness management for non-WSA lands in Utah is unlawful due to lack of authority and due to failure to follow proper procedures before changing land management;

5.    Declare that the RMP provisions which adopt wilderness protection for defined areas exceed BLM's authority and are arbitrary and capricious;

6.    Declare that Defendants' mineral lease deferral policies for lands located in non-WSA areas is a *de facto* withdrawal and a land use decision, because the policies apply to millions of acres of public land and further declare that Defendants must either end all deferral policies or comply with the mandatory withdrawal and land

**Plaintiffs' First Amended and Supplemented Complaint for Declaratory, Mandatory and Injunctive Relief**

classification procedures required by FLPMA;

7.  In the alternative, declare the Wild Lands manuals, MLP instruction memoranda, and their implementation unlawful for failure to adopt these land management and program changes without rulemaking under the APA, as required by FLPMA, and are further unlawful for failure to coordinate and consult with state and local governments, as required by regulation and memoranda of understanding;

8.  Declare that Defendants have failed to consider the potentially significant environmental impacts of Secretarial Order and related policies, including the MLP program and *de facto* wilderness management, as required by NEPA;

9.  Declare that Secretarial Order 3310 and the manuals and Defendants' *de facto* wilderness management impinge on powers that were reserved to the states and delegated to local governments and the Defendants' failure to follow the procedures to coordinate and to ensure consistency with such land use plans violates both the powers reserved to the states and as recognized in FLPMA;

10. Enjoin Defendants from further implementation of Secretarial Order 3310 and the manuals; enjoin Defendants from implementing *de facto* wilderness management or wilderness withdrawals without complying with applicable procedures; and enjoin Defendants from managing the RMPs contrary to the land use decisions made in the current RMPs that govern Utah public lands;

11. In the alternative, enjoin Defendants from implementing Secretarial Order 3310 or the MLP Instruction Memorandum until it completes rulemaking in accordance with

the APA; and enjoin Defendants from implementing Secretarial Order 3310 and the

MLP instruction memorandum without coordinating with local governments in

accordance with NEPA rules and applicable memoranda of understanding;

12.     Order Defendants to pay Plaintiffs' costs and fees incurred herein as allowed by

law; and

13.     Any and all other relief which the Court deems just and proper in the circumstances.

Dated: March 22, 2011

            Respectfully submitted,

/s / Constance E. Brooks                     /s /  J. Mark Ward
CONSTANCE E. BROOKS                          J. MARK WARD #4436
MICHAEL B. MARINOVICH                        Utah Association of Counties
C. E. Brooks & Associates                    5397 South Vine Street
303 East 17th Avenue, Suite 650              Salt Lake City, UT 84107
Denver, CO 80203                             (801) 265-1331 (telephone)
(303) 297-9100                               (801) 265-9485 (facsimile)


Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2011, I electronically filed the foregoing PLAINTIFFS' **FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY, MANDATORY AND INJUNCTIVE RELIEF** with the Clerk of the Court using the CM/ECF system which will send notification of this filing to all counsel of record.

/s/  Michael B. Marinovich
MICHAEL B. MARINOVICH