Patrick L. Tanner (Utah Bar No. 7319)
BURBIDGE & WHITE, LLC
15 West South Temple, Suite 950
Salt Lake City, Utah 84101
Telephone:  (801) 359-7000
Facsimile:  (801) 236-5319
ptanner@burbidgewhite.com

Jay Jerde (WSB# 6-2773) (pro hac vice)
Deputy Attorney General
James Kaste (WSB# 6-3244) (pro hac vice)
Senior Assistant Attorney General
123 Capitol Building
Cheyenne, WY  82002
Telephone:  (307) 777-6946
Facsimile:  (307) 777-3542
jay.jerde@wyo.gov
james.kaste@wyo.gov

Attorneys for *Amicus Curiae* State of Wyoming

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UINTAH COUNTY, UTAH, et al., )<br><br>Plaintiffs, )<br><br>vs. )<br><br>KEN SALAZAR, Secretary, U.S. Department of the Interior, et al., )<br><br>Defendants. )<br><br>SOUTHERN UTAH WILDERNESS ALLIANCE, et al., )<br><br>Intervenor-Defendants. ) | Case No. 2:10-CV-970-CW<br>Case No. 2:11-CV-391-CW<br>(Consolidated)<br><br>Judge Clark Waddoups<br><br>**STATE OF WYOMING'S MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS** |

STATE OF UTAH,                          )
                                        )
              Plaintiff,                )
                                        )
       vs.                              )
                                        )
KEN SALAZAR, Secretary, U.S. Department of   )
the Interior, et al.,                   )
                                        )
              Defendants,               )
                                        )
SOUTHERN UTAH WILDERNESS                )
ALLIANCE, et al.,                       )
                                        )
              Intervenor-Defendants.    )

---

*Amicus curiae*, the State of Wyoming, through its undersigned attorneys, hereby opposes

Defendants' Motions to Dismiss, and in support of this opposition states as follows:

## INTRODUCTION

On December 22, 2010, without any notice or opportunity for public comment, the

Secretary of the Interior issued Secretarial Order No. 3310 (Order), to provide "direction to the

[Bureau of Land Management (BLM)] regarding its obligation to maintain wilderness resource

inventories on a regular and continuing basis for public lands under its jurisdiction." *See* SOI

Order No. 3310, 2010 WL 5541091 § 1 (D.O.I. Dec. 22, 2010).  The Order "directs the BLM to

protect wilderness characteristics through land use planning and project-level decisions unless

the BLM determines . . . that impairment of wilderness characteristics is appropriate[.]" *Id.*

"Wilderness characteristics" are defined by the Wilderness Act, 16 U.S.C. 1131(c). *Id.* § 3.  The

Order applies to all public lands administered by the BLM, and as a practical matter halts most

new productive uses of the public lands.  The Order imposes a stringent non-impairment mandate on the public lands unless and until the BLM establishes that a particular parcel either does not have wilderness characteristics or that other uses are appropriate.  *Id.* § 4.

On its face, the Order is procedurally and substantively unlawful.  The Order radically alters the balance of multiple uses on the public lands in favor of wilderness and immediately upends every Resource Management Plan in the country.  The Order fundamentally misconstrues the separation between wilderness and other resource values established by the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 through 1785, and attempts to circumvent the clearly expressed will of Congress by establishing *de facto* wilderness study areas by administrative fiat.  In addition to its substantive unlawfulness, the Order was promulgated without public notice and comment as required by the Administrative Procedure Act (APA), 5 U.S.C. § 553, and without any environmental analysis as required by National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 through 4370.

