JOHN E. SWALLOW #5802
Chief Deputy Attorney General
HARRY H. SOUVALL #4919
ROGER F. FAIRBANKS #3792
Assistant Attorney General
MARK L. SHURTLEFF #4666
UTAH ATTORNEY GENERAL
5110 State Office Building
P.O. Box 142477
Salt Lake City, UT 84114-2477
Telephone:  (801) 538-9687
Fax:  (801) 538-9727
jswallow@utah.gov
hsouvall@utah.gov
rfairbanks@utah.gov
    *Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STATE OF UTAH,<br><br>        Plaintiff,<br><br>vs.<br><br>KEN SALAZAR, in his official capacity as Secretary for the Department of Interior; the DEPARTMENT OF THE INTERIOR, an agency of the United States of America; ROBERT V. ABBEY, in his official capacity as Director for the Bureau of Land Management; and the BUREAU OF LAND MANAGEMENT, an agency of the United States of America,<br><br>        Defendants. | AMENDED COMPLAINT<br><br><br>Case No. 2:10-cv970-CW<br>Case No. 2:11-cv-391-CW<br>(consolidated)<br><br><br>Judge  Clark Waddoups<br>Magistrate Judge Samuel Alba |

| | |
|---|---|
| STATE OF UTAH,<br><br>     Plaintiff,<br><br>vs.<br>KEN SALAZAR, in his official capacity as Secretary for the Department of Interior; the DEPARTMENT OF THE INTERIOR, an agency of the United States of America; ROBERT V. ABBEY, in his official capacity as Director for the Bureau of Land Management; and the BUREAU OF LAND MANAGEMENT, an agency of the United States of America,<br>     Defendants. | |

Plaintiff State of Utah (also "State" and "Utah"), for claims against Defendants, alleges as follows:

## **INTRODUCTION**

Plaintiff Uintah County initially filed this lawsuit to challenge the Defendants' unlawful wilderness management policy[1] that has been applied to an estimated 385,000 acres of public lands primarily located in Uintah County, Utah and managed by the Bureau of Land Management ("BLM") in the Vernal Resource Area.  These lands were also within the boundaries of proposed wilderness legislation, H.R. 1925, "America's Red Rock Wilderness

---

[1] Plaintiff State of Utah uses the term "unlawful wilderness management" to include both BLM's procedurally unlawful actions in enacting the policy (Order 3310 and the associated manuals) authorizing the inventory and management of Lands with Wilderness Characteristics along with the substantive  management scheme itself.  Cf. *Wyoming v. Department of Agriculture*, Nos, 08-8061, 09-8075 where Forest Service Roadless Area Conservation Rule was upheld when Rule complied with rulemaking procedures and Rule was not as restrictive as the prohibitions in the Wilderness Act.

Act," (Red Rock Wilderness Bill) that was introduced in the 111th Congress on April 2, 2009, but was never enacted.

On December 22, 2010, Secretary of the Interior Ken Salazar and the DOI issued Order 3310. Shortly thereafter, BLM issued Manuals 6301, 6302, and 6303 (together, "Manuals") pursuant to Order 3310. This procedurally flawed Order—which constitutes a new rule—departs from BLM's established practice by (1) making wilderness protection the land management priority for all public lands administered by the BLM, notwithstanding statutory enumeration of principal or major multiple uses for public lands, which directly conflict with wilderness management; (2) creating a new public land designation of "Wild Lands" that is indistinguishable from Wilderness Study Areas ("WSA") authorized by Section 603 of the Federal Land Policy and Management Act ("FLPMA"); (3) requiring BLM to immediately avoid impairing the wilderness character of those public lands thought to have wilderness character (Lands with Wilderness Character or LWCs); (4) requiring a mandatory review of all project level decisions to identify lands with wilderness character and manage to protect those wilderness characteristics, even if the proposed project must be denied; (5) creating additional steps in the implementation of land management decisions, independent of statutory or regulatory authority; and (6) superseding existing land use management plans.

Order 3310 establishes and defines a new land management category called "Wild Lands" without following rulemaking procedures. Even if DOI had complied with rulemaking, implementation of Order 3310 as promulgated requires a land use plan amendment because the implementation of the new "Wild Lands" category and its accompanying new procedural steps are not authorized or contained within existing land use plans.

Order 3310 is unlawful because it is *ultra vires* and violates the following statutes: (1) the National Environmental Policy Act ("NEPA"), (2) the Administrative Procedures Act ("APA"), and (3) FLPMA.

Order 3310 represents a major federal action which, pursuant to NEPA, requires DOI to take a "hard look" at the environmental consequences of the action and to prepare an Environmental Impact Statement ("EIS").  Without the preparation of an EIS, NEPA requirements were unmet.

Order 3310 violates the APA because it constitutes (1) an arbitrary and capricious departure from BLM's interpretation of its management mandate under FLPMA and (2) rulemaking without compliance with the APA.  DOI's failure to provide any contemporaneous legal interpretation to explain or support this obvious reversal of policy renders the issuance of Order 3310 arbitrary, capricious, and not in accordance with the law.  Order 3310 also violates DOI's own policy of following mandatory notice and comment rulemaking procedures.  Order 3310 violates FLPMA because it (1) constitutes a plan revision or amendment without following the mandatory statutory and regulatory procedures, (2) disregards the deadline for designating WSA's set forth in section 603 of the Act, (3) requires all lands subject to the Order be managed according to the non-impairment standard reserved for WSA's until released by the new procedure, and (4) establishes a new management procedure which requires the BLM to make recommendations to Congress of Wild Lands which the BLM believes to be suitable for inclusion in the National Wilderness Preservation System.

On April 15, 2011, the President signed into law a continuing resolution to fund the federal government for the remainder of fiscal year 2011.  Department of Defense and Full-Year

Continuing Appropriations Act, 2011, Pub. Law No. 112-10, 125 Stat. 38 (Apr. 15, 2011)

("Appropriations Act"). Section 1769 of the Appropriations Act provides:

> For the fiscal year ending September 30, 2011, none of the funds made available by this division or any other Act may be used to implement, administer, or enforce Secretarial Order No. 3310 issued by the Secretary of the Interior on December 22, 2010.

*Id*. This spending restriction was extended to November 18, 2011**.**

On April 30, 2011, Plaintiff State of Utah sued Defendants to obtain an order declaring Secretarial Order 3310 *ultra vires* and unlawful because the Order (1) usurps Congress' authority by amending FLPMA to alter the statutory multiple use priorities and attempts to extend wilderness management to all public lands when the law limits wilderness management to designated WSAs or congressionally designated wilderness and (2) fails to follow the procedures established in FLPMA for rulemaking, amending resource management plans ("RMPs"), for withdrawing public lands from mineral development, coordinating with state and local governments, and examining the possible environmental impacts of a federal action before it is adopted. The actions of the Secretary also arbitrarily and capriciously violate the terms and commitments made in the September 9, 2005, Settlement Agreement ("Utah Settlement Agreement") reached between the DOI and the State of Utah, the School and Institutional Trust Lands Administration ("SITLA") and the Utah Association of Counties ("UAC"). The Utah Settlement Agreement ended litigation in which DOI contended that it only gathered information but did not change management. Unlike that court case, Secretarial Order 3310 changes land management for an estimated 6 million acres of public land in Utah.

On June 1, 2011, after the filing of this action, the Secretary issued a Memorandum to the Director of BLM confirming that pursuant to the Appropriations Act, Order 3310 was being placed in abeyance due to the funding ban and BLM would not designate any "Wild Lands" under the order. This funding ban which was originally set to expire on September 30, 2011, was extended until November 18, 2011.

America's Red Rock Wilderness Act, also known as the "Red Rock Wilderness Bill", is proposed legislation that has been introduced into Congress every year since 1990.  Congress has failed to act on it for over twenty years.  Beginning in 2009, as either preparation for Order 3310 or as an unwritten policy to implement the Red Rock Wilderness Bill, Defendants began to implement the Department of Interior's unlawful wilderness management policy by delaying or rejecting proposed actions by or on behalf of the state or counties in areas subject to the Red Rock Wilderness Bill.

In December 2010, when the Secretary issued Order 3310, Defendants continued to implement the unlawful wilderness policy by delaying or denying projects allowed under existing RMPs in spite of the Continuing Appropriation Act (CAA)§169 which defunded the implementation of Order 3310.  The interests of the State of Utah are being adversely affected by both Order 3310's text and implementation to protect areas in the Red Rock Wilderness Bill in violation of FLPMA, the APA, NEPA and the Continuing Resolutions (CAA§169).  The State is presently suffering a procedural and substantive injury due to BLM's application of Order 3310 or BLM's unlawful wilderness management actions which have adversely impacted numerous recent projects in the State of Utah in which the State has a proprietary and governmental interest. Among BLM's pattern of  unlawful actions are as follows:  1) deferred or denied

mineral leasing in Uintah County, 2) delayed or denied Title V rights-of-way applications, and 3)

the refusal to permit  legitimate and authorized projects  in Carbon and other Utah counties.

