DAVID B. BARLOW, United States Attorney (#13117)
JARED C. BENNETT, Assistant United States Attorney (#9097)
185 South State Street #300
Salt Lake City, Utah 84111
tel: (801) 325-3259; fax: (801) 325-3261
jared.bennett@usdoj.gov

ROBERT G. DREHER, Acting Assistant Attorney General
LUTHER L. HAJEK, Trial Attorney
SARA C. PORSIA, Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
tel: (202) 305-0503; fax: (202) 305-0506
sara.porsia@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| UINTAH COUNTY, UTAH, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> S.M.R. JEWELL, Secretary, <br>U.S. Department of the Interior, *et al.*, <br> Defendants, <br><br> SOUTHERN UTAH WILDERNESS <br>ALLIANCE, *et al.*, <br><br> Intervenor-Defendants. | Case No. 2:10-cv-970-DB-BCW <br>Case No. 2:11-cv-391-DB-BCW <br>(consolidated) <br><br> **DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR COMBINED MOTIONS TO DISMISS PLAINTIFFS UINTAH COUNTY, UTAH ET AL.'S SECOND AMENDED AND SUPPLEMENTAL COMPLAINT AND PLAINTIFF STATE OF UTAH'S FIRST AMENDED COMPLAINT** |

STATE OF UTAH,

        Plaintiff,

    v.

S.M.R. JEWELL, Secretary, U.S. Department
of the Interior, *et al.*,

        Defendants,

SOUTHERN UTAH WILDERNESS
ALLIANCE, *et al.*,

        Intervenor-Defendants.

# TABLE OF CONTENTS

I.   Plaintiffs' Claims should be dismissed for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). ................................................................................ 1

    A.   Plaintiffs Lack Standing to Pursue Their Claims. ..................................................... 2

        1.   Plaintiffs Have Failed to Demonstrate Standing Based on an Alleged Loss of Oil and Gas Revenue. ............................................................ 2

            a.   Plaintiffs Have Failed to Show that the Challenged Policies Caused a Reduction in Royalty Revenue. ................................ 2

            b.   Plaintiffs Have Failed to Show that the Challenged Policies Caused a Reduction in Bonus Bid Payments. ............................ 7

            c.   Plaintiffs' Alleged Economic Harm is Insufficient for Prudential Reasons. ......................................................... 10

            d.   Plaintiffs' Alleged Loss of Oil and Gas Revenue Is Not Redressable. ................................................................ 12

            e.   Alleged Procedural Injuries Alone Are Not Sufficient to Establish Standing. ......................................................... 17

            f.   The Parens Patriae Doctrine Does Not Provide a Basis for Standing. ..................................................................... 18

        2.   Utah's Claims that the Value of SITLA Lands Will Be Diminished Is Not Supported by Any Evidence. .............................................. 21

        3.   Plaintiffs' Claims Regarding Rights of Way Do Not Establish  Standing to Challenge the Policies at Issue in this Case. ........................................ 21

        4.   Plaintiffs' Claims Regarding Wildlife Management Are Insufficient to Establish Standing. ............................................................... 24

    B.   Plaintiffs Have Failed to Challenge Final Agency Action. .................................... 25

        1.   Plaintiffs' Improper Programmatic Challenges Must be Dismissed. ........ 25

        2.   The Challenged Internal Guidance Documents are not Final Agency Actions. .................................................................. 27

    C.   The Larson Exception is Inapplicable to Plaintiffs' Claims. ................................ 34

    D.   Plaintiffs' Claims Are Not Ripe for Review. ....................................................... 38

II.    Alternatively, Plaintiffs' claims should be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ........................................................................ 41

    A.    Plaintiffs' Claims Alleging that BLM Lacks the Authority to Inventory and Manage Lands to Protect Wilderness Values are Incorrect and Fail to State a Claim. ........................................................................................................ 41

    B.    Plaintiffs' Claims for Violation of the APA Requirements for Rulemaking Fail to State a Claim. ................................................................................................ 44

    C.    Plaintiffs' Claims Alleging Violations of FLPMA's Procedural Requirements Fail to State a Claim. ............................................................................................ 47

    D.    Utah's Eighth Cause of Action Fails to State a Claim. ........................................ 48

CONCLUSION ........................................................................................................................ 50

## TABLE OF AUTHORITIES

### CASES

Alaska Prof'l Hunters Ass'n v. Fed. Aviation Admin.,
    177 F.3d 1030 (D.C. Cir. 1999) ...................................................................46, 47

Alfred L. Snapp & Son, Inc. v. Puerto Rico,
    458 U.S. 592 (1982)................................................................................18, 19

Alvarado v. KOB-TV, L.L.C.,
    493 F.3d 1210 (10th Cir. 2007) ...............................................................41

Amigos Bravos v. BLM,
    816 F. Supp. 2d 1118 (D.N.M. 2011) ..............................................19

Ash Creek Mining Co. v. Lujan,
    969 F.2d 868 (10th Cir. 1992) ...............................................................12, 14

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)...............................................................................41

Baca v. King,
    92 F.3d 1031 (10th Cir. 1996) ...................................................12, 14, 16, 17

Ballesteros v. Ashcroft,
    452 F.3d 1153 (10th Cir. 2006) ...............................................................45

Bennett v. Spear,
    520 U.S. 154 (1997)....................................................................28, 29, 30

Block v. North Dakota,
    461 U.S. 273 (1983)..............................................................................50

Bryant v. Yellen,
    447 U.S. 352 (1980)...............................................................................16

CSG Exploration Co. v. FERC,
    930 F.2d 1477 (10th Cir. 1991) ...............................................................38

Chen v. Carroll,
    48 F.3d 1331 (4th Cir. 1995) ...................................................................45

Citizens to Pres. Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971).................................................................................37

Colorado Envtl. Coal.,
161 IBLA 386 (2004).............................................................................44

Colorado v. Gonzales,
558 F. Supp. 2d 1158 (D. Colo. 2007).................................................19

Cmty. Nutrition Inst. v. Young,
818 F.2d 943 (D.C. Cir. 1987)..............................................................45

Connecticut v. Am. Elec. Power Co.,
582 F.3d 309 (2d Cir. 2009), rev'd on other grounds, 131 S. Ct. 2527 (2011).................19

FDIC v. Schuchmann,
235 F.3d 1217 (10th Cir. 2000) ............................................................45

FEC v. Akins,
524 U.S. 11 (1988)................................................................................15

Forest Guardians v. Forsgren,
478 F.3d 1149 (10th Cir. 2007) ............................................................26

Georgia v. Penn. R.R. Co.,
324 U.S. 439 (1945)..............................................................................20

Georgia v. Tennessee Copper Co.,
206 U.S. 230 (1907)..............................................................................19

High Country Citizens' Alliance v. Norton,
448 F. Supp. 2d 1235 (D. Colo. 2006)..................................................27

Holt v. United States,
46 F.3d 1000 (10th Cir. 1995) ..........................................................1, 26

Howard B. Keck, Jr.,
124 IBLA at 55 ................................................................................29, 45

Jacobsen v. Deseret Book Co.,
287 F.3d 936 (10th Cir. 2002) ..............................................................41

Kane County v. Salazar,
562 F.3d 1077 (10th Cir. 2009) ............................................................49

Larson v. Domestic & Foreign Commerce Corp.,
    337 U.S. 682 (1949)............................................................................34, 36, 37

Lassen Motorcycle Club,
    133 IBLA 104 (1995)...............................................................................29, 45

Los Alamos Study Grp. v. U.S. Dep't of Energy,
    692 F.3d 1057 (10th Cir. 2012) ...............................................................1, 40

Lujan v. Def. of Wildlife,
    504 U.S. 555 (1992)................................................................................16, 17

Lujan v. National Wildlife Federation,
    497 U.S. 871 (1990)................................................................................25, 26

Makro Capital of Am., Inc. v. UBS AG,
    543 F.3d 1254 (11th Cir. 2008) .....................................................................1

Marathon Oil Co.,
    139 IBLA 347 (1997).........................................................................3, 13, 15

Marathon Oil Co. v. Babbitt,
    166 F.3d 1221, 1999 WL 3362 (10th Cir. 1999) ......................................13, 16

Marathon Oil Co. v. Babbitt,
    966 F. Supp. 1024 (D. Colo. 1997), aff'd, 166 F.3d 1221 (10th Cir. 1999) ..........13, 14, 15

Massachusetts v. Mellon,
    262 U.S. 447 (1923)......................................................................................18

Massachusetts v. U.S. Envtl. Prot. Agency,
    549 U.S. 497 (2007)...........................................................................18, 19, 20

Minard Run Oil Co. v. U.S. Forest Service,
    670 F.3d 236 (3d Cir. 2011)....................................................................31, 32

Montoya v. Chao,
    296 F.3d 952 (10th Cir. 2002) ......................................................................2

Mount Evans Co. v. Madigan,
    14 F.3d 1444 (10th Cir. 1994) .....................................................................10

Mountain States Legal Foundation v. Andrus,
    499 F. Supp. 383 (D. Wyo. 1980).................................................................18

Nat'l Mining Ass'n v. Jackson,
  880 F. Supp. 2d 119 (D.D.C. 2012) .............................................................32, 33

Nat'l Park Hospitality Ass'n v. Dep't of Interior,
  538 U.S. 803 (2003) .............................................................................................38

Or. Natural Desert Ass'n v. BLM,
  625 F.3d 1092 (9th Cir. 2010) ......................................................................42, 43

Or. Natural Desert Ass'n v. U.S. Forest Serv., No. Civ. 03-381-HA,
  2004 WL 1592606 (D. Or. July 15, 2004) .........................................................27

Or. Natural Res. Council Fund v. Brong, No. Civ. 04-693-AA,
  2004 WL 2554575 (D. Or. Nov. 8, 2004) ..........................................................27

Osborn v. United States,
  918 F.2d 724 (8th Cir. 1990) .........................................................................1, 26

Pac. Gas & Elec. Co. v. Fed. Power Comm'n,
  506 F.2d 33 (D.C. Cir. 1974) ..............................................................................45

Painter v. Shalala,
  97 F.3d 1351 (10th Cir. 1996) ..............................................................35, 36, 37

Palazzolo v. Rhode Island,
  533 U.S. 606 (2001) .............................................................................................39

Pamela S. Crocker-Davis,
  94 IBLA 328 (1986)......................................................................................29, 45

Paralyzed Veterans of Am. v. D.C. Arena L.P.,
  117 F.3d 579 (D.C. Cir. 1997) ............................................................................45

Park Lake Res. L.L.C. v. U.S. Dep't of Agric.,
  197 F.3d 448 (10th Cir. 1999) ............................................................................26

Pennsylvania v. Kleppe,
  533 F.2d 668 (D.C. Cir. 1976) ........................................................................7, 11

Richard D. Sawyer,
  160 IBLA 158 (2003)......................................................................................3, 15

Rocky Mountain Oil & Gas Ass'n v. Watt,
  696 F.2d 734 (10th Cir. 1982) ............................................................................40

SUWA,
    150 IBLA 263 (1999)........................................................................................44

SUWA,
    163 IBLA 14 (2004)..........................................................................................44

SUWA,
    160 IBLA 225 (2003)........................................................................................44

SUWA v. BLM,
    425 F.3d 735 (10th Cir. 2005) ...................................................................48, 49

SUWA v. Palma,
    707 F.3d 1143 (10th Cir. 2013) ............................................................8, 24, 40

In re Sac & Fox Tribe of Miss. in Iowa/Meskwaki Casino Litig.,
    340 F.3d 749 (8th Cir. 2003) ..........................................................................31

Sackett v. EPA,
    132 S. Ct. 1367 (2012).....................................................................................30

Schweiker v.  Hansen,
    450 U.S. 785 (1981).........................................................................................45

Sierra Club v. Peterson,
    228 F.3d 559 (5th Cir. 2000) ..........................................................................27

Sierra Club v. Yeutter,
    911 F.2d 1405 (10th Cir. 1990) ......................................................................26

Sorenson Commc'ns, Inc. v. F.C.C.,
    567 F.3d 1215 (10th Cir. 2009) ......................................................................45

Southway v. Cent. Bank of Nigeria,
    328 F.3d 1267 (10th Cir. 2003) ........................................................................2

Stewart v. Kempthorne,
    554 F.3d 1245 (10th Cir. 2009) ......................................................................10

Sullivan  v. Lujan,
    969 F.2d 877 (10th Cir. 1992) .....................................................13, 14, 18, 19

Summers v. Earth Island Inst.,
    555 U.S. 488 (2009).........................................................................................17

Texas v. United States,
    523 U.S. 296 (1998)........................................................................................40

Thomas v. Union Carbide Agric. Prods. Co.,
    473 U.S. 568 (1985)........................................................................................40

Toilet Goods Ass'n v. Gardner,
    387 U.S. 158 (1967)........................................................................................38

U.S. Postal Serv. v. Gregory,
    534 U.S. 1 (2001)............................................................................................37

Udall v. Tallman,
    380 U.S. 1 (1965)....................................................................................3, 12, 14

Uintah Cnty.,
    182 IBLA 191 (May 9, 2012) .........................................................................23

United States v. Chemical Found. Inc.,
    272 U.S. 1 (1926)............................................................................................37

United States v. Kaycee Bentonite Corp.,
    64 IBLA 183 (1982)........................................................................................45

United States v. Magnesium Corp.,
    616 F.3d 1129 (10th Cir. 2010) ......................................................................46

United Tribe of Shawnee Indians v. United States,
    253 F.3d 543 (10th Cir. 2001) ........................................................................37

Utah v. Babbitt,
    137 F.3d 1193 (10th Cir. 1998) .............................................................17, 22, 26

Utah v. Norton,
    No. 2:96-cv-0870, 2006 WL 2711798 (D. Utah Sept. 20, 2006), aff'd, on ripeness
    grounds by 535 F.3d 1184 (10th Cir. 2008).........................................28, 29, 30, 35, 43, 47

Western Energy Alliance v. Salazar,
    709 F.3d 1040 (10th Cir. 2013) ...........................................................3, 12, 14, 15

Western Energy Alliance v. Salazar,
    No. 10-CV-237F, 2011 WL 3738240 (D. Wyo. Aug. 12, 2011)......................33

Western Energy Alliance v. Salazar,
    No. 10-cv-0226, 2011 WL 37520 (D. Wyo. June 29, 2011) ...........................39

Wyoming Sawmills, Inc. v. U.S. Forest Serv.,
  383 F.3d 1241 (10th Cir. 2004) ...................................................................13, 16

Wyoming v. Dep't of Interior,
  674 F.3d 1220 (10th Cir. 2012) .....................................................1, 7, 10, 11, 19, 21, 26

Wyoming v. Oklahoma,
  502 U.S. 437 (1992)...........................................................................................6

Wyoming v. United States,
  279 F.3d 1214 (10th Cir. 2002) ...........................................................34, 37, 49