On October 1, 2010, Uintah County, the Uintah County Board of Commissioners, and the Utah Association of Counties filed a Complaint against the Secretary of the Interior, the Department of the Interior, the Director of the BLM, and the BLM alleging that Secretarial Order 3310 and the resulting BLM Manuals were promulgated unlawfully.  On April 29, 2011, the State of Utah filed a similar Complaint against the same Defendants.  The Plaintiffs generally allege that Secretarial Order 3310 is an *ultra vires* act, that the Secretary unlawfully circumvented the notice and comment rulemaking procedures required by the APA, that the Order violates the procedural requirements of the FLPMA, that the Order was promulgated in violation of NEPA, that the Order is arbitrary and capricious, and that the Order violates a 2005

Settlement Agreement between the State of Utah and the Department of the Interior.   The Plaintiffs generally ask the Court to declare unlawful and set aside the Order.

The cases were consolidated on June 1, 2011, and on July 8, 2011, the Defendants, and the wilderness advocates who intervened in support of the Defendants, filed motions to dismiss both Complaints.   The Defendants and Defendant-Intervenors contend that the Plaintiffs lack standing, that the issues raised in the Complaints are not ripe for review, that the Order is not a final agency action, that the Court lacks jurisdiction to consider the contract claim, and that Plaintiffs' claims are based on an incorrect interpretation of FLPMA, and therefore, fail to state claims upon which relief can be granted.   In conformity with its limited role as *amicus curiae*, the State of Wyoming will only address the issue of primary importance to Wyoming:   whether FLPMA authorizes the Defendants to manage the public lands to protect wilderness characteristics thereby creating *de facto* wilderness study areas outside of the specific process set forth in the statute.[1]   The facts relevant to the Court's decision on the pending motions have been set forth in great detail in the pleadings and briefs of the principal parties, and will not be repeated here.

## STANDARD OF REVIEW

Defendants' and Defendant-Intervenors' motions are brought pursuant to Fed. R. Civ. Pro. 12(b)(1) for lack of subject matter jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim.   Under either rule, all the well-pleaded allegations of the complaint are accepted as

---

[1] Obviously, the Court must resolve the jurisdictional challenges before considering the merits of Plaintiffs' claims.   In the event the Court determines that it lacks jurisdiction to hear this matter, it must dismiss Plaintiffs' claims without prejudice so that those claims may be brought in a future suit before a court with jurisdiction.   *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216-18 (10th Cir. 2006).

true and construed in the light most favorable to the plaintiff.  *Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1240 (10th Cir. 2000).  The complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  Where a party challenges the allegations supporting subject-matter jurisdiction, the "court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts[.]"  *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).  "In such instances, a court's reference to evidence outside the pleadings does not convert the motion [to dismiss] to a Rule 56 motion [for summary judgment]."  *Id.*

## DISCUSSION

**The plain language of FLPMA and its legislative history preclude the protection of wilderness characteristics as part of the Secretary's general management authority.**

The Defendants claim that the Secretary has the authority to manage the public lands to protect wilderness characteristics pursuant to the general management authority conveyed by FLPMA, although Congress made no such provision in the law.  (Defs.' Mem. in Supp. of Mot. to Dismiss, pp. 45-51).  These assertions persist, even though FLPMA specifically creates separate processes for the protection of lands with wilderness characteristics and for the general management of the public lands.  FLPMA could not be more definitive in its demarcation between the two, and the legislative history of the act confirms this plain common sense reading of the statute.  The fact that the Defendants claim, and two cases involving litigants who were not truly adverse have found, that the statute means something it does not say cannot compel this Court to disregard the plain meaning of a clear and unambiguous act of Congress.  Accordingly,

Plaintiffs' claims for relief based on the Secretary's unlawful exercise of a power not granted to him by Congress cannot be dismissed for failure to state a claim.

The Property Clause in the United States Constitution provides Congress with the power to enact all necessary rules and regulations respecting the federal government's property.  U.S. Const. Art. IV, § 3, cl. 2.  Congress may delegate its power to agencies, but in doing so, it must provide "intelligible principle[s] to which the person or body authorized to [act] is directed to conform[.]"  *J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409 (1928).  An agency may not exercise its authority in a manner that is not consistent with "the administrative structure that Congress enacted into law."  *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 91 (2002).  Agency power to promulgate regulations is limited to the authority delegated by Congress, *Bowen v. Georgetown University Hospital.,* 488 U.S. 204, 208 (1988).  No deference is due an agency's statutory interpretation if that interpretation contradicts the statute's plain language.  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984).