Plaintiff State of Utah brings this Amended Complaint and asks the Court to find

Defendants' actions unlawful, to declare Order 3310 permanently null and void, to have the

Manuals set aside, and to enjoin Defendants from managing public lands in a manner contrary to

the existing law and RMPs.

## I.   JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal

question); 28 U.S.C. § 2201 (declaratory judgment); 28 U.S.C. § 1361 (mandamus); FLPMA, 43

U.S.C. §§ 1701-1784; NEPA, 42 U.S.C. §§ 4321-35; and the APA, 5 U.S.C. § 706.   Judicial

review of Defendants' actions is also available under the doctrine of non-statutory judicial

review of agency action because Defendants have acted without statutory authority and the

challenged actions are *ultra vires*.  *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988).

2.      The APA also authorizes judicial review of Defendants' actions because

Defendants have acted contrary to law and without lawful authority, 5 U.S.C. § 706(2)(C), and

arbitrarily, capriciously, and not in accordance with law.  5 U.S.C. § 706(2)(A).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a

substantial portion of the property subject to the Order is situated within the state of Utah.

## II.   PARTIES

4.      Utah is one of fifty sovereign states forming the United States of America, having

been admitted to the Union on January 4, 1896, on an equal footing with the original states.  The

executive power of the State is vested in the Governor, who is responsible for seeing that the laws of the State are faithfully executed.  Utah Const. art. VII, § 5; UTAH CODE ANN. § 67-1-1.

5.      Defendant Ken Salazar is the Secretary of Interior ("Secretary Salazar").  In his official capacity, Secretary Salazar is responsible for upholding the Constitution of the United States and for setting public lands policy in accordance with the provisions and requirements of federal law, including FLPMA.

6.      Defendant Department of the Interior is the department of the federal government to which Congress delegated authority to administer the public lands (except those administered by the National Forest Service) in accordance with the U.S. Constitution and federal law.

7.      Defendant Robert V. Abbey is the Director of the BLM ("Director Abbey").  In his official capacity, Director Abbey is responsible for managing those public lands under BLM authority in accordance with the U.S. Constitution and federal law.

8.      Defendant Bureau of Land Management is a federal agency within DOI and is responsible for the management of approximately 22.9 million acres of federal surface and 23 million acres of mineral estate in Utah.

### III.      STATUTORY AND REGULATORY FRAMEWORK

**A.      The Wilderness Act**

9.      The Wilderness Act of 1964 was enacted "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness."  Management of these wilderness areas was to be done in "such manner as will leave them unimpaired for future use and enjoyment as wilderness."  16 U.S.C. § 1131(a).

10.     The Wilderness Act process for adding lands to the National Wilderness Preservation System ("NWPS") begins with recommendations to the President from the secretary of either the Departments of Agriculture or Interior.  The President then makes a recommendation to Congress, which reserved to itself the power to designate wilderness. Specifically, the Wilderness Act states that "no Federal lands shall be designated as 'wilderness areas' except as provided for in this chapter or by a subsequent Act."  *Id*.

11.     The Act defines wilderness as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain" and "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvement or human habitation."  A qualifying area is defined as an area that:

> (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, education, scenic, or historical value.

*Id*. § 1131(c).

### B.     The Federal Land Policy and Management Act

12.     Congress enacted FLPMA, 43 U.S.C. § 1701–1787, to establish uniform and coherent administration of public lands.  This Congressional mechanism includes the (1) creation of resource inventories and land use plans, (2) implementation of "multiple use" management plans, (3) management of lands recommended for inclusion in the NWPS as WSAs, and (4) designation and management of Areas of Critical Environmental Concern ("ACECs") according to land use plans.

### 1. Inventory and Land Use Plans

13. Section 201 of FLPMA requires the Secretary of the Interior to "prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern." 43 U.S.C. § 1711(a). This inventory is to be kept current in order to reflect any changed conditions and to "identify new and emerging resource and other values." *Id*.

14. In addition to the requirement to prepare an inventory, FLPMA requires that "[t]he preparation and maintenance of [the] inventory or the identification of such areas *shall not*, of itself, change or prevent change of management or use of public lands." *Id*. (emphasis added).

15. Section 202 of FLPMA requires the Secretary of the Interior, with public participation, to "develop, maintain, and when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." *Id*. § 1712(a). In developing these land use plans, currently known as Resource Management Plans (or RMPs), the BLM must rely "on the inventory of the public lands, their resources, and other values." *Id*. § 1712(c)(4).

16. FLPMA also requires the Secretary of the Interior to "coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of . . . the State and local governments within which the lands are located." *Id*. § 1712(c)(9).

17. Moreover, the Secretary of the Interior:

shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs,

land use regulations, and land use decisions for public lands, including early
public notice of proposed decisions which may have a significant impact on non-
Federal lands.  Such officials in each State are authorized to furnish advice to the
Secretary [of the Interior] with respect to the development and revision of land
use plans [and] land use guidelines. . . for the public lands within such State and
with respect to such other land use matters as may be referred to [the Secretary of
the Interior] by them.

*Id*.

### 2.     Multiple Use and Sustained Yield

18.     As set forth in FLPMA, the guiding principle in the management of the public

lands generally, and the RMPs specifically, is multiple use and sustained yield.  43 U.S.C. §

1732(a).

19.     "Multiple use" is defined as "management of public lands and their various

resources so that they are utilized in the combination that will best meet the present and future

needs of the American people . . . ." *Id*. § 1702(c).

20.     These resources include, but are not limited to, "recreation, range, timber,

minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values."  *Id*.

21.     "Sustained yield" is defined as "the achievement and maintenance in perpetuity of

a high-level annual or regular periodic output of various renewable resources of the public lands

consistent with multiple use."  *Id*. § 1702(h).

22.      As set forth in FLPMA, the "principal or major uses" of public lands include and

are limited to "domestic livestock grazing, fish and wildlife development and utilization, mineral

exploration and production, rights-of-way, outdoor recreation, and timber production."  *Id*. §

1702(l).

### 3.     Wilderness Study Areas

23.     Wilderness Study Areas, or WSA's, are those lands inventoried and identified by BLM as suitable for preservation as wilderness, subject to prior existing rights and uses.  43 U.S.C. § 1782(c).

24.     Because the Wilderness Act does not directly address BLM's authority to designate or manage public lands as wilderness, FLPMA section 603 provides for a two-step inventory and management process.

25.     First, within fifteen years of October 21, 1976, passage of FLPMA, the Secretary of the Interior was to use the section 201 Inventory to review "roadless areas of five thousand acres or more and roadless islands of the public lands."  During that fifteen year period, the Secretary of the Interior was required "from time to time [to] report to the President his recommendation as to the suitability or no-suitability of each area or island for preservation as wilderness."  *Id*. § 1782(a).

26.     On October 21, 1991, BLM's authority to review, recommend, create or manage lands as WSAs terminated.  *Id.*

27.     Second, the President was to advise Congress within two years of each report by the Secretary of the Interior of "his recommendations with respect to designation as wilderness of each such area. . . ."  *Id*. § 1782(b).

28.     As stated above, only Congress has the discretion to either designate WSA lands as part of the NWPS or to release them for other uses.

29.     Prior to congressional determination, management of recommended WSA's must be done in "a manner so as not to impair the suitability of such areas for preservation as

wilderness," subject to prior existing rights and uses (the non-impairment standard). *Id.* § 1782(c).

30.     Pursuant to FLPMA section 302(b), BLM is to manage all other lands to the lesser undue degradation standard.

31.     On December 12, 1979, BLM issued an Interim Management Policy for Lands Under Wilderness Review ("IMP") to provide management guidance to BLM staff for section 603 WSAs pending congressional action.

**4.     Areas of Critical Environmental Concern**

32.     FLPMA defines ACECs as "areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." 43 U.S.C. § 1702(a).

33.     Under FLPMA section 201, the Secretary of the Interior must give priority to ACECs in the inventory of public lands. *Id.* § 1711(a).

34.     Under FLPMA section 202, the designation and protection of ACECs are given priority in the development and revision of land use plans. *Id.* § 1712(c)(3).