## STATUTES

5 U.S.C. § 553(b)(3)(A)......................................................................................44, 46

5 U.S.C. § 704 ...................................................................................................34

5 U.S.C. § 706(2) .........................................................................................25, 27, 34

16 U.S.C. § 1131(a) ...........................................................................................35

16 U.S.C. § 1133 ................................................................................................35

30 U.S.C. § 226(a) .............................................................................................12

33 U.S.C. § 1313.................................................................................................32

42 U.S.C. § 6217 ................................................................................................35

43 U.S.C. § 1701(a)(8).........................................................................................42

43 U.S.C. § 1702(j)..............................................................................................15

43 U.S.C. § 1712(c)(9)..............................................................................17, 42, 47, 48

43 U.S.C. § 1712(f)..........................................................................................47, 48

43 U.S.C. § 1782.............................................................................................35, 43

Energy Policy and Conservation Act Amendments of 2000, Pub. L. 106-469, Sec. 604,
  the Energy Policy Act of 2005, 42 U.S.C. § 15927(b) ..............................................34, 36

Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, Div. E, Sec. 125 (Dec. 23,
  2011) ...........................................................................................................37

Continuing Appropriations Act, Pub. L. No. 112-175, Sec. 101(a)(7) (Sept. 28, 2012) ...............37

Consolidated and Further Continuing Appropriations Act, 2013, Pub. L. No. 113-6, Div. F. Sec. 1101(a)(3) (Mar. 26, 2013) ...................................................................................37

## REGULATIONS

43 C.F.R. § 1610.3 ...........................................................................................................................17

Notice of Intent to Prepare Master Leasing Plan, 77 Fed. Reg. 13,141 (Mar. 5, 2012) ...............17

## RULES

Fed. R. Civ. P. 12(b)(1)......................................................................................................................2

# TABLE OF ACRONYMS

Administrative Procedure Act (APA)

Energy Policy and Conservation Act Amendments of 2000 (EPCA)

Environmental Protection Agency (EPA)

Environmental Impact Statement (EIS)

Expression of Interest (EOI)

Federal Land Policy and Management Act (FLPMA)

Interim Management Policy and Guidelines for Lands
Under Wilderness Review (IMP)

Interior Board of Land Appeals (IBLA)

Lands with Wilderness Characteristics (LWCs)

Master Leasing Plan (MLP)

Mineral Leasing Act (MLA)

National Environmental Policy Act (NEPA)

Record of Decision (ROD)

Resource Management Plans (RMP)

State of Utah School and Institutional Trust Lands Administration (SITLA)

Southern Utah Wilderness Alliance (SUWA)

U.S. Bureau of Land Management Instruction Memorandum (IM)

United States Bureau of Land Management (BLM)

United States Department of the Interior (DOI)

Wilderness Study Areas (WSA)

Wilderness Re-Inventory Areas (WIA)

Defendants, through undersigned counsel, hereby file this Reply Memorandum in Support of their Combined Motions to Dismiss Uintah County, et al.'s Second Amended and Supplemental Complaint and Plaintiff Utah's First Amended Complaint.

**I.      Plaintiffs' Claims should be dismissed for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).**

Defendants have moved to dismiss Plaintiffs' claims for lack of subject matter jurisdiction due to Plaintiffs' failure to satisfy their burden to show that they have standing to assert their claims, that their claims challenge a final agency action as is required by the APA, or that their claims are ripe for review. Plaintiffs' opposition memoranda misstate the standard of review applicable to a Rule 12(b)(1) factual attack on Plaintiffs' claims.  Plaintiffs repeatedly and incorrectly assert that their "factual allegations are presumed to be true," that general allegations are presumed to "embrace those specific facts that are necessary to support the claim," and that the allegations in their complaints must be construed in their favor.  Utah Opp'n at 50, 78, 79, 84; UAC Am. Opp'n at 38.  To the contrary, it is well settled that a court presented with a factual attack pursuant to Rule 12(b)(1) "'may not presume the truthfulness of the [petition's] factual allegations.'" Wyoming v. Dep't of Interior, 674 F.3d 1220, 1231 (10th Cir. 2012) (quoting Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)); Los Alamos Study Grp. v. U.S. Dep't of Energy, 692 F.3d 1057, 1063-64 (10th Cir. 2012).[1]  Because the Court's jurisdiction is at issue in a Rule 12(b)(1) factual attack, it "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Osborn, 918 F.2d at 729-30.

---

[1] See also Osborn v. United States, 918 F.2d 724, 729-30 (8th Cir. 1990); Makro Capital of Am., Inc. v. UBS AG, 543 F.3d 1254, 1258 (11th Cir. 2008).  The cases cited by Plaintiffs are inapposite as none provide the appropriate standard of review for a factual attack on the Court's subject matter jurisdiction under Rule 12(b)(1).  See Holt v. United States, 46 F.3d 1000, 1002–04 (10th Cir. 1995) (explaining the difference between a facial attack and a factual attack).

Moreover, Plaintiffs ignore the fact that they, not Defendants, bear the burden of producing evidence sufficient to establish the Court's subject matter jurisdiction by a preponderance of the evidence.  <u>Southway v. Cent. Bank of Nigeria</u>, 328 F.3d 1267, 1274 (10th Cir. 2003); <u>Montoya v. Chao</u>, 296 F.3d 952, 955 (10th Cir. 2002) ("The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction.") (citation omitted).  Defendants first moved to dismiss Plaintiffs' claims on July 8, 2011. ECF Nos. 66-68.  Rather than responding to Defendants' motions, Plaintiffs moved for, and were granted, leave to conduct jurisdictional discovery, representing to the Court that the documents sought in jurisdictional discovery would reveal facts relevant to Defendants' jurisdictional defenses.  <u>See</u> ECF Nos. 83, 131.  Despite Defendants' production of over one hundred thousand pages of documents, Plaintiffs have failed to offer any evidentiary support for many of their factual allegations and have failed to meet their burden to prove subject matter jurisdiction exists over their claims.

### A.      Plaintiffs Lack Standing to Pursue Their Claims.

Plaintiffs have failed to come forward with evidence demonstrating that the Challenged Policies[2] have caused them an injury that is redressable by a court order.  Therefore, their claims should be dismissed for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1).

### 1.      Plaintiffs Have Failed to Demonstrate Standing Based on an Alleged Loss of Oil and Gas Revenue.

#### a.      Plaintiffs Have Failed to Show that the Challenged Policies Caused a Reduction in Royalty Revenue.

Utah and the Counties offer a similar theory as to how the Challenged Policies allegedly caused them to lose oil and gas revenue.  Utah argues that BLM has deferred offering parcels within the area of the proposed America's Red Rock Wilderness Act ("ARRWA") for oil and gas leasing.  <u>See</u> Utah Opp'n at 25, 29-33.  It further alleges that companies have submitted

---

[2]  The term "Challenged Policies" used herein refers to all BLM policy and guidance documents challenged by Plaintiffs in this consolidated litigation. <u>See</u> Def. Exs. 1-6, 11-13.

2

expressions of interest ("EOI") in certain of these parcels and that BLM has deferred offering them for sale because they were within the proposed ARRWA areas. *Id.* at 38-39. Utah claims that the deferral of these parcels has caused it to lose royalty revenue and bonus bid payments that would otherwise be owed to it under the Mineral Leasing Act ("MLA"). Id. at 37-39, 65-68.

Similarly, the Counties argue that BLM has declined to offer parcels for leasing in response to EOIs if they are within the proposed ARRWA areas or contain lands with wilderness characteristics ("LWC"). UAC Am. Opp'n at 17-18. Further, they argue that, as a result, the number of leases issued has dropped and therefore caused the Counties to lose bonus bid payments. Id. at 18-20, 23-24. In the absence of the Challenged Policies, the Counties argue that additional parcels likely would have been leased and therefore they would have received higher bonus bid payments. Id. at 33-36, 38-40.

As an initial matter, the deferral of lands from leasing is a lawful exercise of the Secretary of the Interior's discretion. It is well established that the Secretary retains the ultimate discretion to lease or not to lease particular parcels. Western Energy Alliance v. Salazar, 709 F.3d 1040, 1044 (10th Cir. 2013) ("[The Mineral Leasing Act ('MLA')] continues to vest the Secretary with considerable discretion to determine which lands will be leased."); see also Udall v. Tallman, 380 U.S. 1, 4 (1965). BLM is not required to lease lands merely because they are designated as "open" in a resource management plan ("RMP"). See Marathon Oil Co., 139 IBLA 347, 356 (1997) ("BLM has authority to eliminate specific parcels from leasing even where they are designated in an RMP as generally suitable for leasing."); Richard D. Sawyer, 160 IBLA 158, 163 (2003) (same).

Lands identified in an RMP as available for leasing typically undergo additional analysis before a decision is made to include them in a lease sale. See W. Energy Alliance, 709 F.3d at 1043 ("If the lands are determined to be available for oil and gas development under the

applicable RMP, the BLM field office conducts an interdisciplinary team review of the parcels, focusing on conflicts with wildlife, habitat, wilderness, land characteristics, planning and other resources values."). "The [] pre-leasing review processes can result in parcel rejections, deferrals, and/or stipulations being placed on the leases." Id. at 1043. Accordingly, contrary to Plaintiffs' repeated assertions, BLM has the authority to defer parcels from leasing in order to further evaluate impacts to the environment or other reasons.

Plaintiffs have failed to demonstrate how the lawful exercise of the Secretary's discretion has caused them to be injured. In their complaints, Plaintiffs alleged that the Challenged Policies had caused them to lose oil and gas royalty revenue and bonus bid payments. See Utah Am. Compl. ¶ 179 (BLM's policies are "causing Utah to [lose] mineral leasing revenues, including bonus payments . . . ."); UAC 2nd Am. Compl. ¶ 107 ("Oil and gas royalties paid to Utah from production in Uintah County dropped almost 50% between the 2008 calendar year and the 2009 calendar year."); see also id. ¶ 109. The Counties tied this reduction specifically to a decrease in production. See id. ¶ 107 ("Following the implementation of *de facto* wilderness management in 2009 and the MLP proposals under IM 2010-117 in early 2010, crude oil and natural gas production declined in Uintah County.").

As it turns out, there was no decline in production. Instead, as Defendants have demonstrated, the publicly available information shows that production of oil and gas on federal lands in both Utah and Uintah County has steadily increased since 2009, the year that Defendants allegedly instituted a policy of *de facto* wilderness management. See Def. Mem. at 23. Further, Defendants demonstrated that, despite the increased production, the lower price of oil and gas caused the value of the oil and gas produced to be lower in fiscal years ("FY") 2008 and 2009, before increasing in the following years. Id. at 24. The drop in the value of the oil and gas produced, along with other economic factors, contributed to an overall decline in oil and gas

revenue in FY 2010 and 2011.  Id. at 25.[3]  But Plaintiffs' premise that the Challenged Policies have caused a decrease in production, which then led to decreased royalty revenue, has been shown to be false.

Faced with compelling evidence that royalty revenues over the past four years have not suffered due to BLM's existing policies, the Counties now abandon the claim that the Challenged Policies have caused them to lose royalty revenue.  See UAC Am. Opp'n at 34 ("DOI's arguments about royalty, energy prices, and production are, thus, irrelevant."); see also id. at 39-40.  And while Utah maintains that the Challenged Policies have caused royalties to decrease, it offers very little to support that assertion.  See Utah Opp'n at 37-39, 65-68.  The only evidence offered is the Declaration of John Harja (ECF No. 83-12), Utah Ex. 31.  The declaration shows that royalty revenues for the six years leading up to FY 2011 were:  FY 2006 - $129,461,187; FY 2007 - $129,301,505; FY 2008 - $134,488,479; FY 2009 - $176,907,089; FY 2010 - $136,760,974; and FY 2011 - $144,338,711.  Harja Decl. ¶ 5.[4]  In FY 2012, royalty revenues were $153,597,800.  See Budget Recommendations, Fiscal Year 2014, Fiscal Year 2013 Supplementals at 10, 28, Def. Ex. 31.  Thus, despite lower oil and gas prices, royalty revenues did not decrease after FY 2008 and actually increased quite significantly in FY 2009.

---

[3] Utah's total mineral leasing revenue actually increased from $150.3 million (royalty – $134.5 million / bonus – $15.8 million) (excluding a FY 2007 carryover of $5.5 million) in FY 2008 to $189.1 million (royalty – $176.9 million / bonus – $12.2 million in bonus) in FY 2009.  See Compiled Utah Annual Budget Summaries (excerpts) (charts for Mineral Lease Funds and Revenue Estimates), Def. Ex. 31; see also Harja Decl. (ECF No. 83-12).

[4] Mr. Harja relies on Utah budget data and therefore the figures in his declaration are largely the same as in the budget summary documents submitted by Defendants.  See Compiled Utah Annual Budget Summaries (excerpts) (charts for Mineral Lease Funds and Revenue Estimates), Def. Ex. 31.  The only discrepancy is that for FY 2008, Mr. Harja excluded $5.45 million in exchanged lands mineral lease carryover from FY 2007.  Compare Harja Decl. ¶ 5 ($150,324,099 total revenue in FY 2008) with Budget Summary, Fiscal Year 2010, Mineral Lease Funds Table Three Year Comparison at 23 ($155,774,100 total revenue in FY 2008), Def. Ex. 31.  But this discrepancy is not significant for purposes of the arguments, and there is no dispute over the Utah Budget figures, which are a matter of public record.

Utah also argues that the Challenged Policies will cause it to lose oil and gas revenue, including royalties and bonus bid payments, over the long term and attempts to liken this case to Wyoming v. Oklahoma, 502 U.S. 437 (1992).  Utah Opp'n at 66-68.  In that case, Wyoming sued Oklahoma over an Oklahoma law designed specifically to increase Oklahoma's revenue from the sale of coal and decrease Wyoming's revenue.  Wyoming v. Oklahoma, 502 U.S. at 443-44.  The law did this by mandating that Oklahoma utilities use at least ten percent Oklahoma coal.  Id. One of the express purposes of the law was to "enhance[] the economy of the State of Oklahoma" by taking coal purchases away from Wyoming.  Id. at 443.

In support of its injury, Wyoming relied on data showing Oklahoma utilities' purchases of Wyoming coal had decreased following the enactment of the law.  Id. at 444-45.  Wyoming also submitted affidavits showing that it had lost roughly $500,000 per year following the passage of the law and that its excess capacity of coal could not be sold elsewhere.  Id. at 445-46.  Oklahoma did not submit any evidence to dispute Wyoming's injury, but it did submit the affidavit of an economist who found that some of Wyoming's losses could be attributed to the lowering of Wyoming's severance tax rate and that even prior to the law, Oklahoma utilities used some Oklahoma coal.  Id. at 445 n.6.  Under these circumstances, the Court found that Wyoming had standing.  See id. at 446-54.

That case is significantly different from Utah's case here and does not support standing. The law in Wyoming v. Oklahoma was designed specifically to take coal tax revenue from Wyoming and give it to Oklahoma and, in fact, did so.  By contrast, the policies challenged in this case have no direct affect on Utah's right to revenues under the MLA or the percentage of revenues that Utah receives. Instead, Utah argues that the policies will have the incidental effect of discouraging oil and gas leasing in Utah, thereby decreasing the royalties that it will receive. See Utah Opp'n at 68.  Thus, these are precisely the type of generalized allegations of incidental

6

economic harm that are insufficient to support standing.  See Wyoming v. U.S. Dep't of the Interior, 674 F.3d 1220, 1234 (10th Cir. 2012); see also Pennsylvania v. Kleppe, 533 F.2d 668, 672 (D.C. Cir. 1976) (State and local governments lack standing "where diminution of tax receipts is largely an incidental result of the challenged action").