Through its passage of the Wilderness Act, Congress retained for itself sole authority to designate wilderness areas.  The Wilderness Act was enacted to "secure for the American people of present and future generations the benefits of an enduring resource of wilderness."  16 U.S.C. § 1131(a).  To achieve its goal, the Wilderness Act immediately designated certain areas as wilderness and provided the procedure for future designation of "wilderness areas."  16 U.S.C. § 1132(a)-(b).  It further provided, "no Federal lands shall be designated as 'wilderness areas' except as provided for in this chapter or by a subsequent Act."  16 U.S.C. § 1131(a).  In addition, one of the "major purposes" of the Wilderness Act was to place "ultimate responsibility for wilderness classification in Congress," and to create a "statutory framework for the preservation

of wilderness that would permit long-range planning and ***assure [that] no future administrator could arbitrarily or capriciously . . . make wholesale designations of additional areas in which use would be limited.***"  *Parker v. United States,* 309 F.Supp. 593, 597 (D. Colo. 1970), *aff'd*, 448 F.2d 793 (10th Cir. 1971) (emphasis added) (quoting H.R. Rep. No. 88-1538 *reprinted in* 1964 U.S.C.C.A.N. 3615).   In other words, the Wilderness Act prohibits precisely what happened in this case.

Conversely, through its passage of FLPMA, Congress delegated power to the Secretary and the BLM to manage the public lands, but that delegation was subject to the constraints in the act.  FLPMA was enacted to establish uniform land policy for the nation's public lands.  FLPMA directs that public lands be managed "on the basis of multiple use and sustained yield unless otherwise specified by law[.]"  43 U.S.C. 1701(a)(7).  In this regard, Congress declared that:

> the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use[.]

43 U.S.C. § 1701(a)(8).  At the same time, the public lands are to be managed in recognition of "the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands[.]"  43 U.S.C. § 1701(a)(12).

Multiple use and sustained yield are specifically defined in FLPMA as follows:

> (c) The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes

into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

* * *

 (h) The term "sustained yield" means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use.

43 U.S.C. § 1702(c), (h).

Multiple use and sustained yield as defined in FLPMA do not explicitly incorporate the concept of wilderness or wilderness characteristics.[2]  Instead, FLPMA does explicitly provide that " 'wilderness' as used in section 1782 of this title shall have the same meaning as it does in section 1131(c) of Title 16."  43 U.S.C. § 1702(i).  Section 1131(c) of Title 16 is the Wilderness Act, which defines wilderness as:

A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain

---

[2]  Similarly, wilderness is not one of the principal or major uses of the public lands.  FLPMA provides that the " 'principal or major uses' of the public lands includes, and is limited to domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production."  43 U.S.C. § 1702(l).

> ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c).

The plain language of FLPMA differentiates between wilderness and multiple use, and their disparate definitions do not suggest an area of overlap between the two terms. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Chickasaw Nation v. United States,* 208 F.3d 871, 880 (10th Cir. 2000) (citations and quotations omitted). Accordingly, had Congress intended for multiple use management to include the protection of wilderness characteristics, it would have said so explicitly.

Congress knows how to specify that wilderness protection is a proper part of multiple use management, and did exactly that in the Multiple Use and Sustained Yield Act, 16 U.S.C. §§ 528 through 531 (MUSYA). In MUSYA, which predates FLPMA, multiple use is defined in much the same manner as in FLPMA, but recognizing that multiple use as defined did not include wilderness, Congress explicitly provided, "[t]he establishment and maintenance of areas of wilderness are consistent with the purposes and provisions of sections 528 to 531 of this title." 16 U.S.C. § 529. Congress could have done the same thing in FLMPA, but it chose instead to provide for the protection of lands with wilderness characteristics separately, rather than in the course of multiple use management.