35.     Prior to designating an ACEC, the BLM State director must provide a 60-day period for public comment on the proposed designation. 43 CFR § 1610.7-2(b).

**5.     Rules and Regulations**

36.     To carry out the purposes of FLPMA, the Secretary of the Interior is required to promulgate rules and regulations. "The promulgation of such rules and regulations shall be

governed by the provisions of chapter 5, title 5," of the APA, 5 U.S.C. §§ 500-596.  43 U.S.C. § 1740.

37.     In 1971, DOI promulgated a rule to follow rulemaking procedures, even if the subject matter would fall within APA exceptions.  Specifically, DOI stated that "[n]otice is hereby given of the policy of the Department of the Interior to give notice of proposed rulemaking and to invite the public to participate in rulemaking in instances where not required by law."  36 Fed. Reg. 8336 (May 4, 1971).

### C.     The National Environmental Policy Act

38.     Congress enacted NEPA to "encourage the enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate health and welfare of man; to enrich the understanding of the ecological and natural resources important to the Nation. . . ."  42 U.S.C. § 4321.

39.     To achieve these goals, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4 and BLM NEPA Handbook, H-1790-1, 3.2.1 (Jan. 30, 2008) (discussing NEPA process).

40.     NEPA defines "major Federal actions" triggering NEPA analyses as "new or revised" agency "plans, policies, or procedures" including, as in the case of Order 3310, "formal documents establishing an agency's policies which will result in or substantially alter agency programs" and "which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based."  40 C.F.R. 1508.18(b)(1).

41.     The "human environment" is defined to "include the natural and physical environment and the relationship of people with that environment."  40 C.F.R. § 1508.14. Furthermore, when economic and social effects are interrelated with natural and environmental effects, "then the environmental impact statement will discuss all of these effects on the human environment."  *Id.*

42.     The EIS must "provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.  This open process of evaluation allows all stakeholders to know the implications of federal actions and have the ability to participate and have their voices heard in the decision making process.

### D.     Administrative Procedures Act

43.     Congress enacted the APA to standardize the way federal administrative agencies propose and establish rules and regulations.  The APA also establishes a process for judicial review of agency decisions.

### 1.     Rulemaking

44.     Rulemaking procedures are clearly laid out in the APA and require both notice and the opportunity to comment.  5 U.S.C. § 553.

45.     Notice of proposed rulemaking is to be published in the Federal Register and must include "(1) a statement of the time, place, and nature of the public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."  *Id.* § 553(b).

46.     After providing notice, an agency must "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation."  *Id*. § 553(b)(3)(A).

47.     Except as otherwise required by statue, the APA provides an exception to the notice and comment requirements for "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice."

48.     Courts will overturn a rule purporting to exist under this exception if it was promulgated pursuant to a direct delegation of legislative power by Congress or "if it changes existing law, policy or practice."  *Rocky Mountain Helicopters, Inc. v. F.A.A.*, 971 F.2d 544, 546 (10th Cir. 1992).

**2.     Judicial Review**

49.     The APA also establishes a procedure for judicial review for those who are suffering a legal wrong as the result of a final agency action and have no other adequate remedy. *Id*. § 704.

50.     The reviewing court may decide "all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  *Id*. § 706.

51.     The court shall, among other things "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . [or] without observance of procedure required by law." *Id*. § 706(2)(A) and (C)-(D).

## IV.   FACTUAL BACKGROUND

### A.      FLPMA Section 202 Resource Management Plan Process

52.      The Federal Land Policy and Management Act requires that BLM "develop, maintain, and when appropriate, revise land-use plans."  43 U.S.C. §1712 (a).  Land use plans are currently known as Resource Management Plans or RMPs.

53.      In general, the purpose of a land use plan is to "maximize resource values for the public through a rational, consistently applied set of regulations and procedures which promote the concept of multiple use management."  43 C.F.R. 1601.1.  A land use plan implements the multiple-use and sustained yield mandate of FLPMA and governs until it is revised.  Any revision of a land use plan must be made according to proper procedure.  43 C.F.R. 1610.5-6.

54.      As a cooperating agency, the State was involved in creating land use plans throughout the State as allowed by the CEQ regulations.  *See* 43 C.F.R § 1610.3-1-2.

55.      Each land use plan specifically addresses BLM's thorough examination of and management decision regarding non-WSA Lands with Wilderness Characteristics, or non-WSA LWCs.

56.      For example, five Utah BLM field offices recently completed land use plans, termed RMPs, and each determined that "[t]he Approved RMP provides the best balance in allowing for uses to occur while providing for protection of non-WSA lands with wilderness characteristics."  Moab Field Office ROD p. 28; Vernal Field Office ROD p. 34; Monticello Field Office ROD p. 38; Richfield Field Office ROD 32; Kanab Field Office ROD p. 28.

57.      Similarly, as an additional example, the Price RMP determined that "[t]he Approved RMP [provides] the best balance in allowing for the protection of certain areas for

17

their wilderness characteristic values while providing for other uses, including extractive uses within the P[rice] F[ield] O[ffice]."  Price Field Office ROD p. 36.

58.     The adoption of a land use plan is a final agency action.  43 C.F.R. § 1610.5-2 (b).

59.     Order 3310 displaces the approved land use plan management decisions concerning non-WSA LWCs.  It does so notwithstanding the fact that, when completing land use plans in Utah, BLM conducted a thorough examination of non-WSA LWCs and did so in compliance with applicable law and procedures.  All BLM land not currently managed as wilderness or as a WSA is subject to Order 3310.

**B.     Wilderness Inventory**

60.     Pursuant to section 603 of FLPMA, BLM inventoried all BLM land in Utah and designated 2.5 million acres as Wilderness Study Areas ("WSA") on November 14, 1980.  BLM increased the WSA designations to 3.2 million acres after protests and administrative appeals led BLM to review and revise its decisions for more than 64 specific inventory units or parts of those units.

61.     Since 1985, BLM has managed and continues to manage 3.2 million acres of public lands in Utah as WSAs.

62.     BLM completed its FLPMA wilderness review in Utah in October 1991 with publication of the statewide wilderness review Final Environmental Impact Statement.  Then Secretary of the Interior Manuel Lujan, Jr. signed the Record of Decision ("ROD") recommending to President George H.W. Bush that approximately 1.9 million acres of the 3.2 million acres of WSAs in Utah be designated as wilderness.  In June 1992, President Bush submitted Secretary Lujan's wilderness recommendations to Congress.

63.     In September 1996, BLM began a re-inventory of certain Utah public lands which were included in pending wilderness legislation to evaluate whether those areas met the inventory criteria of the Wilderness Act.

64.     Then Secretary of the Interior Bruce Babbitt justified the re-inventory on the basis that the first Utah wilderness inventory was flawed and a re-inventory was necessary to correct the errors.  Letter from Bruce Babbitt, Secretary of Interior, to Congressman James V. Hansen (Sept. 6, 1996) ("The degree and duration of controversy surrounding the original wilderness inventory of Utah BLM lands is unparalleled in forty years of national engagement over what areas of federal land ought to be considered for legal protection as wilderness.  This debate has been a Utah-specific one, and we are carrying out a narrowly focused, Utah specific exercise in response.").

65.     No other western state was subject to a re-inventory.

66.     On October 15, 1996, the State of Utah, SITLA, and UAC challenged the legal authority of the Secretary of the Interior to revisit or revise the first wilderness review.  Utah also challenged BLM's *de facto* wilderness management of certain public lands, which were not WSAs established pursuant to the original FLPMA section 603 wilderness review.

67.     BLM defended its Utah re-inventory as only data gathering for an inventory pursuant to section 201(a) of FLPMA and further averred that the re-inventory would not change public lands management without a revision of the land use plans.

68.     BLM further argued that it had independent authority to make changes to the existing land use plans.

69.     The district court entered a preliminary injunction which the Tenth Circuit vacated on the basis that Utah lacked standing to challenge the re-inventory.  The Court based its decision on BLM's statements that it was only collecting information and had not changed public lands management pursuant to the re-inventory.  The Court concluded that Utah had standing to challenge the BLM's interim management of non-WSA lands.  *State of Utah v. Babbitt*, 137 F.3d 1193, 1205-1214 (10th Cir. 1998).

70.     The parties began settlement discussions in 2001, and on April 11, 2003, a settlement was reached ("2003 Settlement Agreement").

71.     In accordance with the 2003 Settlement Agreement, BLM rescinded the (1) Instruction Memorandum No. 2001-075; (2) Instruction Bulletin No. 2001-042; (3) Instruction Bulletin No. 2001-043, Wilderness Study and Procedures Handbook H-6310-1; and (4) Utah Instruction Memorandum No. 2001-092.