Further, unlike Wyoming v. Oklahoma, the evidence submitted by Utah does not establish that it has, in fact, lost tax revenue.  As discussed above, the Harja Declaration does not show that Utah's royalty revenue decreased after FY 2008 despite lower oil and gas prices.  Thus, Utah has failed to offer evidentiary support for its claim that BLM's policies "have directly deprived the State of revenue."  Utah Opp'n at 67.  This puts Utah in the same position as Wyoming and Park County, Wyoming in the litigation involving winter use of Yellowstone National Park.  In that case, the Tenth Circuit distinguished Wyoming v. Oklahoma, stating, "Petitioners in this case have presented us with no evidence that specific loss of tax revenues have occurred, and their assertions of future lost tax revenues are merely speculative."  Wyoming, 674 F.3d at 1235.  The same is true here.

> **b.     Plaintiffs Have Failed to Show that the Challenged Policies Caused a Reduction in Bonus Bid Payments.**

Both Utah and the Counties argue that they were injured by an alleged loss of bonus bid payments and rely heavily on the Harja Declaration to establish that proposition.  See Utah Opp'n at 37-39, 68; UAC Am. Opp'n at 38-40.  Utah claims that the Harja Declaration demonstrates "a drop from $40,000,000 in bonus payments in 2007 to $9,000,000 in 2011" and implies that this drop was due to the Challenged Policies.  Utah Opp'n at 68.  This assertion does not even accurately represent the information in the Harja Declaration. But more importantly, the implied assertion that a $31,000,000 drop in bonus bid payments can be attributed to the Challenged Policies is not supported by the declaration itself.

As stated in Mr. Harja's declaration, the bonus bid payments to Utah beginning in FY 2006 were:  FY 2006 - $40,583,333; FY 2007 - $31,552,661; FY 2008 - $15,835,620; FY 2009 - $12,235,533; FY 2010 - $10,466,370; and FY 2011 - $8,440,420.  Harja Decl. ¶ 5.  Thus, prior to the time Plaintiffs allege that the Challenged Policies were in effect, the bonus bid payments had already decreased by roughly $25 million.  None of that drop can be attributed to Defendants' actions.  In subsequent years, the bonus bid payments decreased by more modest amounts.  Mr. Harja states that the reduction in bonus bid payments "are directly related to the increased difficulty in offering parcels of real interest to the oil and gas exploration industry."  Id. ¶ 6.  But that assertion is not supported by any analysis of the potential factors influencing the bonus payments, including market factors.

Further, because Mr. Harja's declaration was executed in September 2011 and Utah chose not to update it, it omits data for FY 2012.  As reported in Utah's budget documents, Utah received $40,392,500 in bonus bid payment in FY 2012, nearly as high as the record high of FY 2006.  See Budget Recommendations, Fiscal Year 2014, Fiscal Year 2013 Supplementals at 10, 28, Def. Ex. 31.  Utah claims that this information is irrelevant because it post-dates the filing of the complaint.  Utah Opp'n at 68.  Certainly, injury must be established based on the actions challenged at the time the complaint was filed and not on "subsequent events."  SUWA v. Palma, 707 F.3d 1143, 1153 (10th Cir. 2013).  But Utah is claiming that BLM's policies have caused and are continuing to cause it to lose bonus bid payments.  See Utah Opp'n at 68 (arguing that "the Secretary continues enforcing the unlawful wilderness policies . . . thereby denying the state immediate bonus payments and longer term royalties").  Utah cannot claim that it continues to lose money and, at the same time, exclude irrefutable evidence that contradicts its claims of injury.

Perhaps more significant than the amount of the bonus bid payment in FY 2012 is that it shows that Mr. Harja's (and Utah's) underlying assumptions about the causes of the reduction in such payments were just plain wrong. Mr. Harja theorized that the modest drop in bonus bid payments between 2008 and 2011 could be attributed to BLM's policies. See Harja Decl. ¶¶ 6-7. But that failed to account for the well documented decline in oil and gas prices and depressed demand for oil and gas during the recession. See Def. Mem. at 28. The fact that bonus bid payments rebounded nearly to an all time high in FY 2012 thoroughly undermines his conclusion that BLM's policies (allegedly in effect for nearly four years at the time) were causing a decrease in bonus bid payments.

The Counties similarly argue that the deferral of parcels that were nominated through EOIs harmed them economically because they would have obtained a share of the bonus bid payments if the parcels were leased. See UAC Am. Opp'n at 33-36, 38-40. They argue that "UAC members have lost and continue to lose bonus payment revenues." Id. at 34. But the only evidence that they offer to support that proposition is the Harja Declaration, id. at 19, 39, which, as discussed above, fails to account for lower oil and gas prices and other market factors. The Counties simply ignore the fact that bonus bid payments to Utah for FY 2012 were $40.4 million.

The Counties also argue that BLM's data show that leases have been lower in recent years and fewer new leases translates to lower bonus bid payments. See UAC Am. Opp'n at 18, 35; see also UAC Ex. 110. The BLM data show that the number of new leases in Utah over the past six years were: FY 2006 – 351; FY 2007 – 303; FY 2008 – 67; FY 2009 – 155; FY 2010 – 79; FY 2011 – 28; and FY 2012 – 40. UAC Ex. 110. Thus, the decline that the Counties allude to began before FY 2009 when the Challenged Policies allegedly took effect. Moreover, as the Counties recognize, the amount of the bonus bid per acre can vary greatly from a minimum of $2/acre to as high as $10,000 per acre. UAC Am. Opp'n at 34. Due to this variation, the amounts of the bonus

bid payments do not correlate with the number of new leases issued.  For example, in FY 2012, there were only 40 new leases in Utah, but the bonus bid payments were near an all time high. Thus, the Counties' claim that any lease that is deferred causes it to lose money is not borne out by the data.

The Counties also argue that parcels nominated by industry "invariably sell" and therefore this case is like Mount Evans Co. v. Madigan, 14 F.3d 1444 (10th Cir. 1994).  UAC Am. Opp'n at 35; see also id. at 39-40.  In Mount Evans, the court found that the county had established an injury because it would receive a direct 25% royalty from a concession facility if a Forest Service building was ordered to be rebuilt.  14 F.3d at 1451-52.  The Tenth Circuit has subsequently explained that a decrease in tax revenue may be sufficient to establish standing only if the plaintiffs show a direct link between the action and a loss of specific source of revenue.  See Wyoming, 674 F.3d at 1234.  The Counties cannot show such a direct link because their loss in revenue was due largely to economic factors and not the Challenged Policies.

Moreover, their arguments regarding potential future losses rely on assumptions that BLM would lease certain parcels in the absence of its alleged policies, which is simply speculation. Stewart v. Kempthorne, 554 F.3d 1245, 1254 (10th Cir. 2009) ("We cannot make such assumptions, and therefore, the injury argument at this stage is merely conjectural or hypothetical.").  Finally, the court in Mount Evans found that the county's injuries would be redressable because "the County is guaranteed revenue sharing and sales tax money in the event that its requested relief is granted."  14 F.3d at 1451.  As discussed in section I.A.1.d., *infra*, the same is not true here because BLM has broad discretion whether to lease particular parcels and it cannot be compelled to lease specific parcels by a court order.

> **c.**      **Plaintiffs' Alleged Economic Harm is Insufficient for Prudential Reasons.**

Defendants' arguments regarding prudential standing are addressed briefly by Utah and ignored by the Counties. See Utah Opp'n at 69-71. In order to meet the prudential requirements for standing, the Plaintiffs must "assert [their] own legal rights," must not raise "generalized grievances most appropriately addressed by one of the other branches of government," and must assert an injury within the zone of interest of the applicable statute or constitutional provision. Wyoming, 674 F.3d at 1230-31 (citation omitted). The first two of these requirements are at issue here.

As to the first requirement, Utah asserts that it is asserting "injuries that it alone has suffered in its proprietary or sovereign capacities." Utah Opp'n at 70. But that assertion is belied by Utah's own arguments. In support of its theory that it is being injured by BLM's deferral of parcels, Utah cites documents showing that particular companies – Bill Barrett Corp., Robert L. Bayless, Producer LLC, Jones Lease Service, McCormick and Kendall, Summit Energy Co., and Baseline Minerals, Inc. – submitted EOIs. See Utah Opp'n at 38-39. The Counties make similar arguments and rely on similar documents. See UAC Am. Opp'n at 19-20, 23-24. Thus, Utah and the Counties are attempting to assert "legal rights" to the EOIs submitted by independent companies. As discussed below, the EOIs vest the companies with no legal rights to develop any parcels. The Plaintiffs' subsidiary interest in those same EOIs should fail for the same reason.

As to the second requirement, Utah claims that its interest in obtaining oil and gas revenues under the MLA is unique to it and therefore is not a generalized grievance. Utah Opp'n at 70-71. The Tenth Circuit, however, has adopted the reasoning of other circuits that due to the nature of federal policymaking and the potentially broad economic implications to state and local governments, "impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact to support state standing." Wyoming, 674 F.3d at 1234 (quoting Kleppe, 533 F.2d at 672). A generalized reduction in revenue that is incidental to BLM's alleged policies is exactly

11

what Utah and the Counties are relying on in this case to support standing.  Such allegations are

insufficient to support standing and "holding otherwise might spark a wave of unwarranted

litigation against the federal government."  Id.

> ### d.  Plaintiffs' Alleged Loss of Oil and Gas Revenue Is Not Redressable.

Even if the Court finds that Plaintiffs have met the first two standing prongs, the

redressability prong is an insurmountable bar to Plaintiffs' standing based on clear Tenth Circuit

precedent.  The Plaintiffs' alleged injuries relating to oil and gas revenues would not be redressed

by an order of this Court regarding their claims because the MLA gives BLM absolute discretion

as to whether to lease particular parcels.  See 30 U.S.C. § 226(a) ("All lands subject to disposition

under this chapter which are known or believed to contain oil or gas deposits *may* be leased by

the Secretary.") (emphasis added); Udall, 380 U.S. at 4 ("Although the [MLA] directed that if a

lease was issued on such a tract, it had to be issued to the first qualified applicant, it left the

Secretary discretion to refuse to issue any lease at all on a given tract."); see also W. Energy

Alliance, 709 F.3d at 1044.

The Tenth Circuit has consistently found that parties lack standing where the redress of

their injuries depends on a leasing determination that is vested in the ultimate discretion of the

Department of the Interior.  See Baca v. King, 92 F.3d 1031, 1036-37 (10th Cir. 1996) (rancher's

alleged loss of the ability to graze due to a land exchange was not redressable because the

decision to "renew grazing permits and whether public lands should even be designated for

grazing purposes are matters completely within the Secretary of Interior's discretion") (citation

omitted); Ash Creek Mining Co. v. Lujan, 969 F.2d 868, 876 (10th Cir. 1992) (mining company's

alleged loss of the opportunity to lease land subject to an exchange was not redressable because

"no court has the power to vest Ash Creek with mining rights to the exchanged lands"); Sullivan

v. Lujan, 969 F.2d 877, 882 (10th Cir. 1992) (Wyoming's alleged loss of revenue from coal leasing was not a redressable injury because the decision whether to lease the land "is vested absolutely in the federal government's executive branch and not in its judiciary"); see also Wyoming Sawmills, Inc. v. U.S. Forest Serv., 383 F.3d 1241, 1249 (10th Cir. 2004) (a company's alleged loss of ability to log an area was not redressable because the Forest Service "has complete discretion whether to offer the opportunity sought by plaintiff").  Utah and the Counties are in the same position as the plaintiffs in those cases because, even if they obtain a favorable ruling from the Court, the Secretary of the Interior retains the discretion to not lease parcels for oil and gas development.

Further, a similar situation was addressed in Marathon Oil Co. v. Babbitt, 966 F. Supp. 1024 (D. Colo. 1997), aff'd, 166 F.3d 1221 (10th Cir. 1999).  An oil company brought suit challenging the Secretary's removal of parcels from a list of parcels offered for a competitive lease sale.  See id. at 1024-25.  As indicated in the related Interior Board of Lands Appeal ("IBLA") decision, the Secretary removed certain parcels prior to the lease sale in order to protect lands with wilderness characteristics, and the plaintiffs alleged very much the same kind of *de facto* management alleged here.  See Marathon Oil Co., 139 I.B.L.A. 347, 352 (1997) (alleging that an environmental group proposed that BLM "manage over 200,000 acres of BLM lands in Colorado as if they were statutory wilderness areas").  Nevertheless, the Court found that Marathon lacked standing because its alleged injury – the inability to competitively bid on the parcel – could only be redressed by a decision "compelling the executive branch to make land available for competitive leasing under the [MLA]," which the court lacked the power to do. Marathon Oil, 966 F. Supp. at 1026.  The Tenth Circuit affirmed relying on its prior precedents. See Marathon Oil Co. v. Babbitt, 166 F.3d 1221, 1999 WL 3362, at *1-2 (10th Cir. 1999) (unpublished).

13

In response, Utah barely touches on redressability, except to state that "[a]n injunction and declaratory relief by this court would redress the State's economic injuries and free up these lands as open for mineral leasing as defined in existing RMPs." Utah Opp'n at 68. Based on the clear Tenth Circuit precedent discussed above, however, Utah's alleged injury is not redressable because an order of this Court could *not* compel BLM to lease the lands at issue. Utah's response misunderstands BLM's leasing process. By deferring certain parcels, BLM has not closed them from leasing; rather, deferral allows BLM to conduct additional analysis of environmental and other issues relating to those parcels. See W. Energy Alliance, 709 F.3d at 1043; BLM Handbook H-3120-1 at 9, Def. Ex. 10. The parcels remain open for leasing, but it is entirely within BLM's discretion to decide whether to lease them. See Udall, 380 U.S. at 4.

The Counties have a number of theories as to why their alleged injuries are redressable despite the Tenth Circuit's precedent to the contrary. First, they argue that they are not seeking an order requiring BLM to issue leases. UAC Am. Opp'n at 41. Actually, that appears to be exactly what the Counties are seeking – they are asking the Court to compel BLM to offer leases in areas where parcels have been deferred. See, e.g., UAC Sec. Am. Compl. at 87 (asking the Court to declare that Defendants must "end all deferral policies"). Even taking the Counties at their word that they are not seeking such relief, the precise relief they are seeking is irrelevant. As in Sullivan, Baca, Ash Creek, and Marathon Oil, only an impermissible order compelling BLM to offer parcels in a lease sale could redress the Counties' alleged injuries stemming from the alleged loss of leasing revenue.[5]

Second, the Counties argue that BLM's authority to issue leases under the MLA is limited by FLPMA and the requirement that it act in conformance with an RMP. UAC Am. Opp'n at 41.

---

[5] Plaintiffs argue that the plaintiffs in Marathon Oil and Ash Creek sought an order compelling BLM to issue leases. See UAC Am Opp'n at 43. It is not apparent from the opinions that such relief was actually sought. See Ash Creek, 969 F.2d at 874; Marathon Oil, 966 F. Supp. at 1026.

The fact that certain areas are "open" for leasing in an RMP, however, does not mandate that the parcels be leased.  Marathon Oil, 139 IBLA at 356 ("BLM is not strictly bound by the terms of an RMP when considering whether to lease a particular parcel."); see also Richard D. Sawyer, 160 IBLA at 163.  Therefore, BLM acts in conformance with an RMP even when it chooses not to lease parcels that are designated as open for leasing in the RMP.