FLPMA goes on to differentiate between inventory and land use planning for multiple use purposes and for wilderness preservation. Generally, Sections 201 and 202 of FLPMA

govern the classification and management of the public lands.  43 U.S.C. §§ 1711, 1712.  Section

201 provides in pertinent part:

> (a) The Secretary shall prepare and maintain on a continuing basis an inventory of
> all public lands and their resource and other values (including, but not limited to,
> outdoor recreation and scenic values), giving priority to areas of critical
> environmental concern.  This inventory shall be kept current so as to reflect
> changes in conditions and to identify new and emerging resource and other
> values.  The preparation and maintenance of such inventory or the identification
> of such areas shall not, of itself, change or prevent change of the management or
> use of public lands.

43 U.S.C. § 1711(a).  Once the public lands have been inventoried:

> The Secretary shall, with public involvement and consistent with the terms and
> conditions of this Act, develop, maintain, and, when appropriate, revise land use
> plans which provide by tracts or areas for the use of the public lands.  Land use
> plans shall be developed for the public lands regardless of whether such lands
> previously have been classified, withdrawn, set aside, or otherwise designated for
> one or more uses.

43 U.S.C. § 1712(a).  Moreover, "[i]n the development and revision of land use plans, the

Secretary shall [] use and observe the principles of multiple use and sustained yield set forth in

this and other applicable law[.]"  43 U.S.C. § 1712(c)(1).  Neither wilderness nor wilderness

characteristics are identified in the list of specific directions for the Secretary to follow in the

development and revision of land use plans.  43 U.S.C. § 1712(c).  In fact, the word

"wilderness," a term specifically defined in FLPMA, is not present in either Section 201 or 202.

Moreover, neither section authorizes the Secretary to preserve certain public lands in their

"natural condition," and the words "natural condition" are not present in either Section 201 or

202.[3]

---

[3] As will be evident in the discussion below, the policy of FLPMA to preserve certain lands in
their "natural condition" refers solely to the wilderness study process outlined in Section 603.  43
U.S.C. § 1782.  This is evident not just from the structure of FLPMA, but also from the

In contrast to multiple use management which generally applies to the majority of public lands, FLPMA also "provides a method and a statutory mandate to examine BLM lands for wilderness characteristics, and, where appropriate, to incorporate the lands into the wilderness system." *Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 745 (10th Cir. 1982) (citing H.Rep. No. 1163 at 3, 17-18; S.Rep. No. 583 at 43-45).  It is widely acknowledged that "[s]ection 603 provides an exception to the BLM's mandate to manage public lands under the principles of multiple use and sustained yield.  This section gave the BLM a time-limited power to select federal lands under its control meeting the definition of wilderness for designation as [wilderness study areas]."  *Utah v. Norton*, No. 2: 96-CV-0870, 2006 WL 2711798, at *8 (D. Utah Sept. 20, 2006) (unpublished).  Section 603 provides in pertinent part:

(a) Lands subject to review and designation as wilderness

**Within fifteen years after October 21, 1976, the Secretary shall review those roadless areas** of five thousand acres or more and roadless islands of the public lands, identified during the inventory required by section 1711(a) of this title **as having <u>wilderness characteristics</u> described in the Wilderness Act of September 3, 1964** (78 Stat. 890; 16 U.S.C. 1131 et seq.) and shall from time to time report to the President his recommendation as to the suitability or nonsuitability of each such area or island for preservation as wilderness: *Provided*, []That the Secretary shall report to the President by July 1, 1980, his recommendations on those areas which the Secretary has prior to November 1, 1975, formally identified as natural or primitive areas. The review required by this subsection shall be conducted in accordance with the procedure specified in section 3(d) of the Wilderness Act [16 U.S.C.A. § 1132(d)].