72.     The 2003 Settlement Agreement was vacated on August 8, 2005, after the Court granted the intervenors' motion to vacate the consent decree.

73.     On September 9, 2005, the parties entered into an executory settlement outside of the authority of the Court ("Utah Settlement Agreement").  The terms of the Utah Settlement Agreement are substantively identical to the terms of the 2003 Settlement.

74.     The Utah Settlement Agreement states that DOI's authority to conduct wilderness reviews and establish WSA's under FLPMA section 603 terminated no later than 1993, or two years after the Secretary of the Interior forwarded BLM's wilderness recommendations to the President.  *See* 2005 Settlement Agreement (September 9, 2005) p. 11 at ¶ 1.

75.     BLM acknowledged that as of the date of the Utah Settlement Agreement, it

lacked authority to "establish, manage, or otherwise treat public lands, other than section 603

WSAs and congressionally designated wilderness, as WSAs or as wilderness pursuant to the

section 202 [planning] process absent congressional authorization." *Id.* p. 12 at ¶ 5.

76.     In the Stipulated Facts preceding the terms of the Utah Settlement Agreement,

DOI and BLM agreed that the terms of the Utah Settlement Agreement (1) were "consistent with

the language of FLPMA and other applicable law and regulation;" and (2) respect[ed] the right

of Congress to reach a final resolution of Utah wilderness issues." *Id*. p. 9 at ¶ 19(e)-(f).

77.     More than ten environmental organizations challenged the Utah Settlement

Agreement.  *Utah v. Norton*, 2:96-cv-00870, 2006 WL 2711798 (D. Utah 2006).

78.     The district court dismissed the environmental groups' cross-claims for lack of

standing, ripeness, and final agency action, concluding that even if there was standing, the cross

claims were without legal support because the parties "clearly have the better interpretation of

the law." *Id*. at ¶ 29.  Thus, the Court concluded that the Utah Settlement Agreement "is

consistent with the law and restores the proper interpretation of FLPMA." *Id*. at ¶ 24.

79.     On appeal, the Tenth Circuit affirmed the dismissal of an environmental group's

cross-claims because they were not ripe for adjudication.  *Utah v. U.S. Dept. of the Interior*, 535

F.3d 1184 (10th Cir. 2008).

80.     On May 20, 2009, DOI responded to questions posed by Utah Senator Robert F.

Bennett regarding its authority to establish WSAs.  DOI agreed it had no authority to establish

WSAs after October 1993.  ("All of the requirements of section 603 were to be completed . . . by

October 21, 1993, at which the authority expired.")  Letter to Robert F. Bennett from Christopher

J. Mansour on behalf of Secretary Salazar (May 20, 2009).

81.     In that same May 20, 2009, exchange, DOI also agreed that the terms of the Utah

Settlement Agreement were consistent with FLPMA and approved of the district court's

statement that the Utah Settlement Agreement is "consistent with the law and restores the proper

interpretation of FLPMA."  ("We believe that the settlement agreement and Judge Benson's

opinion in *Utah v. Norton* are consistent with FLPMA.")  *Id.*

### C.     Order 3310: Wild Lands

82.     On December 23, 2010, citing the Reorganization Plan of 1950, as amended, 5

U.S.C.§ 301, 43 U.S.C. §§ 1451, 1453, the Wilderness Act of 1964, 16 U.S.C. § 1131-1134, and

FLPMA, excluding section 603, Secretary of the Interior Salazar announced Secretarial Order

3310, Protecting Wilderness Characteristics on Lands Managed by BLM.  (December 22, 2010).

83.     The Governor of Utah was notified only a few hours prior to the announcement of

Order 3310 by a telephone call from Director Abbey and after it had been released to the media.

The Governor asked if there was any opportunity to provide substantive comment and was told

that it would be released as written.

84.     Order 3310 provides, in part, that:

> The protection of wilderness characteristics of public lands is a high priority for
> the Bureau of Land Management (BLM) and is an integral component of its
> multiple use mission. . . .  All BLM offices *shall* protect these inventoried
> wilderness characteristics when undertaking land use planning and when making
> project-level decisions by avoiding impairment of such wilderness characteristics
> unless the BLM determines that impairment of wilderness characteristics is
> appropriate and consistent with applicable requirements of law and other resource
> management considerations.  Where the BLM concludes that authorization of
> uses that may impair wilderness characteristics is appropriate, the BLM *shall*
> document the reasons for its determination and consider measures to minimize

impacts on those wilderness characteristics.  Where the BLM concludes that protection of wilderness characteristics is appropriate, the BLM shall designate these lands as "Wild Lands" through land use planning.

Order 3310, §§ 1, 4 (emphases added).

85.     Order 3310 reflects an obvious change in the management regime of public lands in that it:  (1) establishes a new public lands designation, "Wild Lands;" (2) creates additional steps in the management process of public lands, independent of statutory or regulatory authority; and (3) has the practical impact of nullifying prior land use management decisions made in all land use plans.  *See National Mining Association v. Lisa Jackson et al.*, Civil Action No. 10-1220 (2011).

**1.     Order 3310 Establishes a New Public Lands Designation, "Wild Lands."**

86.     Order 3310 establishes a new category of public lands—"Wild Lands."  Wild Lands is "[a] designation resulting from a land use plan decision to protect LWCs.  In designating an area as Wild Lands, the land use plan will make decisions to protect the area's wilderness characteristics to avoid impairment."  Manual 6302.3.

87.     The new Wild Lands designation contravenes FLPMA in several respects.

88.     First, "Wild Lands" is a designation not provided for in the existing statutory framework.  The "principal or major" uses of public lands as set forth in FLPMA include and are limited to "domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production."  43 U.S.C. § 1702(l).  "Wild Lands" therefore is a category of public lands not provided for in or recognized by FLPMA.

89.     Second, Order 3310 elevates the management of wilderness characteristics above all other public uses in contravention of FLPMA's multiple use mandate for non-WSA lands.

90.     Specifically, FLPMA's multiple use mandate requires that no single land use be elevated above another.  *Compare* 43 U.S.C. § 1732(a) (the "Secretary [of the Interior] shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 202 of this Act.") *with* Order 3310 § 4 ("all BLM offices *shall* protect these inventoried wilderness characteristics when undertaking land use planning and when making project-level decisions") (emphasis added).

91.     BLM has no authority to so elevate any particular use of public lands.  Indeed, in response to questions regarding whether BLM had statutory authority to elevate non-WSA LWC's above the other uses set forth in FLPMA, Director Abbey responded that he was "not aware of" any.  (Question:  "But you have no statutory authority to weigh one multiple use over the other?"  Answer by R. Abbey:  "I'm not aware of one.").  *Hearing on Wild Lands Policy Before the House Natural Resources Committee* (March 11, 2011) (statement of Robert Abbey, Director of Bureau of Land Management).

92.     Additionally, the Manuals require that wilderness characteristics be "clearly lacking" before lands may be managed as anything other than Wild Lands.  The "clearly lacking" standard ensures that lands with *any* wilderness characteristics will be managed as Wild Lands to the exclusion of any other principal or major uses.

93.     Third, Order 3310 contravenes FLPMA's management mandate by adopting the non-impairment standard for Wild Lands:  "All BLM office*s shall p*rotect . . . wilderness characteristics . . . by avoiding impairment of" those characteristics.  Order 3310, § 4 (emphasis

added).  The stringent non-impairment standard is reserved for WSAs.  *See* FLPMA 43 U.S.C. §

1782(c) (WSAs are to be managed "so as not to impair the suitability of such areas for

preservation as wilderness").

94.     DOI confirmed, in response to questions from Senator Robert F. Bennett, that

BLM did not have authority to apply the non-impairment standard to non-WSAs.  (Question by

Senator Bennett:  "Does the BLM have authority to apply the non-impairment standard . . . to

lands that are not designated as WSAs under Section 603 [of FLPMA]?"  Answer by DOI:

"No.").  Letter to Robert F. Bennett from Christopher J. Mansour on behalf of Secretary Salazar

(May 20, 2009).

95.     By virtue of Order 3310 and its new designation "Wild Lands," BLM has, without

authority, attempted to create and manage public lands as wilderness.  The defining

characteristics of Wild Lands and wilderness are identical.  They are lands that:

> (1) generally appear[] to have been affected primarily by the forces of nature, with
> the imprint of man's work substantially unnoticeable; (2) ha[ve] outstanding
> opportunities for solitude or a primitive and unconfined type of recreation; (3)
> ha[ve] at least five thousand acres of land or is of sufficient size as to make
> practicable its preservation and use in an unimpaired condition; and (4) may also
> contain ecological, geological, or other features of scientific, education, scenic, or
> historical value.