Third, the Counties argue that BLM's deferral of certain parcels from lease sales amounts to a *de facto* withdrawal of land from leasing.  UAC Am. Opp'n at 41.  As discussed above, BLM has the authority to defer parcels for additional environmental analysis.  See W. Energy Alliance, 709 F.3d at 1043.  Such deferrals do not constitute a withdrawal of land under 43 U.S.C. § 1702(j).  Nor does the evidence support the notion that BLM has effectively removed the ARRWA lands from leasing in order to protect LWCs.  As even the Counties concede, BLM has leased parcels in the ARRWA.  See UAC Am. Opp'n at 17; see also UAC Ex. 32 (leasing information memorandum indicating that sections of 7 parcels in the Price Field Office and all or parts of 5 parcels in the Monticello Office within the ARRWA would be leased in the May 19, 2009 lease sale).  Moreover, BLM may have any number of reasons for deferring parcels, including concerns regarding sage grouse and white-tailed prairie dogs – reasons that are not related to LWCs.  See UAC Exs. 25, 38; Utah Ex. 20.  Regardless of what Plaintiffs call BLM's deferrals, they lack standing to challenge the deferrals because a court order cannot compel the leases to be issued.  See Marathon Oil, 966 F. Supp. at 1026.

The Counties also assert that they may satisfy the redressability prong by showing a "plausible benefit" from a court order.  UAC Am. Opp'n at 41 (citing FEC v. Akins, 524 U.S. 11, 25 (1988)).  In Akins, the Supreme Court enunciated the principle that, in order to establish redressability in a case against the federal government, a plaintiff need not prove that the agency would reach a different conclusion if the decision were vacated and remanded.  Id. at 25.  A

similar principle was subsequently articulated in <u>Lujan v. Def. of Wildlife</u>, 504 U.S. 555, 572 n.7 (1992) (a plaintiff may have standing to challenge an agency's decision based on alleged procedural violations "even though he cannot establish with any certainty that" the agency's decision would change). Fully cognizant of <u>Lujan</u>, however, the Tenth Circuit has, on multiple occasions, found that litigants lack standing when redressability depends on the discretionary leasing decision of a federal agency. <u>See</u> <u>Marathon Oil Co.</u>, 166 F.3d at *1-2 (distinguishing <u>Lujan</u>); <u>Baca</u>, 92 F.3d at 1035-36 (citing <u>Lujan</u>). Accordingly, the Counties cannot escape the Tenth Circuit's standing precedents through citation to <u>Akins</u>.[6]

In addition, there is no factual basis for the Counties' assertion that a court ruling in their favor "would make it likely that the currently deferred EOIs would be offered, because the 2008 RMPs have already determined that these lands are available for leasing." UAC Am. Opp'n at 42. Again, the Counties are confusing "open" in an RMP with a requirement to lease the lands, which does not exist. They cannot show that the Secretary would choose to lease the lands because that decision lies within the Secretary's discretion, and any such argument flies in the face of the Tenth Circuit's rulings on redressability.

The Counties also claim that they would obtain a benefit "if DOI proceeded to propose an MLP rule, issue a withdrawal, and amend the RMPs." UAC Am. Opp'n at 43. It is unclear what the Counties mean by this, but if they mean that they want the ability to participate in the MLP process, then that is already provided for in the MLP guidance documents. The MLP process and the potential designation of an MLP will be conducted pursuant to the land use planning process

---

[6] <u>Bryant v. Yellen</u>, 447 U.S. 352 (1980) is of no relevance here. There, the Court found that land owners had standing to intervene in a suit challenging provisions affecting water rights because, if the provision were applied, they would likely be able to purchase lands from private landowners at below market prices. <u>Id.</u> at 368. Redressability did not depend on the absolute discretion of a land management agency. Indeed, in <u>Wyoming Sawmills</u>, the Tenth Circuit distinguished <u>Yellen</u> on that basis. 383 F.3d at 1249 ("As in <u>Baca</u>, the federal agency has complete discretion as to whether to offer the opportunity sought by plaintiff . . . .").

and the requirements of NEPA.  <u>See</u> Def. Exs. 2 & 3.  Further, BLM has already initiated the

NEPA and land use planning processes to potentially amend the Moab RMP to designate an

MLP.  <u>See</u> Notice of Intent to Prepare Master Leasing Plan, 77 Fed. Reg. 13,141 (Mar. 5, 2012).

The Counties will be able to participate in that process pursuant to 43 U.S.C. § 1712(c)(9) and 43

C.F.R. § 1610.3 <u>et seq.</u>,  which will inform BLM's decisions regarding the potential MLP.

### e.   Alleged Procedural Injuries Alone Are Not Sufficient to Establish Standing.

The Counties argue that alleged violations of procedural rights designed to protect a

concrete interest are sufficient to establish standing.  UAC Am. Opp'n at 44 (citing <u>Utah v.</u>

<u>Babbitt</u>, 137 F.3d 1193, 1216 (10th Cir. 1998) (citing <u>Lujan</u>, 504 U.S. at 573 n.8).  As already

discussed, the Supreme Court has recognized that in cases in which an agency's decision is

challenged, the redressability standard is somewhat relaxed, meaning that a litigant need not

demonstrate that the agency would reach a different decision on remand.  <u>Lujan</u>, 504 U.S. at 572

n.7.  While recognizing that principle, the Tenth Circuit has consistently ruled that redressability

is still lacking when redress is contingent upon the discretion of a land management agency.  <u>See,</u>

<u>e.g.</u>, <u>Baca</u>, 92 F.3d at 1035-36.

Furthermore, the fact that Plaintiffs allege a violation of procedural rights does not in any

way diminish their obligation to prove that they have been injured by Defendants' actions.  The

Supreme Court has explained that "deprivation of a procedural right without some concrete

interest affected by the deprivation – a procedural right <i>in vacuo</i> – is insufficient to create Article

III standing."  <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 496 (2009).  In addition, "[u]nlike

redressability, . . . the requirement of injury in fact is a hard floor of Article III jurisdiction that

cannot be removed by statute."  <u>Id.</u> at 497.  Thus, regardless of the type of violation alleged –

procedural or substantive – the same standard for proving injury applies.  As discussed above, the

17

Counties do not meet the standards for Article III standing, and their claims of injury are not saved by recasting them as procedural injuries.[7]

### f.  The *Parens Patriae* Doctrine Does Not Provide a Basis for Standing.

Utah argues in the alternative that its standing may be based on the *parens patriae* doctrine.  Utah Opp'n at 71-75.  This assertion is without legal merit.  In general, a state may sue to protect its quasi-sovereign interests relating to the general welfare of its populace under the doctrine of *parens patriae*.  See Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 601-02 (1982).  In lawsuits against the federal government, however, a state does not have standing to protect quasi-sovereign *parens patriae* interests because the federal government is presumed to represent the interests of the citizens as *parens patriae*.  Id. at 610 n.16 (citing Massachusetts v. Mellon, 262 U.S. 447, 485-86 (1923)); Sullivan, 969 F.2d at 883.

Utah claims that this principle was altered by the Supreme Court's decision in Massachusetts v. U.S. Envtl. Prot. Agency, 549 U.S. 497 (2007).  Massachusetts, however, did not turn on the *parens patriae* doctrine, nor did it even address that doctrine.  Instead, the State of Massachusetts was found to have standing in that case based on a different interest than the ones being asserted by Utah here.  The Supreme Court, relying on prior precedent that allowed a state to sue under a nuisance theory, ruled that Massachusetts could sue the federal government to protect its quasi-sovereign interest in all of the lands within its borders.  549 U.S. at 519 ("Just as Georgia's independent interest 'in all the earth and air within its domain' supported federal jurisdiction a century ago, so too does Massachusetts' well-founded desire to preserve its

---

[7] The Counties also cite Mountain States Legal Foundation v. Andrus, 499 F. Supp. 383 (D. Wyo. 1980).  UAC Am. Opp'n at 44.  That case, however, was decided before the Tenth Circuit established the principle that an alleged injury is not redressable when such redress is contingent upon an agency's discretionary leasing authority.  See Sullivan, 969 F.2d at 882.  The district court's analysis of injury in Mountain States, see 499 F. Supp. at 396-97, did not take these later precedents into account and therefore should not be relied upon by the Court.

sovereign territory today.") (quoting Georgia v. Tennessee Copper Co., 206 U.S. 230, 237

(1907).  By contrast, nothing in the Massachusetts opinion suggests that a state may sue to protect

its interest in the well being of its citizens, including economic interests, a principle that has

previously been rejected by the Supreme Court.  See Snapp, 458 U.S. at 609-10 & n.16.

Indeed, the Tenth Circuit has addressed this issue after Massachusetts and acknowledged

that this principle still applies.  Wyoming, 674 F.3d at 1232 ("[A]s Petitioners concede, they

cannot bring a suit on behalf of local business owners, i.e., their citizens, but must instead sue to

protect their own sovereign interest.") (citing Sullivan, 969 F.2d at 883).  Nor do any of the other

cases cited by Utah following Massachusetts support the notion that a state may sue to protect its

quasi-sovereign economic interests against the federal government under the doctrine of *parens

patriae*.  See Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 335-349 (2d Cir. 2009) (finding

that states had met the requirements of the *parens patriae* doctrine and Article III standing in suit

against electrical power companies), rev'd on other grounds, 131 S. Ct. 2527 (2011); Colorado v.

Gonzales, 558 F. Supp. 2d 1158, 1164-65 (D. Colo. 2007) (finding that Colorado lacked standing

to sue to compel the federal government to enforce federal immigration laws under the doctrine of

*parens patriae*); Amigos Bravos v. BLM, 816 F. Supp. 2d 1118, 1125, 1138-39 (D.N.M. 2011)

(referencing the *parens patriae* doctrine in passing and finding that environmental groups lacked

standing to challenge a quarterly lease sale).

Utah points to language in a footnote in Massachusetts wherein the Supreme Court

indicated that a state may bring suit against the federal government in order to compel the

government to act in accordance with requirements of federal law.  See 549 U.S. at 520 n.17

("[T]here is a critical difference between allowing a State 'to protect her citizens from the

operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its

rights under a federal law (which it has standing to do)."  In Massachusetts, the states sought to

compel the federal government to regulate greenhouse gas emissions under the Clean Air Act,

which the federal government was not doing.  See id. at 510.  By contrast, in this case, Utah is

challenging the Secretary's discretionary decisions under the MLA to defer certain parcels rather

than lease them. Accordingly, even according to the footnote cited by Utah, this is a case that falls

into the category of cases for which a state is precluded from raising a *parens patriae* interest

against the federal government, *i.e.*, it is a case challenging the application of federal law against

entities within the state.[8]

Finally, even if the Court were to find that Utah may assert a *parens patriae* interest in

this case, that does not relieve Utah of demonstrating Article III standing.  Indeed, in

Massachusetts, after discussing the states' quasi-sovereign (or sovereign) interest in protecting its

land and air, the Supreme Court proceeded to analyze whether the state had Article III standing.

Massachusetts, 549 U.S. at 521-26.  Utah fails to demonstrate Article III standing for the reasons

discussed above, and its additional allegations of harm in its *parens patriae* argument are too

vague and speculative to support standing. Utah claims that "[s]urely the effects of Defendants'

actions have affected more than a thousand job opportunities in Utah."  Utah Opp'n at 75.  But

that assertion is pure speculation and is not supported by any evidence.

The Counties acknowledge that they may not sue the federal government under the

doctrine of *parens patriae* to protect the general welfare of their citizens.  See UAC Am. Opp'n at

69-70.  They claim, however, that they are not asserting such rights.  See id.  Defendants interpret

this to mean that the Counties are not relying on any allegations of injury relating to the well

being of county citizens.  Defendants note that the Counties appeared to be making such

allegations in their complaint.  See UAC Sec. Am. Compl. ¶ 109 ("Reduced revenues and fewer

---

[8] Georgia v. Penn. R.R. Co., 324 U.S. 439 (1945) is of no help to Utah because it was a suit
brought against railroad companies, not against the federal government.  See id. at 443-45.

high paying jobs is an impact repeated throughout Utah . . . .").  Those allegations (even if proved) cannot establish standing to sue the federal government because they fall within the doctrine of *parens patriae*.  <u>Wyoming</u>, 674 F.3d at 1232 ("Petitioners' asserted interest in the jobs of their citizens implicates standing pursuant to *parens patriae*, which, as the parties agree, is not available when a state sues the federal government . . . .").

### 2. Utah's Claims that the Value of SITLA Lands Will Be Diminished Is Not Supported by Any Evidence.

Utah argues that it has suffered an injury for purposes of Article III standing due to the diminished value of SITLA lands, but those claims are not supported by any evidence.  <u>See</u> Utah Opp'n at 40-41.  Utah simply asserts without any evidentiary support that "840,233 acres of state trust lands" will be diminished in value because they are located in the area subject to the proposed ARRWA.  <u>Id.</u>  Because Utah offers no evidence to support the diminution in value of SITLA lands, it should not be considered by the Court in response to a factual challenge to Utah's standing.  <u>See</u> <u>Wyoming</u>, 674 F.3d at 1231 (in response to a factual challenge, "a district court may not presume the truthfulness of the . . . factual allegations") (citation omitted).  Moreover, SITLA's publicly reported financial information does not demonstrate that SITLA revenues have decreased significantly over the last four years.  <u>See</u> Def. Mem. at 33.  Further, Utah has not demonstrated that the fluctuations in SITLA's revenue have been caused by a decrease in production or that the alleged injury to SITLA is redressable.

### 3. Plaintiffs' Claims Regarding Rights of Way Do Not Establish Standing to Challenge the Policies at Issue in this Case.

Plaintiffs have not demonstrated that they have been injured by the Challenged Policies due to the effects of those policies on the processing of right of way applications.  They point to few concrete examples of right of way applications that they claim have been affected, and none of those examples are sufficient to demonstrate an injury caused by BLM's policies.

Utah argues that right of way applications for Cedar Mesa and Indian Canyon in San Juan County are not being processed.  See Utah Opp'n at 34 (citing Turri Decl. ¶¶ 2, 4, Utah Opp'n Ex. 34).  But, as already demonstrated, BLM approved a right of way in the Cedar Mesa area in June 2013 and is continuing to process the application in the Indian Canyon area.  See Def. Mem. at 34.  Utah also claims that BLM failed to process an application for Notom Road in Garfield County (Utah Opp'n at 41), but that application was approved nearly two years ago in February 2012.  See Def. Mem. at 34.

Utah also claims that it has suffered an injury due to BLM's use of a certain definition of road in inventorying lands under its policies.  See Utah Opp'n at 42.  As discussed in section II.D., *infra*, Utah's arguments that BLM's policies violate FLPMA are without merit.  With respect to injury, Utah claims that BLM's use of a particular definition of road "has led to unjustified road closures and restricted access to entire areas as detailed above."  Utah Opp'n at 42.  But Utah fails to specify which roads have been closed or which areas have been restricted and fails to offer any evidentiary support for those claims.  Further, conducting an inventory of public lands under FLPMA § 201, standing alone, does not give rise to an injury for purposes of Article III standing.  See Utah v. Babbitt, 137 F.3d 1193, 1206-10 (10th Cir. 1998).