(b) Presidential recommendation for designation as wilderness

The President shall advise the President of the Senate and the Speaker of the House of Representatives of his recommendations with respect to designation as wilderness of each such area, together with a map thereof and a definition of its boundaries. Such advice by the President shall be given within two years of the

definition of wilderness which "is protected and managed so as to preserve its natural conditions."  43 U.S.C. § 1702(j) incorporating 16 U.S.C. § 1131(c).

receipt of each report from the Secretary. A recommendation of the President for designation as wilderness shall become effective only if so provided by an Act of Congress.

(c) Status of lands during period of review and determination

During the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands according to his authority under this Act and other applicable law in a manner so as not to impair the suitability of such areas for preservation as wilderness[.]

43 U.S.C. § 1782 (emphasis and underline added).

Thus, when Congress meant wilderness it said wilderness, and when it meant lands with wilderness characteristics it said lands with wilderness characteristics. Congress' decision to create a separate mechanism for reviewing lands with wilderness characteristics and to create wilderness study areas is of tremendous consequence, because " '[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode.' " *Christensen v. Harris County*, 529 U.S. 576, 583 (2000) (quoting *Raleigh v. Gaston R. Co. v. Reid*, 13 Wall. 269, 270, 20 L.Ed. 570 (1872)). Moreover, as this Court has recognized,

It makes no sense that the same Congress that jealously recognized its sole authority to declare wilderness and that set up two major laws (the Wilderness Act and FLPMA) to accomplish a properly considered exercise of that authority, would have created within one general section (section 202) of FLPMA an open-ended authority on the part of the executive branch of government to create WSAs which, once created, result in *de facto* wilderness. The Wilderness Act's process clearly ended in ten years, and FLPMA's wilderness designation provisions, including those relating to the creation of WSAs, clearly ended in 1991, with the President's recommendation to Congress based thereon to occur no later than 1993.

2006 WL 2711798 at 29. Similarly, it makes no sense that Congress would set forth a specific procedure for the protection of lands with wilderness characteristics, and then create within one

general section of FLPMA an open-ended authority for the Secretary to do the same thing unilaterally.

While it is clear that FLPMA established two distinct processes, one for multiple use management and one for the protection of lands with wilderness characteristics, the two courts that have considered the issue have determined that the statute does not foreclose the consideration of wilderness characteristics and management to the non-impairment standard outside of the Section 603 process.  In *Oregon Natural Desert Association v. BLM*, 531 F.3d 1114 (9th Cir. 2008), *opinion amended to reflect settlement*, 625 F.3d 1092 (9th Cir. 2010), the court held that the BLM had a duty under the NEPA to analyze the effects of a land use plan on lands possessing wilderness characteristics.  *Id.* at 1115-16.  In reaching this conclusion, the court found:

> Importantly, although 43 U.S.C. § 1782 [Sec. 603] provides a mechanism by which the BLM may submit lands to Congress for legislation preserving them, the BLM's authority to identify lands with "wilderness characteristics" is not limited to the § 1782 process.  Rather, as § 1782 makes clear, it is the 43 U.S.C. § 1711(a) [Sec. 201] general resource inventory process, which catalogues "all public lands and their resource and other values," *id.*, that is to identify lands "as having wilderness characteristics described in the Wilderness Act." *Id.* § 1782(a); see also *Sierra Club v. Watt*, 608 F.Supp. 305, 309-10 (C.D.Cal.1985) (describing the "inventory preparation requirement of [§ 1711]" as the first step in the wilderness review and designation process of § 1782); *Wilderness Soc'y*, 119 I.B.L.A. 168, 170-72 (1991) (discussing the wilderness process as occurring under both §§ 1711 and 1782).  In other words, wilderness characteristics are among the "resource and other values" of the public lands to be inventoried under § 1711.  The BLM's land use plans, which provide for the management of these resources and values, are, again, to "rely, to the extent it is available, on the inventory of the public lands, their resources, and other values." 43 U.S.C. § 1712(c)(4).