*Compare* 16 U.S.C. § 1131(c) *with* Manual 6301.14.  As set forth in the Wilderness Act of 1964,

the above characteristics are *wilderness* characteristics.  They are also identical to the

characteristics that describe Wild Lands in Order 3310 and Manuals.  Additionally, Manuals

6302 and 6303 employ the same criteria to manage non-WSA LWCs as BLM currently applies

to manage characteristics describing Wild Lands.  There is, therefore, no distinction between the

identification and management of wilderness and Wild Lands—except the name.

96.     Finally, BLM's authority to inventory and manage for WSAs under section 603 of FLPMA expired in 1993.  Thus, BLM has acted without and beyond its authority by creating wilderness under the guise of the new designation, "Wild Lands."

**2.     Order 3310 Creates Additional Steps in the Management Process of Public Lands**

97.     Order 3310 requires BLM to implement the following additional steps in the planning and management process of public lands:  (1) complete a re-inventory of all non-WSA public lands; (2) identify lands with wilderness characteristics; and (3) once identified, "protect wilderness characteristics through land use planning and project-level decisions by avoiding impairment of such wilderness characteristics."  Order 3310 § 4 (the "Additional Steps").

98.     The Additional Steps have been implemented without statutory or regulatory authority.

99.     Pursuant to FLPMA, the current steps in the management process of public lands require that (1) the land use plans be made in coordination with state and local governments; and (2) the public be given notice and opportunity to comment on land use plans.  To date, the land use plans in Utah have followed these established steps.  43 U.S.C. § 1712 (c)(9); 43 U.S.C. § 1712 (f).

100.    Once a land use plan is approved, the land is to be managed pursuant to that plan until and unless the plan is revised according to proper procedures.  BLM Land Use Planning Handbook, H-1601-1(IV)(A); *See also* 43 C.F.R. 1610.5-5 (discussing amendment procedure for RMPs).

101.    Order 3310 is immediately effective as to all new land management decisions without regard to the existing land use plans.

102.    The very act of completing the Additional Steps effectively revises the land use

plans and subjects the process to unconstrained agency discretion while failing to abide—indeed,

completely disregarding—the statutorily prescribed revision process.

103.    The Additional Steps also have the effect of elevating non-WSA lands to the level

of wilderness by requiring BLM to manage non-WSA LWCs to the non-impairment standard

when "undertaking land use planning and when making project-level decisions."  Order 3310 §

4.  The non-impairment standard is reserved for WSAs, and there is no statutory authority for

BLM to manage non-WSA lands to the non-impairment standard rather than to the undue

degradation standard applicable to all other non-WSA lands.

### 3.    Order 3310 Nullifies Prior Land Use Management Decisions as Established by the Most Recent Land Use Plans

104.    Order 3310 nullifies all prior land use management decisions established by and

memorialized in land use plans.  That is, Order 3310 creates an interim land management status

for all non-WSA public lands in Utah while the Additional Steps are being taken.  During that

interim period:  (1) no land use plan can be implemented as studied and approved, resulting in

nullification of existing land use plans; (2) no approved management activity in the land use plan

can be analyzed under the plan; (3) wilderness characteristics (to be newly identified) will be

managed pursuant to Order 3310 and not pursuant to the land use plan; (4) the designation of

Wild Lands will be implemented without revising the existing land use plan; and (5) newly

designated non-WSA LWCs will be managed to the stringent non-impairment standard.

105.    Additionally, Order 3310 grants BLM unconstrained agency discretion:  for

project-level decisions in areas where the "BLM determines that the land appears to have

wilderness characteristics that have not been both inventoried and analyzed in a land use

planning process conducted in accordance with this Order [3310], the BLM *shall preserve its discretion* to protect wilderness characteristics through *subsequent* land use planning." Order 3310, § 5 (emphases added). *See also* Manual 6301.12 (requiring management of public lands to avoid impairing wilderness characteristics where "(1) the project area appears to have wilderness characteristics that have not been inventoried and analyzed consistent with Secretarial Order 3310; and (2) the proposed project may impair those apparent wilderness characteristics").

106. Order 3310 therefore creates an interim management plan status that lasts until a statutorily authorized revision process has begun.

107. Additionally, the "may impair" standard is both vague and without statutory authority; thus, it grants the agency what amounts to unconstrained and unreviewable discretion.

108. With respect to projects that are proposed in LWC areas, BLM must conduct a separate NEPA wilderness impairment impacts analysis and either (1) deny the action; (2) approve the action; (3) approve the action with measures to minimize impacts on wilderness characteristics; or (4) postpone the decision until wilderness characteristics can be addressed through a land use planning process. Manual 6303 at .13.

109. After the NEPA process is concluded, Order 3310 fundamentally changes BLM planning by removing many planning and project decisions from the local district offices to the Washington, D.C. Office ("WO"), specifically placing key planning decisions outside the statutory FLPMA process, including, most importantly, its public process.

110. Because Order 3310 does not exempt any project or land use approved under any of the land use plans, Order 3310 will significantly and substantially change the RMPs without a plan amendment in violation of FLPMA and the APA.

111.    On April 15, 2011, the President signed into law a continuing resolution to fund

the federal government for the remainder of fiscal year 2011. Department of Defense and Full-

Year Continuing Appropriations Act, 2011, Pub. Law No. 112-10, 125 Stat. 38 (Apr. 15, 2011)

("Appropriations Act"). Section 1769 of the Appropriations Act provides:

> For the fiscal year ending September 30, 2011, none of the funds made available by
> this division or any other Act may be used to implement, administer, or enforce
> Secretarial Order No. 3310 issued by the Secretary of the Interior on December 22,
> 2010.

*Id.*    Subsequently, on June 1, 2011, the Secretary of Interior confirmed that "I am confirming

today that, pursuant to the 2011 CR, the BLM will not designate any lands as "Wild Lands."

The 2011 Continuing Resolution expired on September 30, 2011, though it, and its defunding

requirement, has currently been extended through November 18, 2011.  Secretarial Order 3310

has not been withdrawn or repudiated.  The BLM continues to implement its "Wild Lands"

policy and engage in wilderness management in contravention of law and existing RMPs,

FPLMA, and the APA.

112.    Despite Continuing Appropriations Act §169's ban on funding "Wild Lands"

Policy, it appears that the BLM has made management decisions and undertaken management

actions to enforce Order 3310 policies to protect lands designated in the Red Rock Wilderness

Bill .  The management decisions and actions constitute unlawful wilderness management of

Utah's lands which has resulted in the pecuniary and monetary injury to the State of Utah and its

residents.

113.    On March 30, 2011, Carbon County, the Utah Department of Agriculture and the

Utah Division of Wildlife Resources sought a permit from the BLM to conduct sage grouse

mitigation in a sage brush flat area of Carbon County by using mechanical means to take out older sections of sage brush to improve the area for sage grouse habitat.

114.    Shortly after receiving the request from Carbon County and the State of Utah to conduct sage grouse habitat improvement, the local BLM office, through its wildlife biologist, rejected this request because the area was considered "Wild Lands" under Order 3310.

115.    This action harmed Utah's ability to manage wildlife and improve sage-grouse habitat, and constitutes implementation of Order 3310.

116.    Even after the June 1, 2011, memorandum placing Order 3310 in abeyance the BLM still refuses to allow this habitat mitigation to proceed, effectively managing for wilderness in an area not subject to any restrictions on current BLM RMPs.

117.    In addition, the BLM is unlawfully engaging in implementing the Red Rock Wilderness Bill through management of lands as wilderness without authority or any RMP amendment.

118.    It is BLM's responsibility to determine which public lands are available for oil and gas leasing through the land use planning system as mandated by FLPMA.  The Vernal RMP, which is administered by the Vernal, Utah BLM office, classifies public lands as one of four leasing categories: open with standard stipulations, open with special terms or conditions, open but no surface occupancy allowed, or closed to leasing.

119.    A similar planning system process and oil and gas leasing categorization system exists in the RMPs administered by the BLM offices located in Moab, Price, Monticello and Richfield.

120.    Since January 2009, in the Vernal Resource Area, several oil and gas companies have nominated parcels that are classified in the 2008 Vernal RMP as suitable and available for leasing in accordance with BLM policy for identifying public lands that should be offered at quarterly sales.  Since these nominated parcels were located within the boundaries of the proposed Red Rock Wilderness Bill (e.g., H.R. 1916, 112th Congress), Utah BLM received instructions from the Office of the Secretary or from authorized officials at  the secretarial level in Washington D.C. not to place these nominated Red Rock parcels on the quarterly sale list. Two parcels from the May 2010 Vernal sale were specifically listed as deferred for Red Rock Wilderness Bill.