The Counties claim that certain right of way applications relating to energy development projects have been affected by the Challenged Policies.  UAC Am. Opp'n at 30 (referencing applications relating to the Ruby Pipeline and the TransWest Express and Energy Gateway South transmission lines).  Even assuming that the modifications to the requested rights of way were

prompted by the Challenged Policies, the Counties have failed to show how they were injured by the modifications.[9]

The Counties also point to BLM's decision to close Saddletree and Atchee Wash Roads. See UAC Am. Opp'n at 30-31, 40.  That decision, however, was made in the Vernal RMP.  See Def. Mem. at 35-36.[10]  Therefore, it is not at issue here.  Further, BLM's decision regarding the Saddletree and Atchee Wash roads did not prevent an oil and gas leasing project from moving forward.  See id.  Moreover, the Counties already raised a separate challenge to BLM's decision regarding these roads, and their arguments were rejected by the IBLA.  See Uintah Cnty., 182 IBLA 191, 194-96 (May 9, 2012).

As the Counties acknowledge, BLM approved the right of way application for Seep Ridge Road within the area of the ARRWA.  UAC Am. Opp'n at 31; see also Def. Mem. at 34-35. They also point to the application regarding Rector Ridge, which remains pending.  See UAC Am. Opp'n at 31-32.  But the reason that BLM has not yet made a decision on the application has nothing to do with the wilderness policies challenged in this case.  Rather, BLM required additional time to conduct a Class III cultural resources survey.  See Def. Mem. at 35.  The Counties also claim that BLM is not processing applications in the ARRWA area, see UAC Am. Opp'n at 32, but that is not the case, as evidenced by the approval of the Seep Ridge Road right of way – one of the few right of way applications the Counties identify.

---

[9] The Counties allege that BLM has not completed an infrastructure and monitoring plan to enable the opening of the Factory Butte and Caineville Play Areas to OHV use, but they offer no evidence to support that claim.  See UAC Am. Opp'n at 30.

[10] The Counties are incorrect that the RMP made no route designations.  See UAC Am. Opp'n at 30-31, 40.  BLM's Record of Decision for the Vernal RMP states that "[t]he route designations described in the Travel Management section of the Approved RMP and identified in Figure 15a are effective upon issuance of this Record of Decision."  Vernal RMP at 22, Def. Ex. 7.  BLM's State Director found over two years ago that "[u]nder the Vernal RMP, portions of the Saddletree Draw and Atchee Wash Roads located within the White River corridor as shown in Figure 15a of the RMP are closed to motorize travel unless authorized by BLM."  Modified State Director Review Decision (Apr. 8, 2011), Def. Ex. 48.

Plaintiffs argue that, even if BLM is processing right of way applications in the ARRWA area, there has been a delay in the processing of those applications and they have been harmed by that delay.  See Utah Opp'n at 69; UAC Am. Opp'n at 37-38, 40.  Plaintiffs have not shown that the Challenged Policies have caused these alleged delays.  The Counties (especially Uintah County) have submitted numerous right of way applications over the past few years, and BLM has expended considerable time and resources processing those applications.  See, e.g., Def. Exs. 46-47.  BLM has coordinated extensively with the Counties regarding those applications and has attempted to process them according to the Counties' priorities.  See Def. Ex. 45.

Further, Plaintiffs have not demonstrated how these alleged delays injured them.  Utah alleges obliquely that BLM's delay has prevented it from conducting maintenance on roads and "allowed natural forces to reclaim some of these roadways."  Utah Opp'n at 69.  However, Utah provides no specifics and no proof as to roadways that have been reclaimed by natural forces. Similarly, the Counties assert that "Uintah County's obligation to provide road services is unduly burdened by these delays."  UAC Am. Opp'n at 37.  They too, however, provide no evidence as to what roads need to be repaired or what county obligations are being burdened.[11]

### 4.   Plaintiffs' Claims Regarding Wildlife Management Are Insufficient to Establish Standing.

Utah argues that the Challenged Policies are preventing it from managing wildlife within the state, and the Counties make similar allegations.  See Utah Opp'n at 39-40; UAC Am. Opp'n at 32.  The basis for these allegations is a declaration from the Public Lands Director for Carbon County, Utah.  See Sacco Decl., Utah Ex. 43.  Mr. Sacco claims that a sage grouse habitat

---

[11] The Counties point to the applications for Saddletree and Atchee Wash Roads.  UAC Am. Opp'n at 40.  But those applications were not submitted until May 2013.  See Def. Exs. 38 & 39. Therefore, the assertion that those claims have been delayed is without basis, and an alleged injury based on those applications, filed well after the complaint, cannot serve as a basis for standing.  See Palma, 707 F.3d at 1153.

improvement project relating to a Bill Barrett Corporation Energy Project in the Nine Mile

Canyon area has not been permitted to move forward.  See Sacco Decl. ¶¶ 4-6.  As Defendants

have already demonstrated, however, BLM is not holding up the energy project at issue and is

working with the applicant and the Utah Division of Wildlife Resources to create a sage grouse

mitigation plan.  See Def. Mem. at 36-37; Def. Ex. 40.  Thus, Utah has not demonstrated that it

has been prevented from managing wildlife, and these allegations are insufficient to establish

standing.

> **B.**     **Plaintiffs Have Failed to Challenge Final Agency Action.**
>
> **1.**     **Plaintiffs' Improper Programmatic Challenges Must be Dismissed.**

Plaintiffs fail to distinguish Lujan v. National Wildlife Federation, 497 U.S. 871 (1990),

wherein the Supreme Court expressly held that federal courts lack jurisdiction over programmatic

challenges because such claims do not challenge discrete final agency actions under the APA, 5

U.S.C. § 706(2).  Lujan deprives the Court of jurisdiction over all of the Counties' claims as well

as Utah's Ninth Cause of Action.

Plaintiffs contend that the case at bar "involves challenges on a smaller, more specific

scale" than that involved in Lujan and that the scope of this controversy has been reduced "to

manageable proportions."  Utah Opp'n at 78; UAC Am. Opp'n at 55-56.  However, Plaintiffs'

characterization of their lawsuits as "small" or "manageable" does not make them justiceable.

Plaintiffs assert broad challenges to BLM's alleged de facto management of millions of acres of

public lands within Utah.  Utah. Am. Compl., ¶¶ 115, 170, 195; UAC 2nd Am. Compl. ¶¶ 208,

223, 251. These challenges are not limited to a single discrete decision or decisions, but generally

extend to, inter alia, management of oil and gas leasing, processing of Title V right of way

applications, management of sage grouse habitat, and BLM's oil shale and tar sand land

allocations for leasing adopted in a 2013 ROD.  See e.g., Utah. Am. Compl., ¶¶ 142, 170, 180,

253, 259, Prayer for Relief; UAC 2nd Am. Compl. ¶¶ 84-85, 88, 114, 132, 164, Prayer for Relief. The programmatic challenges asserted in this consolidated litigation are indistinguishable from the challenge rejected by the Supreme Court in Lujan.[12]

Utah's attempts to distinguish Lujan from the instant case based on the fact that Lujan involved the resolution of a summary judgment motion, and it also argues that this case is controlled by Utah v. Babbitt, 137 F.3d 1193 (10th Cir. 1998), but those arguments both fail.[13] These arguments rely on Utah's misstatement of the standard of review applicable to Defendants' Rule 12(b)(1) factual attack on Utah's claims which, as explained *supra* on pp. 1-2, is not the lenient standard reserved for Rule 12(b)(6) motions to dismiss. Here, the Court "'may not presume the truthfulness of the [petition's] factual allegations'" and instead "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Wyoming, 674 F.3d at 1231 (quoting Holt, 46 F.3d at 1003); Osborn, 918 F.2d at 729-30. Moreover, because Lujan's holding that a plaintiff "cannot seek wholesale improvement of [a] program by court decree" was not predicated on the standard of review it applied to the plaintiffs' claims, the fact that Lujan involved a summary judgment motion is a distinction without a difference. See 497 U.S. at 871.

---

[12]   Indeed, the Lujan plaintiffs' allegations are strikingly similar to Plaintiffs' broad allegations, except the Lujan plaintiffs argued that BLM focused too heavily on mineral exploitation:

> Respondent alleges that violation of the law is rampant within this program-failure to revise land use plans in proper fashion, failure to submit certain recommendations to Congress, failure to consider multiple use, inordinate focus upon mineral exploitation, failure to provide required public notice, failure to provide adequate environmental impact statements.

Lujan, 497 U.S. at 891.

[13]   The Tenth Circuit's opinion in Utah v. Babbitt did not consider or decide whether the *de facto* wilderness management challenged in that case was an improper programmatic challenge barred by Lujan. Utah does not dispute this fact. Utah Opp'n at 79. Moreover, Utah ignores other Tenth Circuit precedent that explicitly recognized that programmatic challenges fail to challenge final agency action under Lujan. See Sierra Club v. Yeutter, 911 F.2d 1405, 1421 (10th Cir. 1990); Park Lake Res. L.L.C. v. U.S. Dep't of Agric., 197 F.3d 448, 453 (10th Cir. 1999); Forest Guardians v. Forsgren, 478 F.3d 1149, 1156 (10th Cir. 2007).

The district court cases cited by Utah (Utah Opp'n at 79-80) are inapposite as they all involved specific challenges to discrete agency actions. See High Country Citizens' Alliance v. Norton, 448 F. Supp. 2d 1235, 1248-49 (D. Colo. 2006) (plaintiffs challenged two separate agreements entered into between the United States and the State of Colorado); Or. Natural Res. Council Fund v. Brong, No. Civ. 04-693-AA, 2004 WL 2554575, at *2 (D. Or. Nov. 8, 2004) (plaintiffs challenged two timber sales); Or. Natural Desert Ass'n v. U.S. Forest Serv., No. Civ. 03-381-HA, 2004 WL 1592606, at *9 (D. Or. July 15, 2004) (plaintiffs challenged decisions to authorize grazing activities on two allotments and alleged agency failures to act).

Finally, Utah's attempt to distinguish the Fifth Circuit's well reasoned decision in Sierra Club v. Peterson, 228 F.3d 559 (5th Cir. 2000), by arguing that Peterson "involved a challenge under APA 706(1) instead of APA 706(2)," also fails. See Utah Opp'n at 80 n.7.  The Peterson court specifically considered whether the "Forest Service's general allowance of even-aged management in the Texas forests" constituted a final agency action under the APA, 5 U.S.C. § 706(2), and held that the plaintiffs' challenge was "precisely the type of programmatic challenge that the Supreme Court struck down in Lujan." Peterson, 228 F.3d at 564-66.  That the Fifth Circuit also rejected the plaintiffs' alternative theory that the Forest Service "failed to act" under 5 U.S.C. § 706(1), does not render the Peterson opinion any less persuasive with respect to the case at bar.  See id. at 568.

## 2.    The Challenged Internal Guidance Documents are not Final Agency Actions.

Plaintiffs also contend that jurisdiction exists over their claims because the Challenged Policies represent final agency action.  Utah argues that the Challenged Policies "marked the consummation of the agency's decisionmaking process," "changed the management of approximately 6 million acres of public lands" and "impose an addition [sic] step in the planning process."  Utah Opp'n at 81-82.  The Counties contend that all agency manuals and handbooks

are final agency action because they are binding on BLM.  UAC Am. Opp'n at 51-55.  Plaintiffs'

arguments rely on misstatements as to the content and effect of the Challenged Policies, as well as

on a mischaracterization of the mineral leasing process, including BLM's discretion to defer

parcels from leasing pending further analysis. Plaintiffs also misstate the applicable test for

determining whether agency action is "final agency action" established by the Supreme Court and

ignore this Court's previous decision on point. See Bennett v. Spear, 520 U.S. 154, 177-78

(1997); Utah v. Norton, No. 2:96-cv-0870, 2006 WL 2711798, at *15 (D. Utah Sept. 20, 2006),

aff'd, on ripeness grounds by 535 F.3d 1184 (10th Cir. 2008).  Under Bennett, Plaintiffs must

show that the action complained of "mark[s] the 'consummation' of the agency's decisionmaking

process" and it "must be one by which 'rights or obligations have been determined,' or from

which 'legal consequences will flow.'"  520 U.S. at 178 (citations omitted).  The case law cited

by Plaintiffs is either distinguishable or inapposite.

The Challenged Policies simply do not mark the consummation of BLM's decisionmaking

process with respect to any public lands. Neither Secretarial Order 3310 (which has been

defunded) nor its implementing manuals (which have been superseded) designate any Wild Lands

or preclude any project that may impair wilderness characteristics.  Def. Mem. at 14, 43-45.

Manual 6310 simply supplies guidance to BLM regarding procedures for conducting wilderness

characteristics inventories under Section 201 of FLPMA.  Id. at 44-45; Def. Ex. 5. Manual 6320

supplies guidance to BLM regarding the consideration of lands with wilderness characteristics in

conjunction with BLM's land use planning under FLPMA § 202.  Def. Mem. at 44-45; Def. Ex.

6.  IM 2010-117 and the 2013 Handbook Insert provide guidance to BLM regarding an MLP

process. Def. Mem. at 45-46; Def. Exs. 2 and 3.  Plaintiffs fail to acknowledge that IM 2010-117

and the 2013 Handbook Insert do not identify any areas for MLP analysis, mandate specific

outcomes, or change the management of a single acre of public lands. See Utah Opp'n at 32;

UAC Am. Opp at 24, 53-54, 56, 72-73. Instead, these policies provide internal consideration for identifying areas that could potentially benefit from preparation of an MLP—an analytical process which may or may not result in any subsequent decisions. They also direct BLM to comply with the procedural requirements of Section 202 of FLPMA, NEPA, and all other applicable laws when considering the development of an MLP within an identified area.

The Counties incorrectly assert that all "[a]gency manuals and handbooks are final agency action because they are binding on BLM." UAC Am. Opp'n at 51.[14] This argument misstates the applicable test under Bennett, which requires Plaintiffs to show that the Challenged Policies themselves bind BLM to a particular result that forecloses BLM's options, determine rights or obligations, or have specific legal consequences. 520 U.S. at 178. This Court rejected an argument virtually identical to the Counties' argument in Utah v. Norton, 2006 WL 2711798 at *15. In that case, SUWA argued that the Wilderness Settlement was a final agency action because it bound BLM to a particular interpretation of FLPMA regarding wilderness inventory and protection of wilderness under Section 202 of FLPMA. Id. at *14. This Court rejected that argument, finding that the inquiry as to whether an agency action binds the agency is focused on whether the challenged action "bound the affected agencies so that certain actions were foreclosed." Id. at *15. This Court then held that the Wilderness Settlement was not a final agency action because it did not "strip the BLM of its powers to protect lands it determines to

---

[14] The Counties urge the Court to adopt a more expansive view of the term "binding" which would extend to all BLM Manual sections, handbooks and instruction memoranda. The Counties cite no support for the novel legal proposition that all internal guidance documents automatically constitute final agency action. See UAC Am. Opp'n at 5, 49, 51, 73. While the IBLA has repeatedly held that BLM is required to follow the direction in its manuals and handbooks, it has also repeatedly and consistently held that these internal guidance documents "are not regulations", "do not have the force and effect of law", and are not binding on "the public at large." Wyo. Outdoor Council James M. Walsh, 159 IBLA 388, 417 (2003); Howard B. Keck, Jr., 124 IBLA 44, 55 (1992); Lassen Motorcycle Club, 133 IBLA 104, 108 (1995); Pamela S. Crocker-Davis, 94 IBLA 328, 332 (1986).

have wilderness characteristics in a manner substantially similar to the manner in which such lands are protected when designated as WSAs." Id. at *14.  Here, the Challenged Policies do not bind the agencies to certain actions, i.e., they do not mandate the protection of lands with wilderness characteristics, nor do they foreclose any management actions.