531 F.3d at 1119 -1120 (footnote omitted).  The court went on to find that FLPMA contemplates that the inventory process includes identification of wilderness characteristics and is not time limited.  *Id.* at 1134.  The court then found that the wide authority given to the Secretary by

FLPMA to manage the public lands is broad enough to allow for management of lands with wilderness values.  *Id.* at 1135.  Finally, the court found that because such an approach "entails alterable rather than permanent protection of land as wilderness, it is not at all equivalent to § 1782(c) protection."  *Id.* at 1136.

Similarly, in *Utah v. Norton*, the court considered the validity of a settlement between the State of Utah and the BLM which recognized that the Section 603 wilderness study and designation process had been completed, but asserted that the BLM still had authority under Section 201 to inventory the public lands for resources and other values which may include "characteristics that are associated with the concept of wilderness."  2006 WL 2711798 at *5.  In its decision upholding the settlement agreement, the court noted the BLM's broad discretion under FLPMA, found that the statute permits the agency to manage public lands to protect their wilderness character, and that such management does not create *de facto* wilderness, because the management plan is subject to change.  2006 WL 2711798 at *23.  This finding has never been presented to the Tenth Circuit Court of Appeals.  *See Utah v. U.S. Dep't of Interior*, 535 F.3d 1184 (2008) (holding that challenge to settlement agreement was not ripe).

It is important to point out that in neither of the foregoing decisions were the courts faced with litigants who had an interest in seeing FLPMA construed as it is written.  The litigants in *Oregon Natural Desert Association* consisted of the BLM and an environmental group, both of whose interests were served by maintaining the BLM's erroneous interpretation of its authority under FLPMA.  Conversely, while the State of Utah in *Utah v. Norton*, had an overriding interest in correcting the BLM's erroneous interpretation, it had no incentive to do in litigation that which it had resolved favorably by settlement.  Moreover, in that case, Utah faced and this Court

14

rejected an explicit attempt to designate Section 202 wilderness study areas after the authority provided in Section 603 to do so expired.  While the court made several statements in dicta regarding the Secretary's authority to address lands with wilderness characteristics pursuant to Section 202, that issue was not before the court.  Thus, the decisions in *Oregon Natural Desert Association* and *Utah v. Norton* are of little persuasive value since they are not the product of a vigorous adversarial process on the issue presented in this litigation.

Had truly adverse litigants fully briefed the courts in those cases they would have demonstrated that the specific provision for the protection of wilderness characteristics in Section 603 and the conspicuous absence of any mention of wilderness or wilderness characteristics in Sections 201 and 202, shows that Congress did not intend to give the Secretary any authority related to wilderness characteristics beyond that provided in Section 603.  This decision is perfectly in keeping with Congress' choice in the Wilderness Act to retain control over the establishment of all wilderness areas.  Truly adverse parties would have pointed out to the courts the consistent separation of wilderness and multiple use management in FLPMA and the lack of any overlap in the definitions applicable to the two processes.  Moreover, such litigants would have shown that such separation coupled with the specific time limitations set forth in Section 603 was a clear mandate from Congress to put wilderness issues to rest by a specific date.  Unfortunately, the courts never had the benefit of those arguments which are well founded in the plain and unambiguous language of the statute.  Had parties who were truly interested in enforcing FLPMA's plain and unambiguous language been before these courts, the results would likely have been very different.

Moreover, in neither case did the parties provide any briefing on the legislative history of FLPMA.  Of course,

> A statute must be interpreted to effect its evident purpose, *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979), and to be consistent with "evidenced congressional intent," *Symons v. Chrysler Corp. Loan Guarantee Board*, 670 F.2d 238, 242 (D.C.Cir.1981). Although our analysis "must begin with the language of the statute itself," *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979), <u>congressional purpose and intent are best divined by examining the statute's legislative history and background.</u>

*Rocky Mountain Oil and Gas Ass'n*, 696 F.2d at 745 (underline added).