121.    In addition, upon information and belief, in late January, 2009, DOI/BLM directed Utah BLM employees that completion and implementation of  the 1999 wilderness re-inventory and report was a key goal for Utah BLM.  Utah BLM employees were advised that the 1999 wilderness re-inventory and report would guide public land management in Utah instead of the completed and approved RMPs that were adopted after public and cooperative process involving all public and private stakeholders in accordance with FLPMA rules and procedures.

122.    Since January 2009, at or about the time the aforementioned directive was issued, no significant parcels located within geographic areas proposed for wilderness in the Red Rock Wilderness Bill have been offered for auction since January 2009.  Many of these same parcels are within areas currently listed as open for leasing under the Mineral Leasing Act and the provisions of current BLM RMPs.

123.    In addition to these unlawful internal directives resulting in the implementation of the Red Rock Wilderness Bill, 1999 wilderness re-inventory and report and Order 3310, the

BLM Utah Deferred Lands List for the May, 2010 sale, page 3, shows that two parcels were deferred because of the Red Rock Wilderness Bill.

124.     The deferral of the leases of these parcels to mandate proposed, but not enacted, legislation violates FLMPA, the Mineral Leasing Act and public policy.

125.     BLM's pattern of deferring otherwise legitimate oil and gas leases causes Utah to lose money owed to it under the Mineral Lease Act. These funds that have been lost are payable to Utah as Bonus Payments upon leasing of a parcel.  Since January 2009, when Secretary of the Interior Salazar was appointed, bonus payment to the State of Utah for the lease of oil and gas parcels has decreased by nearly 47%.  In 2008, the year prior to Secretary Salazar's appointment, Utah received approximately $15,835,620 in bonus payments for oil and gas leases.  During 2009, 2010 and 2011, these bonus payments have steadily declined.  During Utah fiscal year 2011, Utah bonus payment revenue was $8,440,420. This decreasing revenue trend is due in large part to BLM's unlawful decision to refuse or delay the issuance of oil and gas leases in proposed wilderness areas under the Red Rock Wilderness Bill or in the proposed 1999 wilderness re-inventory and report.

126.     Besides this significant downward trend in Utah bonus payment revenues, in February 2009, Secretary Salazar of the Department of Interior, less than one month after his appointment, unilaterally withdrew 77 oil and gas leases on Utah's lands and deferred the issuance of further leases.  A Washington D.C. team of BLM and National Park Service employees also undertook a review of the lease of these 77 oil and gas lease parcels. On October 7, 2009, the team issued its report.  Thereafter, Defendants directed that any leases issued in Red Rock Wilderness Bill areas be deferred pending a case by case parcel review using a soon-to-be

released Wilderness Characteristics Inventory Manual.  No leases were issued on these lands. The DOI team acknowledged that the lease parcels were in Red Rock Wilderness Bill areas.

127.     In spite of any exhaustive review as a wilderness alternative, BLM specifically chose not to protect for wilderness characteristics in the respective RMPs.

128.     As part of the same pattern and practice of unlawful wilderness management, on May 17, 2010, the BLM Director issued a new Oil and Gas Leasing Reform Policy for Land Use Planning and Lease Parcel Reviews (IM 2010-117) without public, state, or local agency consultation or involvement.

129.     In IM 2010-17, BLM's instruction memorandum, the BLM Director set out mandates that supersede the resource allocations and management decisions made in the respective Utah RMPs. Contrary to the RMP decisions, the instruction memorandum states that it will be necessary to defer parcels from leasing while additional resource information, such as wilderness qualities, is collected and analyzed.

130.     The unsupported premise of IM 2010-17 is that all of the Utah RMPs are based on flawed information, even though in every case, the revised Utah RMPs greatly increased the restrictions and limits on oil and gas leasing and specifically studied management options for the disputed Utah lands.  Each parcel deferred from sale costs Utah revenues as bonus payments under the Mineral Leasing Act that would otherwise have been received had the BLM followed existing RMPs and offered nominated leases for sale at auction.  These revenues to the State of Utah have declined by 75% since 2006, dropping from approximately $40 million in 2006 to approximately $10 million in State fiscal year 2010.

131.    Upon information and belief, the Plaintiff maintains that all proposed land use authorizations permitted under the Vernal RMP are now categorically reviewed to determine whether they are within Red Rock Wilderness Bill boundaries, and if so, they are accordingly denied.  These wilderness management actions include blanket refusals to offer for sale the public lands nominated for the mineral lease sales, denials of pipeline rights-of-way, and Applications for Permits to Drill ("APD") on oil and gas leases, where by law, an Operator has the right to drill on the existing leaseholds, thereby depriving the State of Utah of mineral lease revenues on lands previously approved for leasing.

132.    In addition to BLM unlawful enforcement of Order 3310 and deferral of all oil and gas leases in the proposed Red Rock Wilderness Bill Area, Utah BLM officials have also advised Uintah County officials that BLM will not issue Title V rights-of-way on existing county roads located within the boundaries of the Red Rock Wilderness Bill.  This unlawful BLM policy prevents issuance of Title V permits for county roads that BLM has not documented.  Furthermore, this unlawful management practice contrasts the BLM practice prior to January 2009, when Secretary Salazar was appointed, where the BLM regularly issued such Title V permits.

133.    Similarly, San Juan County, Utah has had a request for Title V FLPMA rights-of-way pending in the Cedar Mesa and Indian Canyon areas of that county.  In 2011, the local BLM office Director told a county agent that the reason for the delay was that the local office manager from the BLM had been given direction from the Washington Office of the BLM that he take no action approving projects in lands subject to the Red Rock Wilderness Bill.  This directive is in violation of FLPMA, the APA, and BLM's RMP for the Monticello Field Office.

134.     In accordance with DOI interpretative rule and secretarial memorandum, BLM must work with counties regarding their R.S. 2477 rights-of-way.  Issuance of a FLPMA Title V permit is the preferred method to document road reconstruction.  *See Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735 (10th Cir. 2005); Revocation of January 22, 1997, Interim Policy; Revocation of December 7, 1988 Policy.

135.     Upon information and belief, in 2009, DOI issued direction to the Utah State BLM Office to impose wilderness management policies on all Red Rock Wilderness Bill lands throughout Utah, regardless of the land use planning decisions made in the governing RMPs or FLPMA thereby violating 43 U.S.C. § 1712(a); 43 C.F.R. § 1610.5-5.  All resource management actions must conform to existing land use plans unless and until amended. 43 U.S.C. §§ 1732(a), 1712; 43 C.F.R. §§ 1610.5-3, 1610.5-5

136.     This direction is corroborated by other agency documents, including the revised NEPA Interdisciplinary Team Checklist for proposed land use authorizations, wherein the BLM Vernal Field Office lists the Red Rock Wilderness Bill as a resource consideration to deny proposed actions.

137.     This action has caused harm to the State of Utah and its counties abilities to manage its roads and transportation system by delaying or denying routine permits for the sole purpose of benefiting proposed legislation.  No law, rule, or policy provides that pending wilderness legislation is a basis to exclude proposed actions authorized under the current BLM RMPs.

**D.     Harm to the State**

135.    The State of Utah is entitled to rely on the statutorily enacted processes and procedures that govern the management of millions of acres of public lands within its borders.

136.    The issuance of Order 3310 causes specific injury to Utah in the following ways:

      a.    The Secretary of the Interior acted beyond his statutory and congressionally delegated authority;

      b.    The Secretary of the Interior failed to follow proper rulemaking procedures;

      c.    The Secretary of the Interior failed to follow FLPMA, which requires public notice, opportunity for comment, and coordination with and meaningful involvement of State and local governments;

      d.    The Secretary of the Interior, through the state BLM office, is failing by virtue of the order to implement the properly adopted RMPs at the project-level decision-making level.

      e.    The Secretary of the Interior failed to comply with the NEPA requirement that an EIS be prepared for all major federal actions.

137.    The State is presently suffering procedural and substantive injuries to its proprietary and governmental interests, which are a result of the application of Order 3310 and/or unlawful wilderness management pursuant to the Red Rock Wilderness Bill to project-level decision-making by BLM through delayed leasing, delayed or denied Title V rights of way and delayed or denied sage grouse habitat management.

138.     Specifically, the State of Utah has been denied Bonus Revenues from lease sales deferred for illegal deference to the Red Rock Wilderness Bill, implementation of Order 3310, or other actions allegedly protecting lands outside the BLM planning process.