More generally, Plaintiffs have failed to identify any "rights or obligations" determined by any of the Challenged Policies or any "legal consequences" that flow from these Policies. Plaintiffs complain that they have been aggrieved by or affected by the Challenged Policies, but this is not the applicable standard.  See Bennett, 520 U.S. at 178; Sackett v. EPA, 132 S. Ct. 1367, 1371 (2012).[15]  As explained more fully in Section I.A.1.a.  supra, Plaintiffs' arguments as to the alleged "effects" of the Challenged Policies rely on mischaracterizations of the mineral leasing process, BLM's discretion, and of the Policies themselves.  None of the Challenged Policies direct BLM to defer parcels located in lands with wilderness characteristics or MLP areas from competitive lease sales. See Def. Exs. 1-6, 12-14.  As explained supra in Section I.A.1.a. on pp. 3-4, BLM has absolute discretion to determine whether to offer a parcel for lease, which includes the discretion to defer making a parcel available in a competitive lease sale in order to further consider the potential consequences of development. Thus, Plaintiffs are incorrect to assume that if BLM receives an EOI, it is required to offer such parcel for lease if it is within an area designated as "open" to oil and gas leasing in an RMP.  Further, Plaintiffs mischaracterize deferrals (which are by definition temporary or intermediate steps in the decisionmaking process) as denials or withdrawals of the lands subject to deferrals or as rejections of EOIs. See Utah Opp'n at 35, 48, 84, 85, 86 (alleging "denials" of expressions of interest and applications); UAC

---

[15]  The Supreme Court's recent decision in Sackett is instructive. In Sackett, the court found that an EPA compliance order was a final agency action because it imposed on the plaintiffs "legal obligation" to restore their property "according to an agency-approved Restoration Work Plan" and because legal consequences flowed from the order, including exposure "to double penalties in a future enforcement proceeding." 132 S. Ct. at 1371-72.

Am. Opp'n at 17, 24, 41 (alleging "rejections" of expressions of interest), 44-45 (alleging withdrawals). [16]

The Third Circuit's decision in Minard Run Oil Co. v. U.S. Forest Service, 670 F.3d 236 (3d Cir. 2011), on which the Counties substantially rely, is distinguishable from the instant case. In Minard Run, the U.S. Forest Service ("Forest Service") entered into a settlement agreement whereby it agreed to undertake appropriate NEPA analysis prior to issuing notices to proceed to those seeking to develop privately owned minerals in the Forest.  670 F.3d at 245.  The Forest Service also issued a statement announcing that "no new drilling in the [forest] would be authorized" until an EIS had been completed and subsequently warned mineral rights owners that commencing new drilling operations without approval "may result in criminal penalties."  Id. at 245-46.  Finding that "[a]n agency determination of a particular issue that will not be reconsidered in subsequent agency proceedings may represent the consummation of the agency's decisionmaking process on that issue," the Third Circuit held that the settlement agreement and policy statement amounted to a final decision to impose a moratorium on drilling. Id. at 248.[17] In contrast to the policy at issue in Minard Run, the Challenged Policies simply provide for an internal process without determining the outcome of that process. Also, any parcels that are currently deferred from leasing remain under consideration for future leasing. See In re Sac & Fox Tribe of Miss. in Iowa/Meskwaki Casino Litig., 340 F.3d 749, 756 (8th Cir. 2003) (order temporarily closing casino was not final agency action).

---

[16]  Utah also contends that IM 2011-154 was applied in the 2012 Oil Shale and Tar Sands Final Programmatic Environmental Impact Statement ("EIS") and 2013 ROD, but it barely mentions this ROD in its Amended Complaint and fails to assert a claim challenging the EIS or ROD.  See Utah Am. Compl. The fact that Utah has only pointed to subsequent decisions by BLM underscores the fact that the Challenged Policies were not themselves final agency actions.

[17]  Inasmuch as the Counties argue that all agency policy statements or internal guidance documents are final agency actions, the above quoted language from Minard Run offers no support for this contention.

Moreover, Minard Run's holding relied heavily on the Third Circuit's finding that Forest Service's actions had "significant legal consequences for mineral rights owners" as "they must stop all new drilling or face criminal penalties."  670 F.3d at 247-48.  Minard Run is thus distinguishable from the instant case. Here, the minerals at issue are publicly owned.  Neither the companies that have submitted EOIs nor Plaintiffs have a property right in the public minerals they seek to have developed by compelling BLM to lease certain parcels—much less a dominant property right to the mineral estate. While Plaintiffs contend that they have suffered adverse financial consequences, they have failed to identify "significant legal consequences" directly resulting from the Challenged Policies.

National Mining Ass'n v. Jackson, 880 F. Supp. 2d 119, 128-33 (D.D.C. 2012) also does not support Plaintiffs' claims.  National Mining Ass'n involved a challenge to a final guidance memorandum issued by the EPA, which the district court found effectively established region-wide water quality standards to be applied by EPA regional offices in its limited review of Clean Water Act ("CWA") § 402 permits authorized by state permitting agencies. Id. at 138.[18] The district court found that EPA's final guidance had the binding effect of forcing state permitting agencies that had assumed exclusive authority to regulate § 402 permits to adhere to the new standard established in the guidance or risk formal objection from EPA.  Id. at 132-33.  Unlike EPA's final guidance in National Mining Ass'n, the Challenged Policies do not alter any other agency's exclusive authority. The Challenged Policies merely prescribe internal guidance for

---

[18]  Section 402 of the CWA seeks to regulate the discharge of pollutants into navigable waters through a permitting program, including regulating the water quality by setting water quality based effluent standards.  Nat'l Mining Ass'n, 880 F. Supp. 2d at 126 (citing 33 U.S.C. § 1313). Under the CWA, states can assume the authority from EPA to issue § 402 permits once EPA approves the state permitting program, which provides the state with "exclusive authority" to issue § 402 permits.  Id. at 125-26.  In such circumstances, EPA has only a limited authority over permits, e.g., states must submit draft permits to EPA and EPA may object if the proposed permit is inconsistent with the CWA or federal regulations.  Id.

BLM in conducting land inventories and potential future land management decisions, while leaving room for land managers to exercise their discretion as to the content of the potential decisions, and without prescribing a particular result.[19]  They are not comparable to the final guidance memorandum at issue in National Mining Ass'n.

Western Energy Alliance v. Salazar, No. 10-CV-237F, 2011 WL 3738240, at *7 (D. Wyo. Aug. 12, 2011), also does not support review of Plaintiffs' substantive claims.  In that case, the court properly declined to address the plaintiff's substantive claims asserted on the grounds of ripeness, agreeing with the defendants' "argument that a resolution of the substantive claims would benefit from the specific facts surrounding any future [] submittal, and the choices made by government employees in response to those facts."  Id.  The court's conclusion that the plaintiff's procedural claim challenged a final agency action, was predicated on its finding that the challenged guidance document was a substantive, legislative rule that "adopted a final, binding and substantive change to [the agency's] past practices."  Id. at *6.  Western Energy Alliance is thus distinguishable from the instant case because the guidance document at issue affected the legal requirements applicable to oil and gas lessees with legally protected property rights by disallowing the application of a statutorily created categorical exclusion under NEPA for certain applications for permits to drill wells on leased lands. See id.

---

[19]  To the extent the Counties argue that BLM's compliance with its legal obligations under NEPA for the Counties' Title V permit applications satisfies the second element of the Bennett test, that argument is without merit. See UAC Am. Opp'n at 55. First, the Challenged Policies do not supply any guidance with respect to NEPA compliance for Title V permit applications. See Def. Exs. 1-6, 12-14. Second, the Counties have not asserted a specific challenge to any Title V permitting decision. Third, because BLM is obligated to comply with NEPA prior to issuing a right of way, BLM's NEPA compliance does not alter Plaintiffs' rights or obligations under Bennett.

**C.      The <u>Larson</u> Exception is Inapplicable to Plaintiffs' Claims.**

Having failed to challenge final agency action, as is required to pursue a challenge under the APA, 5 U.S.C. § 706(2), the Counties argue that they are entitled to evade the requirements of the APA and pursue claims of *ultra vires* agency action because they contend that BLM's "alleged *de facto* wilderness management" (1) is beyond the authority granted BLM to manage public lands under FLPMA and is contrary to the Wilderness Act, as made applicable to BLM through FLPMA and, (2) is contrary to the Energy Policy and Conservation Act Amendments of 2000 ("EPCA"), Pub. L. 106-469, Sec. 604, the Energy Policy Act of 2005, 42 U.S.C. § 15927(b), and the appropriations acts defunding Secretarial Order 3310.  UAC Am. Opp'n at 66-68.  Utah similarly contends that <u>Larson v. Domestic & Foreign Commerce Corp.</u>, 337 U.S. 682 (1949), supplies jurisdiction for their Fifth and Ninth Causes of Action because BLM lacks the authority to "manage for anything similar to wilderness" under both FLPMA and the Wilderness Act. Utah Opp'n at 51-61. These arguments are all without merit.

Plaintiffs' arguments that their *ultra vires* claims may proceed because BLM lacks authority to inventory and manage for the protection of wilderness characteristics on public lands rely on an improper and unsupportable construction of both the Wilderness Act and FLPMA.  As explained *infra* in Section II.A., Plaintiffs are mistaken that BLM lacks the authority, outside of the FLPMA § 603 process, to inventory and manage lands to protect wilderness characteristics. [20]

---

[20]  Utah offers a creative interpretation of the Tenth Circuit's decision in <u>Wyoming v. United States</u>, 279 F.3d 1214, 1235 (10th Cir. 2002).  Under <u>Wyoming</u>, Utah argues, a plaintiff need not satisfy the APA's final agency action requirement if the plaintiff challenges an agency decision as "in excess of statutory jurisdiction" under 5 U.S.C. § 706(2)(C).  However, this interpretation is contrary to the plain language of the APA.  5 U.S.C. §§ 704, 706(2). It is also contrary to the Tenth Circuit's decision in <u>Wyoming</u>, in which the state challenged the U.S. Fish and Wildlife Service's refusal to authorize the state to conduct a vaccination program, which the Tenth Circuit assumed, without deciding, constituted a final agency action under § 706(2).  279 F.3d at 1236 (stating that "we remain mindful that '[j]udicial review of final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of

Plaintiffs are equally mistaken with respect to the Wilderness Act, which establishes a National Wilderness Preservation System "composed of federally owned areas designated by Congress as 'wilderness areas,'" 16 U.S.C. § 1131(a), and which was made applicable to BLM managed lands by FLPMA, 43 U.S.C. § 1782.  While only Congress has the power to designate "wilderness areas" by enacting a law providing for such permanent designation, 16 U.S.C. § 1131(a), nothing in the Wilderness Act or in FLPMA prohibits BLM, or any federal agency, from identifying or inventorying lands with wilderness characteristics and, once those lands are identified, from managing those lands in order to protect those characteristics, where appropriate. See 16 U.S.C. § 1131; 43 U.S.C. § 1782. Neither the Wilderness Act, nor FLPMA, support Plaintiffs' attempt to evade the requirements of the APA.  Painter v. Shalala, 97 F.3d 1351, 1358 (10th Cir. 1996) (Larson exception unavailable where Medicare Act did not expressly prohibit consideration of volume offsets).[21]

Section 604 of the EPCA, also relied on by the Counties and currently codified at 42 U.S.C. § 6217, merely provides for an inventory of all onshore Federal lands identifying "United States Geological Survey estimates of the oil and gas resources underlying these lands," including an identification of any restrictions to the development of such resources.  42 U.S.C. § 6217. This inventory was published in 2003.  See http://www.blm.gov/energy/epca/EPCAfact.pdf.

---

Congress'"). Utah has cited no authority in support of its argument that § 706(2)(C) is an exception to the final agency action requirement.

[21]  Plaintiffs also impermissibly conflate congressionally designated wilderness and WSAs with lands with wilderness characteristics.  See Utah Opp'n at 53-61; UAC Am. Opp'n at 57-63. Though lands that fall within any of these three categories will have an undeveloped character there is an important distinction. Congressionally designated wilderness is subject to the prohibitions in the Wilderness Act, 16 U.S.C. § 1133. Established WSAs "cannot be revised" and "become, in effect de facto wilderness until Congress Acts," Utah v. Norton, 2006 WL 2711798, *23, and BLM is required to manage such lands "in a manner so as to not impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c). In contrast, BLM retains the discretion to manage lands with wilderness characteristics in accordance with FLPMA's multiple use mandate.  Utah v. Norton, 2006 WL 2711798, *23.

Because nothing in the EPCA required the development of public lands, see Pub. L. No. 106-469, Sec. 604, it cannot serve as a basis for the Counties' claims asserting *ultra vires* agency action. Painter, 97 F.3d at 1358.

The Counties' assertion that the Energy Policy Act of 2005, 42 U.S.C. § 15927(b), supplies a basis for their claims of *ultra vires* agency actions also fails. The cited provision is a general policy statement which is legally insufficient as a basis for invoking the Larson exception. See Painter, 97 F.3d at 1358. It does not prohibit the implementation of the Challenged Policies, or withdraw BLM's authority and discretion to inventory and manage public lands to protect wilderness characteristics. See 42 U.S.C. § 15927(b). Moreover, Plaintiffs ignore that 42 U.S.C. § 15927(b) also provides that any development of unconventional fuels "should be conducted in an environmentally sound manner, using practices that minimize impacts" and "with an emphasis on sustainability." 42 U.S.C. § 15927(b). Thus, the Challenged Policies are clearly consistent with the cited provision from the Energy Policy Act of 2005, 42 U.S.C. § 15927(b).

BLM has not violated the appropriations acts defunding Secretarial Order 3310, which the Counties cite in support of their claims of *ultra vires* agency action. The Counties do not contest the fact that, on June 1, 2011, the Secretary of the Interior issued a memorandum to the Director of BLM confirming that, pursuant to the appropriations act signed into law earlier that year, BLM would not designate any "Wild Lands" under the Order. Defs. Ex. 15. Nor do the Counties dispute that, on July 25, 2011, IM 2011-154 placed the manuals implementing Secretarial Order 3310 into abeyance, or that the Order's implementing manuals were superseded by Manuals 6310 and 6320 on March 15, 2012. See Defs. Exs. 4-6. Instruction Memorandum 2011-154 and Manuals 6310 and 6320 are markedly different than the Secretarial Order and implementing manuals they replaced, and do not contain several of the provisions which form the basis for Plaintiffs' claims. Compare Defs. Exs. 1, 12-14 with Def. Exs. 4-6. Moreover, Plaintiffs fail to

note that although subsequent appropriations acts have continued to defund Secretarial Order

3310, they have remained silent as to IM 2011-154 and BLM Manuals 6310 and 6320.  See

Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, Div. E, Sec. 125 (Dec. 23, 2011);

Continuing Appropriations Act, Pub. L. No. 112-175, Sec. 101(a)(7) (Sept. 28, 2012);

Consolidated and Further Continuing Appropriations Act, 2013, Pub. L. No. 113-6, Div. F, Sec.