When FLPMA's legislative history is considered, it is even more apparent that Congress did not intend for the Secretary to use his general management authority under Sections 201 and 202 to inventory or protect lands with wilderness characteristics after the period set forth in Section 603.  FLPMA is the product of different House and Senate bills, and the statute's legislative history starts in the Senate on December 18, 1975, and a bill referred to as S. 507. That bill did not separate multiple use management and wilderness review into different sections. Instead, Section 102 of S. 507 set forth the inventory and wilderness review provisions together, and provided in pertinent part:

> Sec. 102.   Inventory.--(a) The Secretary shall prepare and maintain on a continuing basis an inventory of all national resource lands, and their resource and other values (including outdoor recreation and scenic values), giving priority to areas of critical environmental concern.   **Areas containing wilderness characteristics** as described in section 2(c) of the Act of September 3, 1964 (78 Stat. 890, 891), **shall be identified within five years of enactment of this Act**.

S.R. No. 94-583 at 4 (1975) (emphasis added).  The bill went on to provide:

> (d) **Areas identified pursuant to section 102 as having wilderness characteristics shall be reviewed within fifteen years of enactment of this Act** pursuant to the procedures set forth in subsections 3(c) and (d) of the Act of September 3, 1964 (78 Stat. 890, 892-893): Provided, however, That such review

16

shall not, of itself, either change or prevent change in the management of the national resource lands.

*Id.* at 5 (emphasis added). Thus, the continuing duty to inventory the public lands did not extend to lands with wilderness characteristics, which must be identified within the time limits set forth in the bill.

This conclusion is reinforced in the Senate's section by section analysis of the bill. In its discussion of the inventory process, the Senate Report states that "[a]s part of the inventory process, the Secretary is to identify <u>within five years</u> of S. 507's enactment any roadless areas of five thousand acres or more and roadless islands <u>containing wilderness characteristics</u> as described in section 2(c) of the Wilderness Act (Act of September 3, 1964, 78 Stat. 890, 891)." S.R. No. 94-583 at 43 (underline added). Moreover, the section by section analysis also makes clear that the wilderness provisions of the bill were designed to supersede the Secretary's practice of designating "primitive areas" and provide an "affirmative statutory base" for the protection of "areas found to have wilderness characteristics." *Id.* at 44. Thus, one of the purposes of the new legislation was to constrain the Secretary from unilaterally removing lands with wilderness characteristics from multiple use management.

The House bill was referred to as H.R. 13777 and is substantially similar to FLPMA as enacted. The House bill separated multiple use management and wilderness review into two separate sections (Section 202 and Section 311). Thus, any confusion that may have been created by the discussion of multiple use management and wilderness review in the same section in S. 507 was removed by their separation in H.R. 13777. The House bill makes clear that there simply is no overlap between land use planning and the process for protecting lands with wilderness characteristics.

In addition, in the section by section analysis, the House Report explained that the purpose of Section 311 was to "extend[] the Wilderness Act to the public lands."  H.R. Rep. No. 94-1163 at 17 (1976).  Of course, the Wilderness Act preserved Congress' power to decide which lands with wilderness characteristics would be removed from multiple use management, and there is no role for the Secretary in those decisions under that Act.  Accordingly, the Secretary has no role related to wilderness or wilderness characteristics outside that provided in Section 311.  The section by section analysis in the report related to Section 202 reaffirms as much by saying nothing about wilderness or wilderness characteristics in the land use planning process.  *Id.* at 435-37.

Similarly, the section by section analysis related to Section 201, which addresses the Secretary's obligation to conduct inventories of the public lands, provided as follows:

> This provision directs the Secretary of the Interior and the Secretary of Agriculture to inventory the lands (**except wilderness**) under their respective jurisdiction, and subject to the availability of funds, to identify such lands and provide state and local governments with data from the inventory.

*Id.* at 5 (emphasis added).  This statement by the House could not be clearer.  The Secretary's continuing obligation to inventory the public lands simply does not include wilderness, because the only authority to consider wilderness characteristics for any purpose is found exclusively in Section 311 (Section 603 of the final legislation).