139.     The State's proprietary rights to its roads are being injured through the delay or denial of Title V rights-of-way due to a BLM policy and practice of not processing any applications in areas located in the Red Rock Wilderness Bill or areas considered for protection under Order 3310, even though these rights-of-way applications are allowed under existing RMPs and are necessary to the maintenance of a safe and convenient transportation system.

140.     The State has been injured by failing to receive notice and an opportunity to comment on Order 3310.

141.     Order 3310, if permitted to stand, will injure the State by subjecting the State to additional, illegal process.

142.     Under the Mineral Leasing Act, the State of Utah receives one-half of all revenues generated from lease sales and royalties for oil and gas leases on BLM lands in Utah.  The BLM policy and practice of continued unlawful wilderness management practices implementing Order 3310 and the yet to be enacted Red Rock Wilderness Bill is causing Utah to lose mineral leasing revenues, including bonus payments, on parcels from the May 2010 sale and other leasing parcels.

143.     Upon information and belief, the State of Utah is being prevented from managing its proprietary interest in wildlife in Carbon County, Utah and other areas of the state due to implementation of Order 3310 even though the policy was placed in abeyance.  The continued implementation of Order 3310 is preventing Utah from accessing areas using necessary

mechanical means to improve sage-grouse habitat and thereby avoid a possible decision listing the species as "threatened" under the Endangered Species Act, thereby further impacting oil and gas development lease revenues and grazing on public lands.

144.    With regards to lands available for leasing under the existing RMPs, Order 3310 and/or the unlawful wilderness management pursuant to the Red Rock Wilderness Bill subjects lands otherwise available for leasing to a *de facto* plan amendment.

145.    Order 3310 therefore results in a loss of value to the State of its trust lands for leasing inasmuch as they are surrounded by those federal lands otherwise available for leasing under the existing RMPs.

146.    The State has a proprietary interest in its joint ownership of rights-of-way on public land which it validates through FLPMA Title V applications.  These applications are currently being refused for processing due to instructions from Washington to the local office to delay or deny any applications for projects, including Title V rights-of-way on lands within the Red Rock Wilderness Bill, including the applications for Title V rights-of-way in the Cedar Mesa and Indian Creek areas of San Juan County.  The failure to process these rights-of-way in areas open to such rights-of-way under existing RMPs is a violation of law causing continuing harm to the proprietary interests of the State of Utah.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(The Issuance of Order 3310 is an *Ultra Vires* Act)**

147.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 146.

148.     The issuance of Order 3310 is an *ultra vires* act in that Defendants have created categories of land and new processes beyond that allowed under FLPMA.

149.     First, Order 3310 mandates that all lands not yet inventoried under its procedures are to be managed to a non-impairment standard.

150.     The non-impairment standard is reserved only for WSAs and land included within the NWPS.  FLPMA requires that all other lands are to be managed to an undue degradation standard.

151.     Therefore, by mandating a non-impairment standard on all non-WSA/non-NWPS lands, Defendants have acted beyond the authority granted them in FLPMA, which, as described above, has caused injury to the state.

152.     Second, Order 3310 mandates that all LWCs be managed to a non-impairment standard.

153.     There is no statutory authority to manage LWCs to a non-impairment standard outside of the Wilderness Act unless as an ACEC.  An ACEC designation still requires a plan amendment.

154.     Therefore, by mandating a non-impairment standard on all LWCs, Defendants have acted beyond the authority granted them in FLPMA and have thus caused injury to the State.

155.     Third, Order 3310 allows an LWC to be impaired for a specific project if allowed by the BLM's Washington Office.

156.    There is no mechanism in the State's land use plans or federal statute that allows for the impairment of an LWC.  The process for such impairment is strictly a creation of Order 3310.

157.    Therefore, by allowing the impairment of an LWC on a case-by-case basis, Defendants have acted beyond the authority granted them in FLPMA thus causing injury to the state.  The State is presently suffering a procedural injury which is a result of the application of Order 3310 to project-level decisions by BLM in the State of Utah in which the State has a proprietary and governmental interest including wildlife habitat management in Carbon County, Title V rights-of-way in San Juan County and mineral leasing funds in Uintah and other counties.

## SECOND CAUSE OF ACTION

### (Secretary of Interior May Not Implement Public Lands Management Changes Without Rulemaking Procedures)

158.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 157.

159.    Even assuming the Secretary of the Interior had the legal authority to issue Order 3310, it was implemented without notice and comment rulemaking procedures under the APA, 5 U.S.C. §§ 551(5), 553.

160.    FLPMA expressly provides that its provisions shall be implemented through APA rulemaking.  43 U.S.C. § 1740 ("The Secretary [of the Interior], with respect to the public lands, shall promulgate rules and regulations to carry out the purposes of this Act and of other laws applicable to the public lands . . . .  The promulgation of such rules and regulations shall be governed by the provisions of chapter 5 of title 5 . . . .").

40

161.    Consistent with this mandate in FLPMA, in 1970, the Administrative Conference of the United States recommended that governmental agencies agree to follow rulemaking procedures, even if the subject matter would fall within APA exceptions. Of special significance, the Office of the Secretary of the Interior adopted the same requirement for it and its agencies: "Notice is hereby given of the policy of the Department of the Interior to give notice of proposed rulemaking and to invite the public to participate in rulemaking in instances where not required by law." 36 Fed. Reg. 8336 (May 4, 1971).

162.    Rulemaking is especially necessary because, as in this case, an agency may not dramatically break from a longstanding interpretation, including the interpretation of FLPMA embodied in the 2005 Settlement Agreement, through policy guidance without first engaging in APA notice and comment rulemaking. DOI failed to revise its previous definitive interpretation of FLPMA and implementing regulations without first engaging in APA rulemaking.

163.    Order 3310 and Manuals, therefore, were not issued by way of a proper APA process, in violation of FLPMA and DOI policy.

164.    The State is presently suffering a procedural injury which is a result of the application of Order 3310 to project-level decisions by BLM in the State of Utah in which the State has a proprietary and governmental interest including wildlife habitat management in Carbon County, Title V rights-of-way in San Juan County and mineral leasing funds in Uintah and other counties.

## THIRD CAUSE OF ACTION

**(Violation of FLPMA's Procedural Public Comment and Coordination with State and Local Governments Requirements)**

165.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 164.

166.    Even assuming the Secretary of the Interior had the legal authority to issue Order 3310, he failed to follow FLPMA, which requires public notice, opportunity for comment, and coordination with and meaningful involvement of State and local governments.

167.    As required by FLPMA, the Secretary of the Interior must "allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands."  43 U.S.C. § 1712(f); *see also* 43 U.S.C. § 1739(e) (same).

168.    DOI must also coordinate with and provide for meaningful involvement of state and local governments "in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands."  43 U.S.C. § 1712(c)(9).

169.    BLM regulations implementing FLPMA are in accord. "The public shall be provided opportunities to meaningfully participate in and comment on the preparation of plans, amendments and *related guidance* and be given early notice of planning activities." 43 C.F.R. § 1610.2 (emphasis added).  The term "guidance" for preparation of resource management plans includes "National level policy which has been established through legislation, regulations, executive orders or other Presidential, Secretarial or Director approved documents." 43 C.F.R. §

1610.1. Order 3310, which provides for the protection of wilderness characteristics in the land use planning process, fits within this category.

170. The Secretary of the Interior did not comply with regulations requiring him to provide notice and comment periods. Nor did he coordinate with state and local governments before signing and announcing Order 3310. Instead, Director Abbey placed a call to the Utah Governor a few hours prior to the announcement of Order 3310.

171. The preclusion of notice, public comment, and coordination with state and local governments in the development and issuance of Order 3310 violates FLPMA's legislative and regulatory mandates.

172. The State is presently suffering a procedural injury which is a result of the application of Order 3310 to project-level decisions by BLM in the State of Utah in which the State has a proprietary and governmental interest including wildlife habitat management in Carbon County, Title V rights-of-way in San Juan County, and mineral leasing funds in Uintah and other counties.

## FOURTH CAUSE OF ACTION

### (NEPA Violation)

173. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 173.

174. Order 3310 significantly affects the human environment under NEPA, which required the Secretary of the Interior to prepare an environmental impact statement (EIS), including an analysis of the economic impacts of the action, before undertaking the action. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.4, 1508.27; BLM NEPA Handbook H-1790-1.3.2.1.

175.    While NEPA compliance is procedural, it imposes "action-forcing" procedures that require an agency to take a "'hard look' at environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

176.    Order 3310's requirements to manage to the non-impairment standard and to inventory for wilderness characteristics constitute major federal actions which trigger the need for NEPA analysis.