1101(a)(3) (Mar. 26, 2013). Had Congress found that IM 2011-154 and Manuals 6310 and 6320

ran afoul of its prohibition on expending funds to "implement, administer, or enforce Secretarial

Order No. 3310," Utah Opp'n at 16, it could easily have included a similar prohibition with

respect to these policy and guidance documents; however, it chose not to do so. Painter, 97 F.3d

at 1358 ("Because we may presume Congress knew how to preclude consideration of such offsets

had it so desired, its failure to do so is telling.").

Because the Challenged Policies are within BLM's management authority and not

contrary to applicable substantive law, Larson is unavailable as a basis for jurisdiction over

Plaintiffs' claims.[22]  Plaintiffs disagree with the Challenged Policies, as well as with Defendants'

implementation of their statutorily delegated authority. Plaintiffs' disagreement with agency

policy does not allow them to evade the requirements of APA review by asserting that those

policies are *ultra vires*.  Wyoming, 279 F.3d at 1233 (rejecting argument that an agency lacks the

power to make a decision "when a State, for whatever reason, disagrees with that decision").[23]

---

[22]  Moreover, Plaintiffs seek to compel BLM to offer all lands subject to an EOI for mineral lease sale and to expediently grant Plaintiffs' Title V right of way applications without NEPA review. See e.g., Counties' 2nd Am. Compl. ¶¶ 54, 71, 108, 164, 166, Prayer for Relief; Utah Am. Compl. ¶¶ 146-150, 253-61, Prayer for Relief. Because the relief implicitly requested by Plaintiffs would require "affirmative action by the sovereign or the disposition of unquestionably sovereign property," Larson does not supply jurisdiction over their claims. Painter, 97 F.3d at 1359 (quoting Larson, 337 U.S. at 691 n.11); Blackbear v. Norton, 93 F. Appx. 192, 194 (10th Cir. 2004); United Tribe of Shawnee Indians v. United States, 253 F.3d 543 (10th Cir. 2001).

[23]  Plaintiffs also ignore the presumption of regularity generally accorded to agency decisionmaking and to the official acts of public officers whereby, and "in the absence of clear

### D.    Plaintiffs' Claims Are Not Ripe for Review.

As explained in Section I.B. *supra*, because Plaintiffs have failed to challenge final agency actions, the Court lacks jurisdiction over their claims under the APA.  This failure also renders Plaintiffs claims unripe for review. Even assuming *arguendo* that Plaintiffs could satisfy the final agency action requirement, Plaintiffs have failed to meet their burden to show that their claims are ripe for review.

Despite Plaintiffs' unsupported and conclusory assertion that their claims present "purely legal" issues, see UAC Am. Opp'n at 71-72, Utah Opp'n at 84, resolution of the merits of Plaintiffs' claims will necessarily involve numerous factual issues.  For example, the Court will need to consider whether BLM's handling of EOI's and right of way applications constitutes *de facto* wilderness management, as Plaintiffs claim.  Because resolution of Plaintiffs' claims will necessarily involve the consideration of numerous factual scenarios relating to BLM's implementation of the Challenged Policies, Plaintiffs' claims do not present "purely legal" issues.[24]

Moreover, Plaintiffs ignore precedent holding that generalized challenges to agency policies or regulations are not ripe for review unless raised "in the context of a specific application" of the challenged regulation or policy. Def. Mem. at 50 (citing Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 163-64 (1967); Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 812 (2003); CSG Exploration Co. v. FERC, 930 F.2d 1477, 1485 (10th Cir. 1991)). Secretarial Order 3310 has been defunded, its implementing manuals have been superseded, and

---

evidence to the contrary, courts presume that they have properly discharged their official duties." United States v. Chemical Found. Inc., 272 U.S. 1, 14-15 (1926); Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971); U.S. Postal Serv. v. Gregory, 534 U.S. 1, 10 (2001).

[24]  Utah's contention that even "factual questions should be considered legal questions at this time," Utah Opp'n at 84, is incorrect. See *supra* at pp. 1-2.

it has not been applied in a specific context.[25]  Def. Mem. at 43-44.  Plaintiffs' claims also do not

challenge any specific application of the rest of the Challenged Policies;[26] rather, Plaintiffs assert

generalized challenges to the Policies themselves or to alleged *de facto* wilderness management

or alleged *de facto* mineral withdrawals.  UAC 2d Am. Compl. ¶¶ 147-260; Utah Am. Compl. ¶¶

190-261.[27]

     The Counties incorrectly contend that "[t]here is no additional agency process or

application to occur" with respect to the Challenged Policies and that "individual lease sale

decisions will not change."  UAC Am. Opp'n at 72.  Plaintiffs complain of parcels temporarily

deferred from being offered at a lease sale pending further evaluation[28] and right of way

applications currently being processed, all of which are subject to additional agency processes.

See *supra* Sections I.A.1.a. and I.A.3.  With respect to the areas currently undergoing MLP

review, none of these reviews has yet been completed and no land management decisions have

been made based on these reviews.  In fact, since Defendants filed their motion to dismiss on

September 17, 2013, BLM has significantly revised the area to be analyzed through the land use

---

[25] The lone action that Plaintiff Utah contends is directly attributable to Secretarial Order 3310 is
an alleged rejection of a request to use mechanical means to improve sage grouse habitat in
Carbon County.  See Utah Opp. at 39-40, 80; Utah Ex. 43.  As explained *supra* in Section I.A.4,
BLM is working with the applicant and the Utah Division of Wildlife Resources to create a sage
grouse mitigation plan.  Further, Utah has not asserted a claim challenging this alleged action or
failure to act by BLM.  See Utah Am. Compl.

[26] As noted in fn.16 *supra*, Plaintiffs' have failed to assert a claim specifically challenging the Oil
Shale and Tar Sands ROD.

[27]  Western Energy Alliance v. Salazar, No. 10-cv-0226, 2011 WL 37520, at *1-2 (D. Wyo. June
29, 2011), which is referenced by the Counties but inaccurately cited, did not involve BLM's
deferral to offer certain parcels in a competitive lease sale, but instead considered the legal
question as to whether BLM's delay in issuing leases sold to the highest bidder at a competitive
lease sale constituted "agency action unlawfully withheld or unreasonably delayed" under the
APA, 5 U.S.C. § 706(1).  Western Energy Alliance thus does not support the Counties' argument
that their claims are ripe for review.

[28] As explained *supra* in Section I.B.2. on pp. 30-31, Utah incorrectly characterizes deferrals as
"denials" or "rejections." Palazzolo v. Rhode Island, 533 U.S. 606, 621 (2001), is thus inapposite.

planning process as part of the proposed Glen Canyon MLP.  The proposed Glen Canyon MLP was reduced from 650,000 acres to 360,000 acres.  Compare Def. Ex. 17 (Glen Canyon-San Juan River Assessment) with Def. Ex. 49 (Glen Canyon MLP (Revised)).  As a result of this revision, parcels located within areas previously included in the proposed Glen Canyon MLP are currently on BLM's preliminary competitive oil and gas lease sale list for the May 2014 lease sale and are being evaluated for lease.  See Def. Ex. 50 (Excerpts from Environmental Assessment).  If a claim "rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" it is not ripe for adjudication.  Texas v. United States, 523 U.S. 296, 300 (1998) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-581 (1985)); Palma, 707 F.3d at 1160.  Because BLM's decisionmaking process is ongoing, the effect of the Challenged Policies is not yet known.

As explained in Section I.A. *supra*, Plaintiffs have not suffered a concrete and particularized injury that is fairly traceable to Defendants' challenged actions and thus failed to meet their burden to show standing.  Even if Plaintiffs could demonstrate standing, the contingent indirect effects complained of as a result of the Challenged Policies (alleged loss of bonus payments, alleged loss of projected revenue, and delay in processing right-of-way applications) are not the type of direct and immediate effects required to show that an action is ripe for review.  See Rocky Mountain Oil & Gas Ass'n v. Watt, 696 F.2d 734, 742 (10th Cir. 1982) (finding that rejections of applications for permits to drill caused companies to suffer irreparable financial harm as a result "of the loss of monies previously invested and the halting oil and gas exploration and development"); Los Alamos Study Grp., 692 F.3d at 1068 (holding that the plaintiffs claim was not ripe).

II.   **Alternatively, Plaintiffs' claims should be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).**

Plaintiffs' opposition memoranda rely heavily on the fact that, in reviewing a motion to dismiss under Rule 12(b)(6), all well-pled facts are accepted as true and construed in Plaintiffs' favor. See Utah Opp'n at 50-51; UAC Am. Opp'n at 38.  However, many of the "facts" alleged by Plaintiffs are merely legal conclusions couched as factual allegations, and thus the Court is not required to accept them as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Moreover, because the Court may consider documents referred to in Plaintiffs' complaints that are central to their claims, the Court need not accept Plaintiffs' conclusory allegations as to what the Challenged Policies state, but may instead consider the documents themselves as the best evidence of what they provide. See Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002)). Plaintiffs' conclusory allegations fail to state any claim for relief. Thus, even if the Court concludes that it has jurisdiction over any of Plaintiffs' claims, they should be dismissed under Rule 12(b)(6).

A.   **Plaintiffs' Claims Alleging that BLM Lacks the Authority to Inventory and Manage Lands to Protect Wilderness Values are Incorrect and Fail to State a Claim.**

Central to the Counties' First, Second, Third, Fourth and Sixth Causes of Action, and to Utah's First, Fourth, Fifth, and Ninth Causes of Action is Plaintiffs' contention that BLM lacks the authority to manage lands to protect wilderness characteristics outside of the FLPMA § 603 process.[29]  As explained in Defendants' Motion to Dismiss at 57-63, there is ample authority in

---

[29] As explained *supra* at p. 35 n. 21, Plaintiffs improperly conflate congressionally designated Wilderness and WSAs with lands with wilderness characteristics.  Plaintiffs also improperly conflate the non-impairment standard in FLPMA § 603 with any consideration of wilderness characteristics in the land use planning process.  Plaintiffs have cited no authority in support of this contention and a review of the Challenged Policies shows that they do not import the mandatory non-impairment standard in FLPMA § 603. Secretarial Order 3310 and its implementing manuals specifically allow BLM to utilize its discretion to determine whether impairment of wilderness characteristics is appropriate and consistent with legal requirements and

FLPMA, and in judicial decisions interpreting FLPMA, supporting BLM's authority to identify lands with wilderness characteristics and, if appropriate, to preserve those lands "in their natural condition." 43 U.S.C. § 1701(a)(8); Or. Natural Desert Ass'n v. BLM, 625 F.3d 1092, 1111 (9th Cir. 2010) ("hereinafter ONDA").  Plaintiffs' statutory interpretation of FLPMA is unpersuasive and contrary to the Ninth Circuit's holding in ONDA.  Plaintiffs' opposition memoranda either ignore relevant judicial decisions or fail to distinguish them.

In ONDA, the Ninth Circuit analyzed the relationship between inventory requirements in FLPMA § 201 and the Wilderness Act as made applicable to BLM by FLPMA. 625 F.3d at 1098-99.  The ONDA court found that because FLPMA § 603 made clear that lands having wilderness characteristics were to be identified through the general resource inventory process in FLPMA § 201, wilderness characteristics were necessarily "among the 'resource and other values' of the public lands to be inventoried under [Section 201]." Id. at 1098.[30]  The ONDA court further held that "BLM's land use plans, which provide for the management of these resources and values, are [] to 'rely, to the extent it is available, on the inventory of the public lands, their resources, and other values[,]'" id. at 1099 (quoting 43 U.S.C. § 1712(c)(4)), and that "[w]ilderness values are among the resources which the BLM can manage under [FLPMA]." Id. at 1111.

Plaintiffs' statutory interpretation ignores ONDA and relies on Plaintiffs' incorrect contention that BLM's interpretation of FLPMA renders FLPMA § 603 "superfluous in the scheme of public land management."  UAC Am. Opp'n at 59; Utah Opp'n at 54.  This argument

---

management considerations.  Def. Exs. 1, 12, 13, 14. Manuals 6310 and 6320 provide guidance for conducting and maintaining an inventory for wilderness characteristics and for land use planning for identified lands with wilderness characteristics.  Def. Exs. 4, 5, 6.  None of the Challenged Policies impose a mandatory nonimpairment standard similar to that imposed by FLPMA § 603 for WSAs.

[30]  The ONDA court found it significant that FLPMA "does not direct that areas with wilderness characteristics be identified only as part of recommending such areas for 'preservation as wilderness,'" and that FLPMA "contemplates a '*review*' of areas *already* so 'identified'" in the course of the ongoing inventory process. 625 F.3d at 1113 (emphasis in original).

ignores a critical distinction between FLPMA §§ 603 and 202.  Section 603 contains mandatory

requirements for conducting a wilderness review, and for managing wilderness study areas "so as

not to impair the suitability of such areas for preservation as wilderness[.]" 43 U.S.C. § 1782(c).

In contrast, Section 202 allows BLM to use its discretion to protect wilderness characteristics, but

exercises of this discretion are subject to change.  Indeed, this distinction was critical to this

Court's decision in Utah v. Norton, 2006 WL 2711798, at *23:

> Although FLPMA limits the BLM's authority to designate and manage lands as WSAs, it
> provides expansive authority to protect and to preserve public lands in other ways. Thus,
> the proper level of wilderness preservation can be attained without having to bleed
> together section 603's wilderness review authority with section 202's multiple-use and
> sustained-yield land use provisions. The only real difference between managing land
> under section 202 to protect its wilderness character and managing land as a WSA to do
> the same thing—and this distinction is at the crux of this lawsuit—is that a WSA, once
> established, cannot be revised; it becomes, in effect, *de facto* wilderness until Congress
> acts, whereas under section 202, the land will be subject to possible changes in
> management plans.

(emphasis in original); see also ONDA, 625 F.3d at 1113-1114 (recognizing the distinction

between the permanent preservation of wilderness through FLPMA § 603 and BLM's

management discretion to preserve wilderness characteristics in non-WSA areas).

Utah's brief fails to even cite the Ninth Circuit's decision in ONDA. The Counties attempt

to distinguish ONDA on the basis that it involved a NEPA claim, contending that "the precedent

is that wilderness issues that are raised in the NEPA process need to be addressed."  UAC Am.

Opp'n at 62.  However, the Counties ignore the Ninth Circuit's specific holding that "wilderness

characteristics remain a resource that BLM has authority to manage," which was the necessary

predicate for their holding that wilderness characteristics must be considered in a NEPA analysis

"concerning areas which may have such characteristics[.]" ONDA, 625 F.3d at 1116.

Utah also ignores this Court's prior decision in Utah v. Norton, 2006 WL 2711798 at *23,

wherein this Court expressly recognized BLM's ability to inventory federal land "including for a

determination of wilderness characteristics" as well as BLM's "expansive authority to protect and

to preserve the natural values of lands." The Counties acknowledge that "this Court has

recognized BLM's authority to manage lands in a manner that protects wilderness

characteristics," but unsuccessfully attempt to diminish the Court's prior holding.  See UAC Am.