The conference report sheds some additional light on the issue, and with regard to wilderness review, provides:

> 36. Both the Senate bill and the House amendments provided for wilderness studies and inclusion of appropriate wilderness areas in the National Wilderness Preservation System. <u>The House amendments provided specific detail for the conduct of studies, inclusion of lands in the Wilderness Preservation System, and</u>

> exclusion of lands from the study provisions of S. 507. The conferees adopted the
> House amendments with further amendments. []

H.R. Conf. Rep. 94-1724, at 65, reprinted in 1976 U.S.C.C.A.N. 6227, 6237 (underline added).

Thus, the conference report also notes that the House amendments set up a specific separate

process to address wilderness.

In light of the foregoing, had the Ninth Circuit and the District Court in Utah been

presented with a full briefing on the legislative history, they would have reached different

conclusions. The legislative history demonstrates the clear intent of Congress was to establish a

statutory process preempting the Secretary's unilateral removal of lands from multiple use

management. It would be odd indeed for Congress to stop this practice in one section of the

statute, but give the Secretary free rein to continue the practice in another section. Similarly, the

legislative history conclusively shows Congress' desire to create a process that would address

lands with wilderness characteristics within a specific time frame. It would make no sense for

Congress then to authorize the Secretary to address lands with wilderness characteristics in

perpetuity. Accordingly, no court given the benefit of full briefing on the aims of Congress and

the clear legislative history could conclude that Congress authorized the Secretary to protect

lands with wilderness characteristics pursuant to Section 202 of FLPMA.

In defense of its overreaching interpretation of FLPMA, the Defendants assert that they

have always interpreted FLPMA that way and behaved as if they had such authority. (Def.'s

Mem. in Support of Mot. to Dismiss pp. 50-51). Of course, the Defendants' interpretation of

FLPMA and their course of conduct are of no consequence. Defendants cannot usurp a power

not granted to them by Congress by force of habit. *See Chevron*, 467 U.S. at 842-43 ("If the

intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must

give effect to the unambiguously expressed intent of Congress.").  Accordingly, the Defendants'
reliance on their own conduct as an excuse for their failure to follow the law should be ignored
by this Court.

**CONCLUSION**

FLPMA is a simple statute that says precisely what it means.  This Court must follow the
plain and unambiguous language of the statute, and find that Section 603 provides the explicit
and exclusive authority for the Secretary to consider wilderness characteristics for any purpose.
As a consequence there will be fewer lands subject to or protected by (depending on a party's
perspective) the non-impairment standard established in FLPMA for wilderness study areas.
Whether that result is good or bad is irrelevant to the Court's determination in this case.
Congress weighed the costs and benefits of authorizing the Secretary to protect lands with
wilderness characteristics on his own, and declined to grant him that authority.  Anyone
dissatisfied with that decision should seek redress in Congress, and this litigation should be
permitted to proceed to correct the Secretary's unlawful usurpation of authority specifically
retained by Congress.

//

//

//

//

//

//

//

20

WHEREFORE, the State of Wyoming respectfully requests that this Court deny Defendants' and Defendant-Intervenors' Motions to Dismiss.

SUBMITTED this 7th day of October, 2011.

Attorneys for *Amicus Curiae*
State of Wyoming

/s/ Patrick L. Tanner
Patrick L. Tanner (Utah Bar No. 7319)
BURBIDGE & WHITE, LLC
15 West South Temple, Suite 950
Salt Lake City, Utah 84101
Telephone:  (801) 359-7000
Facsimile:  (801) 236-5319
ptanner@burbidgewhite.com

Jay Jerde (WSB# 6-2773)
Deputy Attorney General
jay.jerde@wyo.gov

James Kaste (WSB# 6-3244)
Senior Assistant Attorney General
123 Capitol Building
Cheyenne, WY  82002
(307) 777-6946
(307) 777-3542 Facsimile
james.kaste@wyo.gov