177.    Defendants have not undertaken any NEPA analysis in regards to the issuance of Order 3310.

178.    NEPA grants the State procedural rights, the deprivation of which has injured the State.

## FIFTH CAUSE OF ACTION

### (Order 3310 Is Arbitrary and Capricious)

179.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 178.

180.    The APA authorizes judicial review of agency action that is in excess of statutory authority, without observance of lawful procedures, and therefore arbitrary, capricious, or not in accordance with law.  5 U.S.C. § 706(2).

181.    The issuance of Order 3310 as detailed in the preceding causes of action, was done without authority or observance of lawful procedures and is therefore arbitrary, capricious, and not in accordance with the law.  The Court may therefore hold unlawful and set aside DOI's issuance of Order 3310.

## SIXTH CAUSE OF ACTION

### (Unlawful Wilderness Management)

182.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 181.

183.    Congress reserved to itself the sole authority to designate wilderness.  16 U.S.C. § 1131(a).  Congress granted the Secretary of the Interior specific and limited authority to identify lands meeting the definition of wilderness and studying those lands to make recommendations to Congress.  43 U.S.C. § 1782.  This wilderness inventory and study program expired in 1993 and has not since been expanded or reauthorized by Congress.  Thus, BLM lacks the legal authority to implement wilderness type management.

184.    Defendants have changed the management of lands located within the proposed Red Rock Wilderness Bill to preserve their purported wilderness character, despite the lack of enacted legislation to authorize management of these lands as wilderness. This management change includes but is not limited to overriding the direction in the Vernal RMP and the other Utah RMPs by managing these areas as if they were WSAs under the IMP.  Only Section 603 of FLPMA authorizes BLM to manage lands so as to not impair their wilderness character and that non-impairment standard was and is reserved for WSAs. 43 U.S.C. § 1782.

185.    Defendants have acted *ultra vires*, arbitrarily and capriciously, and not in accordance with law by changing the management of the Red Rock Wilderness Bill areas to close the public lands to mineral development, access, and other land use authorizations.

186.    The unlawful wilderness management actions also change public land management without amending the RMPs as required by FLPMA. 43 U.S.C. § 1712(a); 43

C.F.R. § 1610.5-5. All resource management actions must conform to existing land use plans

unless and until amended. 43 U.S.C. §§ 1732(a), 1712; 43 C.F.R. §§ 1610.5-3, 1610.5-5.

187.    The unlawful wilderness management actions are inconsistent and contrary to the

Utah RMPs, which direct that these affected public lands be managed with emphasis on oil gas

development and other extractive resource values.  BLM may not implement a change in land

management that changes the land use plan without adherence to procedures required by

FLPMA, including meaningful public and state and local agency involvement and the

completion of environmental analyses under the National Environmental Policy Act. 43 C.F.R.

§ 1610-5.5.   This Court so held in *Uintah County et al. v. Norton et al.*, Civil No. 2:00-CV-

04282J (October 26, 2001).

188.    Land use plans and their amendments must be also consistent with state and local

land use plans to the maximum extent consistent with federal law and FLPMA's purposes, and

BLM must address and attempt to resolve inconsistencies. 43 C.F.R. § 1712(c)(9); 43 C.F.R. §

1610.3-2.  In 2007, Uintah County adopted a land use plan for managing non-WSA lands within

the county.  BLM's unlawful wilderness management actions ignore the county policies, and

those of Uintah County in particular.

189.    The subsequent mineral lease sale deferrals occurring in Uintah County do not

conform to the Vernal RMP, which was finalized in October 2008.  Similarly, BLM has adopted

additional procedures for mineral leasing analysis that override the RMP decisions by deferring

all oil and gas leasing until another EIS is written to assess the impacts of mineral leasing.  The

rationale is based on the fact that environmental groups appeal all of the BLM decisions.

Pursuant to Secretarial Order 3310, BLM must make wilderness protection the overriding

priority and new mineral lease sales, mining and construction of transmission lines are not on the list of permitted actions. Manual 6303.14.

190.     Defendants' actions have caused and will cause future loss of revenue to the state from oil and gas lease payments and royalty payments from production. The loss of revenues is also reflected in the *de facto* lease moratorium which precludes development royalties where lessees could not complete their land position and begin drilling. Many of these leases are located in areas included in the Red Rock Wilderness Bill.

191.     Utah has standing to directly challenge Defendants' imposition of the unlawful wilderness management because it is denying Utah mineral lease bonus payments, royalties, rights-of-way to manage its transportation system and is being used as the reason to delay or deny sage-grouse habitat improvement in areas of Carbon County in contravention of existing BLM plans. These actions effect an unlawful amendment to the BLM RMPs in Utah. FLPMA Section 202, which governs land use plans, provides for public participation throughout the land use planning process and the statutory right of coordination with the state. Utah was denied an opportunity to comment on the amendment and has been injured because imposition of these standards interferes with its ability to perform governmental functions and reduces or precludes the receipt of revenues that would otherwise have been paid to the state.

192.     The agency actions which are the subject of this Complaint are final agency actions subject to judicial review, because the change in public land management was directed from the Office of the Secretary or at the secretarial level.

193.     FLPMA established procedures to protect the concrete interests of local governments, including the State of Utah. Plaintiff's injuries will be redressed by an order of the

Court enjoining Defendants from imposing the unlawful wilderness management and mineral leasing withdrawal standards unless and until they comply with FLPMA by formally amending the RMPs and providing for notice and comment and local government involvement. Thus, Plaintiff's injuries are redressable by a favorable decision as it is not necessary to establish with certainty that adherence to the procedures would necessarily change the agency's ultimate decision.

194.    Plaintiff also meets the standing requirements of the APA because Defendants' imposition of the unlawful wilderness management standard constitutes final agency actions, and Plaintiff's claims fall within the zone of interests protected by FLPMA.

195.    The adoption and implementation of the unlawful wilderness protection actions are both final and ripe for judicial review and represent the consummation of Defendants' decision making regarding interim management of public lands within the proposed Red Rock Wilderness Bill.  Defendants' actions affect the rights and obligations of the State of Utah by preventing mineral development, road maintenance, and wildlife management.  There are legal consequences which flow from Defendants' actions including the cancellation of Trust Land leases, interference with otherwise valid rights and reduced revenues, and interference with otherwise lawful governmental functions.  There are no administrative remedies to exhaust because Defendants continue to implement their actions without issuing an appealable decision.

196.    Plaintiff's concrete injuries caused by Defendants' unlawful implementation of unlawful wilderness management will be redressed by a Court order declaring that Defendants adopted said policies without following the procedures mandated by law and enjoining Defendants from changing public land management without amending the RMPs.

197.     Plaintiff seeks a judicial determination that Defendants have acted arbitrarily and capriciously, unlawfully, and *ultra vires* by undertaking the aforementioned actions.  A favorable decision from this Court will redress the legal injuries of the State of Utah and remove the immediate barriers to multiple use of the affected public lands, including mineral development, and leave intact key components of the state's land use and transportation plans. Such a determination and permanent injunction will leave the Utah wilderness debate where it belongs, with the United States Congress.

## VI.  PRAYER FOR RELIEF

WHEREFORE, the State of Utah respectfully requests relief against Defendants as follows:

1.     Declare and set aside Order 3310 as unlawful and *ultra vires* because in its issuance, the Secretary of the Interior acted beyond his statutory authority;

2.     Declare that Order 3310 and the Manuals were issued without following mandatory rulemaking procedures under the APA;

3.     Declare that Defendants have failed to follow FLPMA, which requires public notice, opportunity for comment, and coordination with and meaningful involvement of State and local governments;

4.     Declare that the issuance of Order 3310 is a major federal action that requires Defendants to comply with mandatory NEPA procedures;

5.     Declare and set aside Order 3310 as contrary to law and without lawful authority, and as it is arbitrary and capricious and not in accordance with law

6.      Declare that the BLM practice of managing lands to protect lands in the Red Rock Wilderness Bill is unlawful and enjoin further actions to manage for lands inconsistent with federal law and existing BLM Resource Management Plans.

Respectfully submitted this 4th day of November, 2011

UTAH ATTORNEY GENERAL'S OFFICE


___    /s/ *Harry H. Souvall*_____
By:  Harry H. Souvall
Roger R.Fairbanks
Assistant Attorneys General
John O. Swallow
Chief Deputy Attorney General
Attorneys for the State of Utah

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Amended Complaint was

provided electronically to all parties named below on the 4th day of November, 2011.

_____
HARRY H. SOUVALL
Assistant Attorney General