Opp'n at 61. [31]

Plaintiffs have failed to establish the Counties' First, Second, Third, Fourth and Sixth

Causes of Action, and Utah's First, Fourth, Fifth, and Ninth Causes of Action state a claim for

relief that is plausible on its face. These claims rely on an incorrect and unsupportable

interpretation of FLPMA and accordingly must be dismissed.

### B.    Plaintiffs' Claims for Violation of the APA Requirements for Rulemaking Fail to State a Claim.

Utah's Second and Sixth Causes of Action and the Counties' Fifth Cause of Action assert

claims that the Challenged Policies violate the APA because BLM failed to conduct notice and

comment rulemaking prior to adopting them.  Plaintiffs concede that APA does not require notice

and comment rulemaking for "interpretative rules, general statements of policy, or rules of

agency organization, procedure, or practice[,]" 5 U.S.C. § 553(b)(3)(A).  Utah Opp'n at 8; UAC

Am. Opp'n at 63. Plaintiffs instead argue that notice and comment rulemaking was required for

---

[31]  The Counties cite several opinions by the IBLA, none of which support the proposition for
which they are cited (that BLM lacks authority to manage lands with wilderness characteristics in
order to protect such characteristics). See SUWA, 150 IBLA 263 (1999) (BLM is not required to
consider citizens' group's wilderness finding in NEPA document); SUWA, 163 IBLA 14, 24-27
(2004) (same); SUWA, 160 IBLA 225, 230-31 (2003) ("[L]and use planning decisions are
committed to the discretion of the Director of BLM, and we have no supervisory authority to
compel BLM to conduct a reinventory or to treat the lands on which the parcels are located as
wilderness."); SUWA, 159 IBLA 220, 244 (2003) (same); Colorado Envtl. Coal., 161 IBLA 386,
393 (2004) (finding that BLM "retains authority to consider wilderness characteristics when
amending its RMPs."); SUWA, 158 IBLA 212, 214 (2003) (BLM may administer lands not
included in a WSA for other purposes).  A holding that BLM is not required to consider an
outside group's wilderness findings in a NEPA document is not tantamount to a holding that
BLM lacks authority to inventory for and mange lands for the protection of wilderness
characteristics.

the Challenged Polices because they are not general statements of policy, but are in fact legislative rules.  However, Plaintiffs misstate the relevant standard for determining whether an interpretive rule, procedural rule, or general statement of policy constitutes a legislative rule. Because none of the Challenged Policies "ha[ve] the force of law, and create[] new law or impose[] new rights or duties[,]" they are not legislative rules for which notice and comment rulemaking was required. Sorenson Commc'ns, Inc. v. F.C.C., 567 F.3d 1215, 1222 (10th Cir. 2009) (quoting FDIC v. Schuchmann, 235 F.3d 1217, 1222 (10th Cir. 2000)); Ballesteros v. Ashcroft, 452 F.3d 1153, 1158 (10th Cir. 2006) (legislative rules are those that "affect[] individual rights and obligations") (quoting Morton v. Ruiz, 415 U.S. 199, 232 (1974)); Chen v. Carroll, 48 F.3d 1331, 1340 (4th Cir. 1995) (legislative rules "create new rights and have the force and effect of law").[32]

Although Plaintiffs generally contend that the Challenged Policies are binding on BLM in the sense that BLM employees are generally required to comply with BLM guidance and policy statements, the IBLA has consistently held that the BLM manuals and handbooks "are not regulations," "do not have the force and effect of law," and are not binding on "the public at large."  Wyo. Outdoor Council James M. Walsh, 159 IBLA at 417; Howard B. Keck, Jr., 124 IBLA at 55; Lassen Motorcycle Club, 133 IBLA at 108; Pamela S. Crocker-Davis, 94 IBLA at 332;  United States v. Kaycee Bentonite Corp., 64 IBLA 183, 214 (1982); accord Schweiker v.

---

[32]  The cases cited by Utah apply the same standard.  See Paralyzed Veterans of Am. v. D.C. Arena L.P., 117 F.3d 579, 588 (D.C. Cir. 1997) (in determining whether an interpretive rule is actually a substantive rule, courts "look to whether the interpretation itself carries 'the force and effect of law'") (quoting Am. Mining Cong. v. Mine Saftey & Health Admin., 995 F.2d 1106 (D.C. Cir. 1993)); Community Nutrition Inst. v. Young, 818 F.2d 943, 946 (D.C. Cir. 1987) (in determining whether a policy statement is a legislative rule, courts consider whether it imposes any rights or obligations and whether it "genuinely leaves the agency and its decisionmakers free to exercise discretion") (quoting Am. Bus Ass'n v. United States, 627 F.2d 525, 529 (D.C. Cir. 1980)); Pac. Gas & Elec. Co. v. Fed. Power Comm'n, 506 F.2d 33, 38 (D.C. Cir. 1974) ("A properly adopted substantive rule establishes a standard of conduct which has the force of law.").

Hansen, 450 U.S. 785, 789 (1981) (finding that a claims manual was not a regulation, had no legal force, and did not bind the agency).[33]  Moreover, the Court is not required to accept Plaintiffs' conclusory assertions that the Challenged Policies are "binding" at face value, but may consider the guidance documents themselves.  Despite Plaintiffs' assertions, it is clear that none of the Challenged Policies are legislative rules for the reasons explained in Defendants' Combined Motion to Dismiss – they do not bind the agency's discretion as to the management of a single acre of public lands. Def. Mem. at 63-64.

Utah's alternative argument, that the Court should adopt the D.C. Circuit's decision in Alaska Professional Hunters Ass'n v. Federal Aviation Administration, 177 F.3d 1030, 1034 (D.C. Cir. 1999),  which Utah contends requires "an agency to follow APA rulemaking requirements when issuing a new nonlegislative rule that amends or repeals a previous nonlegislative rule," is also without merit. In United States v. Magnesium Corp., 616 F.3d 1129, 1141 (10th Cir. 2010), the Tenth Circuit expressly declined to reach the issue as to whether it would adopt the holding in Alaska Professional Hunters because it found that, even under Alaska Professional Hunters, "before an agency adopts a definitive interpretation of its own rule it remains free to hear new arguments, make adjustments, and change directions, all without having to undergo notice and comment."[34]  Here, Utah contends that the Settlement Agreement is (1) tantamount to a legislative rule and (2) at odds with Secretarial Order 3310 and Manuals 6310

---

[33] The Counties argue that all instruction memoranda and BLM Handbooks are "binding on BLM" and thus require notice and comment rulemaking. The Counties' interpretation of the APA would render the exceptions in 5 U.S.C. § 553(b)(3)(A) completely meaningless, and require formal rulemaking for any policy statement or guidance document.  The Counties have failed to cite a single case holding that similar guidance documents required formal rulemaking. See UAC Am. Opp'n at 63-64.

[34]  On the facts before it, the Tenth Circuit concluded that because the agency's prior position was a "tentative" interpretation of a statute, the agency was not required to undergo notice and comment rulemaking prior to adopting an interpretation at odds with its previous interpretation. Magnesium Corp., 616 F.3d at 1141-42.

and 6320. This argument fails because, as this Court has already held, the Wilderness Settlement

"does not affect the BLM's ability to prepare and maintain an inventory of any federal land,

including for a determination of wilderness characteristics," and it also allows BLM to exercise

its "discretion to manage lands in a manner that is similar to the non-impairment standard by

emphasizing the protection of wilderness characteristics as a priority over other potential uses."

Utah, 2006 WL 2711798 at *20, *23.  The Wilderness Settlement is not at odds with any of the

Challenged Policies.[35] Alaska Professional Hunters is thus inapposite because Utah points to no

previous BLM interpretation of FLPMA that is contrary to the interpretation in the Challenged

Policies.

## C.   Plaintiffs' Claims Alleging Violations of FLPMA's Procedural Requirements Fail to State a Claim.

In response to Defendants' motion to dismiss the Counties' Eighth Cause of Action and

Utah's Third and Seventh Causes of Action challenging BLM's compliance with alleged FLPMA

procedural "requirements" and "mandates" under 43 U.S.C. §§ 1712(f), 1712(c)(9), 1739(e),

Plaintiffs assert that the Challenged Policies are tantamount to a revision of the relevant RMPs

without following the procedures required by FLPMA.  Utah Opp'n at 77; UAC Opp'n at 65-66.

However, these arguments rely on Plaintiffs' consistent mischaracterization of the mineral leasing

process and of BLM's discretion.  Contrary to Plaintiffs' assertions, BLM is not required to offer

any parcel identified in an EOI for lease simply because it lies within an area designated as

"open" to oil and gas leasing in an RMP.  See supra Section I.A.1.d at p. 16.  Instead, BLM

retains the discretion to determine whether to offer any parcel for lease, even if it is within an area

designated as "open" to oil and gas leasing. See supra Section I.A.1.a at pp. 2-3.  Thus, the mere

---

[35] Indeed, BLM policies issued since the Wilderness Settlement have consistently recognized BLM's authority to inventory public lands for wilderness characteristics and to manage lands to protect such characteristics. Def. Mem. at 62.

deferral of certain parcels pending additional evaluation does not, as a matter of law, equate to a revision of the relevant RMP.  Moreover, Plaintiffs ignore that under the MLP Policy and Manuals 6310 and 6320, any proposed changes to existing land use plans will be carried out in accordance with both FLPMA, including compliance with 43 U.S.C. §§ 1712(c)(9) and 1712(f), and NEPA, which requires public involvement.  Def. Exs. 2, 3, 5, and 6.

> **D.      Utah's Eighth Cause of Action Fails to State a Claim.**

Utah devoted approximately 14 pages of its 94 page opposition memorandum to its Eighth Cause of Action, but in that space completely failed to address the basis for Defendants' motion to dismiss this claim.  See Utah Opp'n at 41-46, 87-94.  In this claim, Utah asserts that Manual 6310, which provides guidance on inventorying lands for wilderness characteristics, is arbitrary and capricious because it does not use the definition of a road adopted by the Court in SUWA v. BLM, 425 F.3d 735 (10th Cir. 2005).  However, as Defendants previously explained, this claim is predicated upon a misinterpretation of SUWA, which considered the standard of acceptance for "public highway" rights of way in Utah under R.S. 2477, but did not purport to redefine the term "road" for all purposes (such as BLM inventories of lands with wilderness characteristics). See Def. Mem. at 66-67.

Manual 6310 expressly states that the definition of a "road" used therein applies "[f]or the purpose of inventorying wilderness characteristics only[.]"  Manual 6310 at 11, Ex. 5.  Contrary to Utah's assertion, Utah Opp'n at 88, the Tenth Circuit in SUWA did not offer a universally applicable definition of the term "road."  In considering the standard of acceptance for the grant previously offered under R.S. 2477 for the construction of "public highways" over unreserved public lands, the SUWA court held, in relevant part, "that evidence of actual construction (appropriate to the historical period in question), or lack thereof, can be taken into consideration as evidence of the required extent of public use, though it is not a necessary or sufficient element"

to prove such acceptance.  425 F.3d at 764, 778.  This limited holding in the R.S. 2477 context in

no way requires BLM to change its definition of a "road" when inventorying for wilderness

characteristics, or gives rise to a cognizable cause of action challenging BLM's failure to do so

under the APA.[36]

Moreover, Utah's position conflicts with the Tenth Circuit's subsequent decision in Kane

County v. Salazar, 562 F.3d 1077 (10th Cir. 2009), in which certain Utah counties sought to

compel BLM to administratively adjudicate the validity of all outstanding R.S. 2477 claims in

preparing a management plan.  In Kane County, the Tenth Circuit reiterated its prior holding "that

the BLM lacks the authority to conclusively resolve R.S. 2477 claims." Kane County, 562 F.3d at

1087 (citing SUWA, 425 F.3d at 757).  The court explained that, while SUWA recognized that

"BLM possessed the authority to 'determin[e] the validity of R.S. 2477 rights of way for its own

purposes' . . . importantly, nothing in federal law requires the BLM to do so."  Id. (quoting

SUWA, 425 F.3d at 757)).  It similarly dismissed the plaintiffs' argument that there was a "long-

standing procedural requirement that the Federal Defendants consider valid existing rights during

planning[,]" stating "we are aware of no provision of federal law that imposes such a procedural

requirement."  Id.  Thus, to the extent Utah suggests that BLM is required to administratively

review the validity of its R.S. 2477 claims in inventorying lands with wilderness characteristics,

---

[36] Wyoming, 279 F.3d at 1239, thus does not support Utah's Eighth Claim for Relief. Wyoming involved a previous judicial determination that federal agencies had acted negligently in managing wildlife with respect to the brucellosis disease.  Id.  Here, no court has held that BLM must consider a "route that was established or has been maintained solely by the passage of vehicles" to be a road for the purposes of a wilderness inventory.  See Manual 6310, at 11, Ex. 5. Indeed, contrary to Utah's allegation that BLM has supplied no "explanation or justification" for the definition in Manual 6310, Utah Opp'n at 91, the Manual clearly explains that its definition of the term "road" is based on the definition in FLPMA's legislative history:

> The word 'roadless' refers to the absence of roads that have been improved and maintained by mechanical means to insure relatively regular and continuous use. A way maintained solely by the passage of vehicles does not constitute a road.

Id. (quoting House of Representatives Committee Report 94-1163 at 17, May 15, 1976).

this argument has already been rejected by the Tenth Circuit. Although the BLM *may* consider for

its own planning purposes the existence of R.S. 2477 rights-of-way in completing its inventories,

it is under no duty to do so.  The agency therefore has no obligation to utilize a definition of

"road" in inventorying lands with wilderness characteristics that would effectively result in R.S.

2477 determinations.[37]

### CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed for lack of jurisdiction

pursuant to Rule 12(b)(1), or alternatively for failure to state a claim pursuant to Rule 12(b)(6).

Respectfully submitted this 17th day of January, 2014.

> DAVID B. BARLOW
> United States Attorney (#13117)
> JARED C. BENNETT
> Assistant United States Attorney (#9097)
>
> ROBERT G. DREHER
> Acting Assistant Attorney General
>
> */s/ Sara C. Porsia*
> SARA C. PORSIA (admitted pro hac vice)
> Trial Attorney
> LUTHER L. HAJEK (admitted pro hac vice)
> Trial Attorney
> U.S. Department of Justice
> Environment & Natural Resources Division
> Natural Resources Section
> Ben Franklin Station, P.O. Box 7611
> Washington, D.C. 20044-7611
> tel: (202) 305-0492; fax: (202) 305-0506
> sara.porsia@usdoj.gov
> luke.hajek@usdoj.gov

---

[37] The Quiet Title Act is the "exclusive means by which adverse claimants [may] challenge the United States' title to real property." Block v. North Dakota, 461 U.S. 273, 286 (1983).  Because the approximately 12,000 R.S. 2477 right of way claims referenced by Plaintiff Utah have not yet been adjudicated, Utah's allegation that "[t]he Tenth Circuit has held that these roads have already vested in the State and counties" is incorrect.  See Utah Opp'n at 92.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2014, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of this filing to all

counsel of record.

/s/ *Sara C. Porsia*
Sara C. Porsia
Trial Attorney
U.S. Department of Justice